The opinion below is hereby signed.  Dated: October 31, 2005.

_____
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re | ) |
| | ) |
| GREATER SOUTHEAST COMMUNITY | ) Case No. 02-02250 |
| HOSPITAL CORP., I, *et al.*, | ) (Chapter 11) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| ――――――――――――――――――――― | ) |
| | ) |
| SAM J. ALBERTS, TRUSTEE FOR | ) |
| THE DCHC LIQUIDATING TRUST, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Adversary Proceeding No. |
| v. | ) 04-10459 |
| | ) |
| PAUL TUFT, *et al.*, | ) |
| | ) |
| Defendants. | ) |

OPINION REGARDING DEFENDANTS' MOTIONS TO DISMISS

This Opinion resolves a series of motions filed by various defendants[1] in this adversary proceeding initiated by Sam J. Alberts as Trustee of the DCHC Liquidating Trust (the "Trust")

_____

[1] The defendants are Paul Tuft, Melvin Redman, Steve Dietlin, Erich Mounce, Donna Talbot, Susan Engelhard, Rebecca Parrett, George Krauss, "John Doe" (representing one or more anonymous directors and/or officers of DCHC), Epstein Becker & Green P.C. and Kutak Rock LLP (collectively the "Defendants").

established by the plan (the "Plan") confirmed under chapter 11

of the Bankruptcy Code, 11 U.S.C. § 101 et seq., in the jointly

administered cases of Doctors Community Healthcare Corporation

("DCHC") and its subsidiary and affiliated debtor corporations

(collectively the "Debtors").[2]  The Trust alleges that DCHC's

former directors and officers (the "D & O Defendants"), with

assistance from two law firms (collectively the "Law Firm

Defendants"), Epstein Becker & Green P.C. ("Epstein Becker") and

Kutak Rock LLP ("Kutak Rock"), negligently and in some instances

intentionally drove the Debtors further into debt in furtherance

of a Ponzi scheme perpetrated by the Debtors' primary if not sole

lender, National Century Financial Enterprises ("NCFE"), and its

subsidiary and affiliated lenders (collectively the "NCFE

Entities").  It seeks recovery not only for assets actually

drained out of the Debtors' estates prior to their bankruptcy

filings, but also for the debt accumulated by the Debtors in the

years leading up to DCHC's bankruptcy filing--an amount totaling

$242 million.

      To that end, the Trust has filed a twenty-one count

Complaint against the Defendants alleging breach of fiduciary

---

      [2] The other Debtors are colloquially known as Greater
Southeast Hospital ("Greater Southeast"), Hadley Memorial
Hospital, Michael Reese Medical Center, and Pacifica of the
Valley Hospital.

duty (Counts I-V)[3] and corporate waste (Counts V-IX) with respect

to the D & O Defendants; aiding and abetting fiduciary duty

(Count XIII) and malpractice (Count XIV) with respect to the Law

Firm Defendants; and "deepening insolvency" (Counts X-XI) with

respect to all of the Defendants.  It also claims (presumably in

the alternative) that the Law Firm Defendants "aided and abetted

deepening insolvency" (Count XI), and seeks the recovery of

fraudulent conveyances from the Law Firm Defendants pursuant to

11 U.S.C. §§ 544, 548, and 550 and Arizona Rev. St. § 44-1004 and

44-1005 (Counts XVI-XXI).  Finally, the Trust claims that it may

recover damages for Counts I-XIV in the alternative as a

"hypothetical judgment creditor" under the "strong-arm" provision

of 11 U.S.C. §544(a) (Count XV).

I

The Debtors filed petitions under chapter 11 of the

Bankruptcy Code on November 20, 2002.  After protracted

proceedings lasting almost 18 months, the Debtors achieved

confirmation of the Plan on April 5, 2004, and their operations

were taken over by entities known as the "Reorganized Debtors."

Section 6.6 of the Plan provides for the creation of the Trust,

which is charged with liquidating certain assets of the Debtors

and distributing the proceeds to certain classes of creditors

---

[3]   The court employs Roman numerals to describe the counts
in lieu of the numbering actually used in the Complaint of "Count
One" and so forth.

3

(including certain unsecured creditors).[4]   Among the assets

transferred to the Trust were any claims that the Debtors could

have raised before, on, or after the petition date with respect

to third parties, (see Plan §§ 1.50, 1.53, 6.6(c)), as well as

any claims against the former directors and officers of the

Debtors arising out of their management and governance of the

Debtors in an amount not exceeding $10 million.  (See Plan §§

1.50, 1.103, 12.1).

The Plan also provides for the creation of a "Liquidating

Trust Reserve" in the amount of $1 million to be used toward the

prosecution of unliquidated claims transferred to the Trust.

(Plan § 1.51).  The Plan further provides that the Debtors'

chapter 11 cases will remain open until the Trust resolves all

claims in its possession, (Plan § 6.7), and that this court

retains jurisdiction over any adversary proceeding initiated by

the Trust.  (Plan Art. XI(b)).

Pursuant to its mandate under the Plan, the Trust initiated

the instant adversary proceeding on November 19, 2004.  (D.E. No.

1).  Presumably in response to motions to dismiss filed by

---

[4] Section 6.6(a) of the Plan specifies that the Trust "shall
be for the benefit of the holders of the NCFE Claim, Allowed
General Unsecured Claims and Allowed Patient Refund Claims."
Other creditors' claims were discharged by the Plan (e.g., if no
timely claim was filed) or assumed by the Reorganized Debtors (as
in the case of allowed medical malpractice claims).  (See
generally Plan Art. IV).

Epstein Becker and Kutak Rock,[5] the Trust filed an amended complaint on April 15, 2005 (D.E. No. 45) (the "Complaint").  The Complaint alleges that DCHC purchased a number of subsidiary hospitals (including the other Debtors) from 1992 through 1999, and that DCHC obtained financing from NCFE or one of the NCFE Entities to either purchase each hospital or fund its accounts receivables.  (Compl. ¶¶ 5-6).  The funding obtained from NCFE and the NCFE Entities was not procured in the best interests of the Debtors, but rather was obtained at NCFE's direction in furtherance of a Ponzi scheme directed by NCFE.  (Compl. ¶¶ 115-125).

According to the Complaint, the NCFE Entities loaned far more money to the Debtors than the Debtors could reasonably repay.  (Compl. ¶¶ 61, 65, 78-79, 96, 110).  Instead, successive NCFE Entities would "pay off" the debt of a particular Debtor and assume a new lender-borrower relationship with that Debtor.

---

[5] Kutak Rock chose to file both a second motion to dismiss the Complaint as amended and a reply memorandum in support of its original motion even though the original motion was moot in light of the Trust's amendments to the Complaint.  See Nat'l City Mortgage Co. v. Navarro, 220 F.R.D. 102, 106 (D.D.C. 2004) (denying without prejudice motions to dismiss complaint that was amended subsequently on grounds of mootness).  Rather than consider Kutak Rock's reply a nullity, the court will treat its reply as an addendum to its memorandum of law in support of its motion to dismiss the amended Complaint in the interests of judicial efficiency and fairness to the parties.  The court has already denied Kutak Rock's Motion to Strike Portions of Plaintiff's Consolidated Opposition to the Motions to Dismiss (D.E. No. 115) for the same reason.  (D.E. No. 131).

(Compl. ¶¶ 46-48, 58-65, 67, 76-79, 89-90).  The Complaint
alleges that this strategy decreased the value of the Debtors'
assets from December 31, 1999, to December 31, 2002, from a net
deficit of $205 million to a net deficit of $460 million.
(Compl. ¶¶ 119-122).  The Debtors' deepening insolvency was a
direct result of the D & O Defendants' abdication of their duties
in favor of NCFE as well as the wasteful practices of the
Debtors.  (Compl. ¶¶ 123-125, 148-172).  The Complaint further
alleges that the Law Firm Defendants helped cause the Debtors'
deepening insolvency by failing to warn the Debtors of the
consequences of their funding arrangements with the NCFE Entities
and by issuing opinion letters and sponsoring testimony that
allowed the NCFE Entities to overfund the Debtors.  (Compl. ¶¶
126-147).

Kutak Rock, Epstein Becker, the D & O Defendants, and former
DCHC directors Rebecca Parrett and George Krauss have all filed
separate motions to dismiss the Trust's Complaint.[6]  Although
certain issues and arguments overlap in their motions, each

---

[6] Epstein Becker also filed a Motion to Strike Scandalous
Material or, in the Alternative, to Compel Disclosures Indicating
Good Faith (D.E. No. 72).  The court does not find the
allegations in the Complaint to warrant such extreme treatment.
The motion will be denied without prejudice.

movant (with the possible exception of George Krauss)[7] raises at
least one unique argument.  Consequently, the court is left with
a morass of arguments to sift through in deciding whether the
Trust's suit should proceed to discovery.

II

Defendants move to dismiss the Complaint pursuant to Rule
12(b)(6) of the Federal Rules of Civil Procedure as incorporated
by Federal Bankruptcy Rule 7012.  The rule permits dismissal of a
complaint due to "failure to state a claim upon which relief can
be granted."  FED. R. CIV. P. 12(b)(6).  "A Rule 12(b)(6) motion
is intended to test the legal sufficiency of the complaint."
Kingman Park Civic Ass'n v. Williams, 348 F.3d 1033, 1040 (D.C.
Cir. 2003).  To survive such a motion, "a complaint need only set
forth 'a short and plain statement of the claim,' FED. R. CIV. P.
8(a)(2), giving the defendant fair notice of the claim and the
grounds upon which it rests."  Id. at 1040.  "However, the court
need not accept inferences drawn by plaintiffs if such inferences
are unsupported by the facts set out in the complaint.  Nor must
the court accept legal conclusions cast in the form of factual
allegations."  Kowal v. MCI Communications Corp., 16 F.3d 1271,

---

[7] Initially, Mr. Krauss argued that the Complaint should be
dismissed with respect to him under Fed. R. Civ. P. 4(m).
(Krauss Memo. at 4-6).  He withdrew that argument in his
consolidated reply memorandum with Rebecca Parrett.
(Parrett/Krauss Reply at 1 n.1).  His remaining arguments are
identical to those raised by Ms. Parrett in her motion to
dismiss.

1276 (D.C. Cir. 1994).

In addition to making numerous arguments regarding the sufficiency of the Trust's pleading, the Defendants also assert a variety of affirmative defenses as grounds for dismissal under Rule 12(b)(6).  Although not resolved ordinarily on a motion to dismiss, such defenses "may be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint."  Smith-Haynie v. District of Columbia, 155 F.3d 575, 578 (D.C. Cir. 1998).

The arguments raised by the various defendants fall into four basic categories: (1) arguments regarding the sufficiency of the Trust's claims against all of the Defendants; (2) arguments regarding the sufficiency of claims raised by the Trust against the D & O Defendants; (3) arguments regarding the sufficiency of claims raised by the Trust against the Law Firm Defendants; and (4) arguments relating to affirmative defenses asserted by all of the parties.  The court considers each of these categories in turn.

    A.   <u>Claims Against All Defendants</u>

        1.   <u>"Deepening Insolvency" claims</u>

Counts X-XII of the Complaint plunge this court into the on-going debate over the existence and nature of the so-called "deepening insolvency" cause of action.  Briefly stated, the theory "refers to the 'fraudulent prolongation of a corporation's

8

life beyond insolvency,' resulting in damage to the corporation
caused by the increased debt." <u>Kittay v. Atlantic Bank of New
York (In re Global Serv. Group, LLC)</u>, 316 B.R. 451, 456 (Bankr.
S.D.N.Y. 2004) (quoting <u>Schacht v. Brown</u>, 711 F.2d 1343, 1350
(7th Cir. 1983)). Originally a theory of damages, <u>see id.</u> at
456-57, the concept has taken on a life of its own, with several
courts treating it as an independent cause of action. <u>See</u>, <u>e.g.</u>,
<u>Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.</u>, 267
F.3d 340, 349-52 (3d Cir. 2001) ("<u>Lafferty</u>"); <u>Official Comm. of
Unsecured Creditors v. Credit Suisse First Boston (In re Exide
Technologies, Inc.)</u>, 299 B.R. 732, 750-52 (Bankr. D. Del. 2002).
Under either permutation, the <u>sine</u> <u>qua</u> <u>non</u> of the concept is that
the defendant breached some pre-existing duty of care owed to the
corporation in deepening its insolvency. <u>See In re Global Serv.
Group, LLC</u>, 316 B.R. at 458 ("[O]ne seeking to recover for
'deepening insolvency' must show that the defendant prolonged the
company's life in breach of a separate duty, or committed an
actionable tort that contributed to the continued operation of a
corporation and its increased debt.") (collecting cases).

This court has recognized that the deepening of a company's
insolvency is harmful. <u>See Drabkin v. L & L Constr. Associates,
Inc. (In re Latin Inv. Corp.)</u>, 168 B.R. 1, 5 (Bankr. D.D.C. 1993)
(considering "damages inflicted in perpetuating the debtor's
existence past the point of insolvency in order to loot"). As

9

the Third Circuit explained in <u>Lafferty</u>:

> [T]he incurrence of debt can force an
> insolvent corporation into bankruptcy, thus
> inflicting legal and administrative costs on
> the corporation. . . . When brought on by
> unwieldy debt, bankruptcy also creates
> operational limitations which hurt a
> corporation's ability to run its business in
> a profitable manner. . . . In addition,
> prolonging an insolvent corporation's life
> through bad debt may simply cause the
> dissipation of corporate assets.

<u>Lafferty</u>, 267 F.3d at 349-50 (citations omitted).

However, recognizing that a condition is harmful and calling it a tort are two different things.  The District of Columbia courts have not yet recognized a cause of action for deepening insolvency, and this court sees no reason why they should.  As District Judge Kaplan recently noted in a similar situation, "[i]f officers and directors can be shown to have breached their fiduciary duties by deepening a corporation's insolvency, and the resulting injury to the corporation is cognizable, . . . that injury is compensable on a claim for breach of fiduciary duty." <u>Bondi v. Bank of America Corp. (In re Parmalat)</u>, 2005 WL 1923839 (S.D.N.Y. Aug. 5, 2005) (dismissing deepening insolvency claim as duplicative where breach of fiduciary duty was also alleged).

The Trust's allegations bear out Judge Kaplan's thesis.  The Trust already alleges that the D & O Defendants breached their fiduciary duties to the Debtors by allowing them to fall deeper into debt for the benefit of the Defendants and NCFE.  Its claim

10

for "deepening insolvency" against those same defendants alleges
the exact same wrong.  (<u>Compare</u> Compl. ¶¶ 176-184, 205-207 <u>with</u>
¶¶ 261-269).  Similarly, the Trust's deepening insolvency claim
against the Law Firm Defendants is really just a re-packaging of
its separate malpractice claim.  (<u>Compare</u> Compl. ¶¶ 282 <u>with</u> ¶¶
312-312).  And the Trust's claim for "aiding and abetting
deepening insolvency" is almost a word-for-word recapitulation of
its claim for aiding and abetting breach of fiduciary duty.
(<u>Compare</u> Compl. ¶¶ 296-297 <u>with</u> ¶ 306).

There is no point in recognizing and adjudicating "new"
causes of action when established ones cover the same ground.
The Trust's duplicative claims will be dismissed.

### 2.  <u>Claims under 11 U.S.C. § 544(a)</u>

Count XV of the Complaint is also largely duplicative of
other counts (specifically, Counts I-XIV), but this is by the
Trust's design.  The "claim" alleges that the Trust stands in the
shoes of a hypothetical judgment creditor with a judicial lien or
creditors' bill under § 544(a) of the Bankruptcy Code, which,
according to the Trust, permits it to (1) pursue claims that such
creditors would hold for breach of fiduciary duty, and (2)
garnish or "seize" the Trust's own claims and prosecute those
claims as a creditor rather than as a representative of the
estate.  (Compl. ¶¶ 318-320).  The Defendants argue that § 544(a)
cannot be used in this manner under <u>Caplin v. Marine Midland</u>

<u>Grace Trust Co.</u>, 406 U.S. 416 (1972).  The Trust points to a

series of cases applying § 544(a) notwithstanding that decision.

(a)

In addressing the argument that a hypothetical creditor

could sue for breach of fiduciary duty, the starting point for

the court's analysis is the language of § 544(a) itself, which

states in pertinent part:

> The Trust shall have, as of the commencement
> of the case, and without regard to any
> knowledge of the Trust or of any creditor,
> the <u>rights</u> <u>and</u> <u>powers</u> of . . . (1) a creditor
> that extends credit to the debtor at the time
> of the commencement of the case, and that
> obtains, at such time and with respect to
> such credit, a judicial lien on all property
> on which a creditor on a simple contract
> could have obtained such a judicial lien,
> whether or not such a creditor exists; [or]
> (2) a creditor that extends credit to the
> debtor at the time of the commencement of the
> case, and obtains, at such time and with
> respect to such credit, an execution against
> the debtor that is returned unsatisfied at
> such time, whether or not the creditor
> exists . . . .

11 U.S.C. § 544(a)(1)-(2) (emphasis added).

The key question is whether the phrase "rights and powers"

encompasses the ability to file any claim that a creditor with a

judicial lien or creditors' bill against the property of the

estate might possess as opposed to only those rights that are

attained by virtue of the hypothetical status of a judicial lien

creditor or an execution creditor.  A handful of courts have held

that it does.  <u>See</u> <u>Sender v. Porter (In re Porter McLeod, Inc.)</u>,

231 B.R. 786, 792-93 (D. Colo. 1999); <u>Raleigh v. Schottenstein
(In re Wieboldt Stores, Inc.)</u>, 131 B.R. 655, 668 (N.D. Ill. 1991)
<u>Collins v. Kohlberg & Co. (In re Southwest Supermarkets, LLC)</u>,
325 B.R. 417, 426-27 (Bankr. D. Ariz. 2005); <u>Henderson v.
Buchanan (In re Western World Funding, Inc.)</u>, 52 B.R. 743, 773-75
(Bankr. D. Nev. 1985).  Other courts, including most circuit
courts to have considered the issue, have reached the opposite
conclusion.  <u>See</u>, <u>e.g.</u>, <u>Shearson Lehman Hutton, Inc. v. Wagoner</u>,
944 F.2d 114, 118 (2d Cir. 1991); <u>E.F. Hutton & Co., Inc. v.
Hadley</u>, 901 F.2d 979, 985-86 (11th Cir. 1990); <u>Mixon v. Anderson
(In re Ozark Rest. Equip. Co., Inc.)</u>, 816 F.2d 1222, 1226-30 (8th
Cir. 1987); <u>Sigmon v. Miller-Sharpe, Inc. (In re Miller)</u>, 197
B.R. 810, 812-15 (W.D.N.C. 1996); <u>Rodolakis v. Shadduck (In re
Shadduck)</u>, 208 B.R. 1, 2-5 (Bankr. D. Mass. 1997).  The basis for
these latter decisions is usually continued deference to <u>Caplin</u>.

In <u>Caplin</u>, the Supreme Court held that a chapter X trustee
under the old Bankruptcy Act could not assert creditors' claims
of misconduct against an indenture trust on behalf of the holders
of debentures issued pursuant to an indenture.[8]  406 U.S. at 434.
The Court held that the Bankruptcy Act did not confer upon the
trustee standing to represent the interests of these creditors
for three reasons.  First, nothing in the Act suggested that the

---

[8] The debenture holders were creditors of the bankruptcy
estate.  <u>Caplin</u>, 406 U.S. at 420 n.11.

trustee should "assume the responsibility of suing third parties
on behalf of debenture holders [_i.e._, creditors]."  _Id._ at 428.
Second, the bankrupt corporation had no claim against the
indenture trustee, and the claims brought by the chapter X
trustee might be subject to subrogation by other creditors
because the bankrupt corporation might be subject to the doctrine
of _in pari delicto_.  _See id._ at 430-31.  Finally, a suit by the
trustee would not preempt suits by other creditors, and would
raise concerns as to the binding effect of the actions taken by
the trustee on those creditors.  _See id._ at 432.

Although _Caplin_ was decided before the enactment of the
Bankruptcy Code, numerous courts, including this one, have
recognized its continuing vitality.  _See In re Latin Investment
Corp._, 168 B.R. at 4.  Generally speaking, these courts have
continued to honor the decision because (1) nothing in the text
or legislative history of the Code contradicts directly the
_Caplin_ opinion; and (2) many of the concerns that informed the
Supreme Court's opinion still exist.  _See E.F. Hutton & Co.,
Inc._, 901 F.2d at 985-86; _In re Ozark Rest. Equip. Co._, 816 F.2d
at 1228-30; _In re Miller_, 197 B.R. at 812-15; _In re Shadduck_, 208
B.R. at 2-5.

With respect to § 544 in particular, courts have noted that
the section as originally proposed by the House of
Representatives included a subsection "(c)" that would have

14

overruled <u>Caplin</u>.   <u>See</u> <u>In re Ozark Rest. Equip. Co.</u>, 816 F.2d at

1228 n.9; <u>In re Miller</u>, 197 B.R. at 812-13.   That section was

eventually deleted by Congress.   The implication (at least for

courts that apply the rule in <u>Caplin</u>) is that Congress would not

have dropped the subsection unless it did not want to overrule

<u>Caplin</u>.   <u>In re Ozark Rest. Equip. Co.</u>, 816 F.2d at 1228-29; <u>In re

Miller</u>, 197 B.R. at 812-13.

Courts interpreting <u>Caplin</u> more narrowly have reasoned that

the Court's concerns about the effect of trustee lawsuits on the

complex congressional system regulating indenture trusts do not

exist with respect to state law tort claims, <u>see</u> <u>St. Paul Fire &

Marine Ins. Co. v. PepsiCo Inc.</u>, 884 F.2d 688, 700-01 (2d Cir.

1989), and that the decision applies only to claims brought on

behalf of individual creditors, not general claims on behalf of

all creditors.   <u>See</u> <u>Koch Refining v. Farmers Union Cent. Exch.,

Inc.</u>, 831 F.2d 1339, 1348-49 & n.11 (7th Cir. 1987).   In

addition, at least one commentator has argued that <u>Caplin</u>'s

ruling was based only on language from the Bankruptcy Act

predecessor to § 541 of the Code and does not limit a Trust's

standing under § 544 in any way.   <u>See</u> Steven E. Boyce, <u>Koch

Refining and In re Ozark: the Chapter 7 Trust's Standing to

Assert an Alter Ego Cause of Action</u>, 64 Aм. Bᴀɴᴋʀ. L.J. 315, 324-

25 (Summer 1990).

The court finds these attempts to limit Caplin unpersuasive. First, while it is true that actions premised on state law tort claims (including this one) do not involve indenture trusts, the Supreme Court was equally concerned that Congress had created "an elaborate system of controls with respect to . . . reorganization proceedings," Caplin, 406 U.S. at 428, yet did not indicate anywhere in the "statutory scheme" that the trustee was responsible for prosecuting creditors' claims. See id. The statutory scheme may have changed since Caplin was decided, but the point remains valid. Nothing in the Bankruptcy Code so much as hints that the trustee has a duty to prosecute the claims of creditors in addition to those of the estate.

Second, the distinction made by the Koch court and its progeny between "personal" and "general" creditors' claims is without real difference. In either case, the trustee would be placed in the position of pursuing a claim that does not belong to the estate and that does not arise as a result of an injury to the debtor corporation. The trustee has no standing to pursue claims arising from injuries to others. See In re Latin Invest. Corp., 168 B.R. at 6-7 (trustee had standing to pursue claims based on injury to bankrupt corporation, but not claims based only on injuries to third-party creditors); accord E.F. Hutton & Co., Inc., 901 F.2d at 985. Indeed, the Seventh Circuit effectively overruled Koch in Steinberg v. Buczynski, 40 F.3d 890

16

(7th Cir. 1994), for this exact reason.  See id. at 892-93
(dismissing the "general"/"personal" distinction made in Koch as
"not an illuminating usage").

Finally, the court finds no language in Caplin suggesting
that the Supreme Court meant to restrict its ruling to what is
now § 541 of the Bankruptcy Code.  To the contrary, the court
framed the issue before it as whether the trustee "ha[d] standing
under [c]hapter X of the Bankruptcy Act" to assert claims on
behalf of debenture holders.  Caplin, 406 U.S. at 416 (emphasis
added).  It found nothing in the entire "statutory scheme" of
chapter X to support such a notion.  Id. at 428.  Moreover, the
Court explicitly rejected the notion that there was "anything in
11 U.S.C. § 110 [Bankruptcy Act § 70]" giving the trustee
authority to prosecute creditors' claims, and alluded to only the
part of 11 U.S.C. § 110 dealing with property of the estate as
relevant.  Id.; see also id. at 424 n.14.[9]  However much one
might disagree with the Supreme Court's conclusions regarding the
language in that section of the old Bankruptcy Act (and this
court does not), that does not entitle this court to ignore or

_____

[9] Section 110 (Bankruptcy Act § 70) contained language
comparable (as relevant here) to that now found in both §§ 541
and 544 of the current Code.  See Bankruptcy Act, 52 Stat. 833,
at § 70(a), 11 U.S.C. § 110(a) (forerunner of current § 541 of
the Bankruptcy Code); see also id. at § 70(c), 11 U.S.C. § 110(c)
(forerunner of Bankruptcy Code § 544).  The Court did not even
view § 70(c) as presenting a basis for an argument by the
bankruptcy trustee that he could pursue creditors' claims against
a third party that is not obligated to the estate.

17

second-guess the conclusions drawn by the Supreme Court on that
issue.

Most importantly, there is nothing in the language of §
544(a) that compels this court to disregard the well-reasoned
holding in <u>Caplin</u>.  As the district court noted in <u>In re Miller</u>,
the "clear import of the statutory language" is to "confer the
<u>status</u>" of a creditor with a judicial lien or creditors' bill on
the trustee, not to make the trustee "an agent of the creditors."
197 B.R. at 814-15 (emphasis in original).  In other words, the
statute vests the trustee with the ability of a judgment lien
creditor to attach or seize both tangible and intangible property
transferred by the debtor to a third party prior to filing for
bankruptcy, but it does not transform the trustee into a "super
creditor" with the ability to raise causes of action separate
from those possessed by the estate.  <u>See</u>, <u>e.g.</u>, <u>In re
Schneiderman</u>, 251 B.R. 757, 760-61 & n.2 (Bankr. D.D.C. 2000) (§
544(a) conferred upon trustee the right to serve writ of
attachment).

As a practical matter, the latter construction would be
impossible to enforce.  After all, how much would the

hypothetical "super creditor's" claim be worth?[10]  Which state's

laws would govern the "super creditor's" rights?  What types of

claims could the "super creditor" bring?  In light of the third

problem identified in Caplin--that an action by the bankruptcy

trustee on behalf of creditors "may be inconsistent with any

independent actions that they might bring themselves," 406 U.S.

at 431-32--what happens to independent actions that creditors may

pursue in their own right against the same defendants for the

same wrongs?[11]  Finally, if the hypothetical judgment lien

creditor extended credit only on the date of commencement of the

bankruptcy case, how can she sue based on a wrong that occurred

before the extended credit?

---

[10] Section 544(a)(1) and (2) are silent regarding the size
of the hypothetical judgment lien creditor's (or execution
creditor's) claim.  The focus is on the rights she has by virtue
of being a judgment lien or execution creditor, not the dollar
amount of her claim, and not those rights that a creditor in
general might have without having attained the status of a
judgment lien creditor (or execution creditor).  Thus, the
court's limited research has revealed no case in which a trustee
attempted to argue that a hypothetical judgment lien or execution
creditor under § 544(a)(1) or (2) could sue to set aside a
transfer that was fraudulent as to future creditors.  If the
Trust's argument was right, a trustee of an estate that is
solvent to the tune of $5 million could pursue such a state law
fraudulent conveyance claim by hypothesizing that a § 544(a)(1)
hypothetical judgment lien creditor's claim was $6 million, thus
rendering the estate hypothetically insolvent.

[11] Section 544(a) does not vest the hypothetical judgment
lien creditor with the claims of actual creditors, and thus does
not displace those creditors' rights to sue third parties on
claims that those actual creditors, but not the debtor, could
pursue.

Section 544(a) is silent on these points, most likely because Congress never intended for the statute to be used in such an expansive manner.  For all these reasons, and for the reasons set forth in Caplin and Steinberg, this court concludes that § 544(a) does not confer upon a trustee the right to assert claims other than those belonging to the estate.[12]

(b)

Applying Caplin does not entirely resolve the disposition of Count XV.  The Trust contends that if a claim that the estate inherited from the debtor under § 541 is barred by defenses that could have been applied against the debtor, a bankruptcy trustee may nevertheless step into the shoes of a hypothetical creditor under § 544(a), execute on those claims, and prosecute those claims free of those defenses that barred only the debtor's pursuit of the claims.  The Trust's argument, while clever, falls apart once one understands that § 544(a) merely enhances the trustee's rights under § 541 by giving him the power of a hypothetical creditor to attach a judicial lien or bring a creditors' bill for property transferred out of the estate.

As the In re Miller court noted, interpreting § 544(a) properly narrows the issue to "whether the [T]rust[] can pursue

---

[12] This includes any claim transferred by the debtor whose transfer is avoided by the trustee under § 544 or any of the trustee's other avoidance powers.  See 11 U.S.C. § 541(a)(3), (4), and (7).

20

the claims against [the Defendants] by virtue of the status conferred by § 544 under the applicable state law."  197 B.R. at 815.  The entire Code provision is "flavored with the notion of the trustee having the power to avoid 'transfers' of the debtor, as were its predecessors, sections 70c and e of the [Bankruptcy] Act."  In re Ozark Rest. Equip. Co., Inc., 816 F.2d at 1229. Section 544(a) does not split the trustee like an amoeba into a simultaneously existent creditor-entity and debtor-entity, with the creditor-entity attaching a lien against or bring a creditor's bill regarding a cause of action already in the possession of the debtor-entity.  It contemplates just one entity, and that is the representative of the estate.  There is no need to employ § 544(a) to bring into the estate that which is already in the estate under § 541, and Congress did not envision that a trustee could actually attach, seize, or garnish a claim that is already in her possession anymore than a creditor with an actual judicial lien or creditors' bill could attach, seize, or garnish a claim that already has been given to her.

Even if the Trust could somehow take this sort of action with respect to its own property, it would not be able to do so with respect to its claims against the Defendants because neither judicial liens nor creditors' bills allow creditors to attach or seize claims that have not been liquidated.  See Consumers United Ins. Co. v. Smith, 644 A.2d 1328, 1356 (D.C. 1994) ("[A] writ of

garnishment covers only the property of the debtor in the hands
of the garnishee at the time the writ is served . . . .");
Davidson-Chudacoffe/Kol-Pak of Arizona, Inc. v. Pioneer Hotel
Co., 630 P.2d 550, 553-54 (Ariz. Ct. App. 1981) (debt must be
"existing, ascertainable[,] and not contingent on other events"
to be subject to garnishment); McNeilly v. Furman, 95 A.2d 267,
272 (Del. 1953) ("[A] tort claim neither liquidated nor readily
susceptible of liquidation[] is not subject to attachment,
execution, garnishment, sequestration[,] or other judicial
process under our laws . . . ."). And even if the Trust could
attach, seize, or garnish its own unliquidated claims against the
Defendants, that action would not benefit it in the slightest
because "an attaching or garnishing creditor can gain no greater
right over the property or interest of the judgment . . . than
the debtor himself has therein." Ellery v. Cumming, 14 P.2d 709,
710 (Ariz. 1932); accord Carina Mercury, Inc. v. Ingaravides, 344
F.2d 397, 400-01 (1st Cir. 1965); US v. Winnett, 165 F.2d 149,
151 (9th Cir. 1948); see also Lakeshore Motor Freight Co. v.
Glendway Indus., Inc., 440 N.E.2d 567, 569-70 (Ohio Ct. App.
1981) (creditors' bill does not allow creditor to direct
prosecution of claim); Bonte v. Cooper, 90 Ill. 440, available at
1878 WL 10181, *3 (Ill. 1878) (creditors' bill or judicial lien
"will not lie to reach assets which the creditor could not
maintain an action in its own name to recover"); accord Noonan v.

22

<u>Stein</u>, 136 P. 1181, 1185 (Colo. 1913).

In sum, the Trust cannot use § 544(a) to bring claims separate from those of the estate or to constructively "seize" the estate's claim in the guise of a creditor, and even if it could, such action would not benefit it in the slightest. Count XV will be dismissed.

B.   <u>Claims Against the D & O Defendants</u>

Aside from its deepening insolvency claims, the Trust's allegations against the D & O Defendants consist of garden-variety fiduciary duty causes of action. Not surprisingly, the D & O Defendants urge dismissal of these claims. Specifically, they argue that Counts I, IV-VII, and IX should be dismissed with respect to every D & O Defendant because they are in general not properly pled (D & O Memo. at 17-20), that Counts I-II, IV-VI, and VIII should be dismissed with respect to DCHC's former officers because the Complaint is not properly pled with respect to those defendants in their capacities as officers (D & O Memo. at 13-14), and that all counts must be dismissed with respect to Paul Tuft in his capacity as a director of DCHC because of an exculpation provision in DCHC's certificate of incorporation (D & O Memo. at 20-21). Defendants Rebecca Parrett and George Krauss also assert these and other arguments in separate motions

23

to dismiss.  (Parrett Memo. at 4-15; Krauss Memo. at 6-7).[13]

     1.   <u>Arguments raised by all D & O Defendants</u>

     (a)  <u>Claims related to the NCFE Entities</u>

The D & O Defendants argue that, with respect to the claims

for breach of fiduciary duty relating to the NCFE Entities'

lending practices (Counts I and IV-V), the Complaint is defective

because it alleges funding arrangements between the NCFE Entities

and DCHC's subsidiary hospital corporations, not DCHC itself.

They contend that whatever duties the directors and officers of

DCHC owed to that company, they were not responsible for harms

incurred by DCHC's subsidiary hospital corporations.

The Trust argues that the D & O Defendants should be held

liable for the actions of the subsidiary hospital corporations

because these subsidiary companies were "dominat[ed]" by DCHC

and, by implication, its fiduciaries.  Alternatively, it argues

that the Complaint alleges sufficient facts to support a piercing

of the corporate veil.  (D & O Opp. at 35-38); <u>see also Phoenix</u>

<u>Canada Oil Ltd. v. Texaco, Inc.</u>, 658 F. Supp. 1061, 1084 (D. Del.

1987) (parent corporation may be liable for subsidiary's actions

if parent dominates the activities of the subsidiary or veil

---

    [13] This summation omits the D & O Defendants' arguments with
respect to Counts X-XI and XV, which this court has already
determined must be dismissed, (<u>see</u> section II.A, <u>supra</u>), and
their arguments for dismissal of all counts on timeliness and <u>in</u>
<u>pari delicto</u> grounds, which the court addresses below.  (<u>See</u>
section II.C.3.b-II.D, <u>infra</u>).

between parent and subsidiary can be pierced).[14]

But there are virtually no facts alleged in the Complaint that support the Trust's position.  The Complaint merely states that DCHC "currently manages and owns" the subsidiary hospitals. (Compl. ¶ 31) (emphasis added).  There is no indication that DCHC forced its subsidiaries to enter into lending agreements with the NCFE Entities, or that there was an identity of interests between the various companies at the time of the challenged loans.[15]

Tellingly, the Trust relies more on the Debtors' Disclosure Statement than its own Complaint to support its "domination" and veil-piercing theories.  (D & O Opp. 34-38).  The court cannot consider this document in the context of a motion to dismiss. Instead, the court must limit its inquiry to the four corners of

---

[14] DCHC was incorporated in Delaware.  Accordingly, the fiduciary duties of its officers and directors are defined by the laws of that jurisdiction.  See Pagonis v. Donnelly, 929 F. Supp. 459, 460 (D.D.C. 1995).

[15] The Trust might have avoided this pleading defect had it alleged in the Complaint that (1) the D & O Defendants could have stopped the NCFE Entities from loaning money to DCHC's subsidiary corporations and chose to allow the loans, (2) they knew or should have known that further loans from the NCFE Entities would harm DCHC in particular (which would be difficult to allege if each subsidiary was insolvent at the time of each loan), and (3) their failure to act proximately caused injury to DCHC itself. But the Complaint does not say this.  It merely says that the D & O Defendants breached their fiduciary obligations to "the Debtors" by allowing NCFE to extend more credit to DCHC's subsidiary entities without ever explaining which of "the Debtors" were harmed.  (Compl. at ¶¶ 179-80, 206-07, 217).  These allegations are too vague to give any defendant proper notice of the basis for the Trust's claims.

the Complaint itself, as well as any documents incorporated by
reference in the Complaint or facts subject to judicial notice.
See Nat'l Treasury Employees Union v. Chertoff, 385 F. Supp. 2d
1, 16 (D.D.C. 2005).[16]  The Trust cannot substitute the Debtors'
Disclosure Statement for its own pleading, and the court will not
abide the Trust's attempted de facto amendment of that pleading
in its opposition to a motion to dismiss.   The court will dismiss
Counts I and IV-V.[17]

---

[16] While the court could take judicial notice of the
Disclosure Statement, that would not resolve the Trust's
predicament.  "The bankruptcy court may take judicial notice of
its own records, but may not infer the truth of facts contained
in documents[] simply because such documents were filed with the
court."  In re H. King & Assoc., 295 B.R. 246, 261 (Bankr. N.D.
Ill. 2003); see also In re MCorp Fin., Inc., 137 B.R. 219, 229
(Bankr. S.D. Tex. 1992).

[17] The closest the Trust comes to properly alleging a breach
of fiduciary duty claim with respect to financing by the NCFE
Entities is found in paragraphs 103 and 124 of the Complaint.  In
those paragraphs, the Trust alleges that the D & O Defendants
allowed the NCFE Entities to "dominate and control DCHC," (Compl.
¶ 124), and that as a result of this domination DCHC purchased
Greater Southeast Hospital "if, when[,] and as" the NCFE Entities
desired, (id.), using loans from the NCFE Entities to do so.
(Compl. ¶ 103).  The problem with supporting a breach of
fiduciary duty claim here, however, is that the Trust fails to
allege in good faith that Greater Southeast was not worth its
purchase price.  Unlike the loans made by the NCFE Entities that
were (under)secured by the Debtors' accounts receivables, which
the Debtors could not repay (thus prolonging the Debtors'
existence and increasing their insolvency), the loan for Greater
Southeast could always be repaid through a sale of that property
assuming that Greater Southeast was worth its purchase price.  As
there is no clear allegation in the Complaint that the NCFE
Entities inflated the value of Greater Southeast prior to DCHC's
purchase, the loan made by NCFE towards that purchase cannot be
construed as deepening DCHC's insolvency.

(b)  <u>Claims alleging "corporate waste"</u>

Counts V-IX of the Complaint allege that the D & O Defendants breached their fiduciary duties to DCHC by engaging in "corporate waste."  This theory of fiduciary breach refers to "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade.'"  <u>White v. Panic</u>, 783 A.2d 543, 554 (Del. 2001) (quoting <u>Brehm v. Eisner</u>, 746 A.2d 244, 263 (Del. Ch. 2000)).  "To prevail on a waste claim . . . , the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests."  <u>Id.</u> at 554 n.36.  "[T]he decision must go so far beyond the bounds of reasonable business judgment that its only explanation is bad faith."  <u>Stanziale v. Nachtomi (In re Tower Air, Inc.)</u>, 416 F.3d 229, 238 (3d Cir. 2005).

Claims alleging waste are "extremely difficult [ones] to prove," <u>Telxon Corp. v. Bogomolny</u>, 792 A.2d 964, 975 (Del. Ch. 2001), because "[i]f it can be said that ordinary businessmen might differ on the sufficiency of the terms, then the court must validate the transaction."  <u>Saxe v. Brady</u>, 184 A.2d 602, 610 (Del. Ch. 1962).  "[A]ny <u>substantial</u> consideration received by the corporation" suffices to defeat the claim.  <u>Brehm</u>, 746 A.2d

27

at 263 (emphasis in original).  One Delaware court has even
described waste as the "Nessie"[18] of fiduciary duty claims
because it so rarely occurs "in the world of real transactions."
<u>Steiner v. Meyerson</u>, 1995 WL 441999, **4-5 (Del. Ch. July 19,
1995).  Nonetheless, courts applying Delaware law have on several
occasions permitted claims for waste to proceed at least to the
discovery phase.  See, <u>e.g.</u>, <u>In re Tower Air, Inc.</u>, 416 F.3d at
241 (plaintiff presented colorable waste claim where complaint
alleged that directors of airline created unprofitable route
"purely to please" officer's family); <u>Meiselman v. Eberstadt</u>, 170
A.2d 720, 721-23 (Del. Ch. 1961) (resolving waste claim based on
alleged excessive compensation as a factual matter).

Counts V-VII and IX of the Complaint do not warrant such
consideration.  Essentially , each of these counts alleges that
DCHC (or "the Debtors" collectively) spent more money than it (or
they) should have, whether it be by approving lending agreements
with high interest rates (Compl. ¶¶ 212-215), using a charter
flight service instead of commercial air lines (Compl. ¶¶ 222-

--------

[18] The reference is to the creature believed by many to
reside at the bottom of Loch Ness outside Inverness, Scotland.
Believers theorize that the lake plays host to a remnant
plesiosaur from the Mesozoic Era.  Other explanations for
sightings of the monster include unusual wave patterns, bubbles
released by volcanic activity at the base of the lake, abnormally
large seals or sturgeon, pareidolia, or intentional hoaxes.
While many claim to have seen the bashful beast, no one has yet
caught it.  <u>See generally</u> Ronald Binns, THE LOCH NESS MYSTERY SOLVED
(Star Books 1984).

224), paying DCHC's president and vice-president too much money
(Compl. ¶¶ 231-234),[19] or spending too much on corporate
overhead.   More importantly, the Complaint does <u>not</u> allege that
DCHC received little or no consideration for these bargains, that
the counter-parties to these transactions failed to perform their
end of the bargain, or that the transactions were made solely to

---

[19] Count VII of the Complaint, alleging "excessive executive
compensation," is somewhat misleading in that it counts as part
of their compensation the loans to Paul Tuft and Melvin Redman
that were forgiven by DCHC and compares their total compensation
(unfavorably) to the average annual income for the top two
officials of 13 hospital holding companies surveyed by the Trust.
(Compl. ¶¶ 232-234).   While perhaps not objectionable in and of
itself, the Trust's <u>separate</u> waste claim for those very same
loans in Count VIII of the Complaint renders its inclusion of
those loans as "income" in Count VII an exercise in double-
counting.   Without the forgiven loans, Paul Tuft received
(according to the Trust's numbers) approximately $2.6 million
from 1999-2000, an average salary of $650,000 per year.   Melvin
Redman received $1.45 million during that same time span, an
average of $362,500 per year.   These averages are actually <u>lower</u>
than the industry averages cited by the Trust.

benefit the individual directors and officers.[20]  The court will
not second-guess the business judgments of the D & O Debtors
merely because the terms of certain deals were not, in hindsight,
"fair" to DCHC.  (Compl. ¶ 215).  Counts V-VII and IX will be
dismissed.

Count VIII of the Complaint is a different story.  In that
count, the Trust alleges that DCHC made loans to Paul Tuft,
Melvin Redman, and Steven Dietlin totaling $5.5 million that were
subsequently forgiven for no consideration and were not required
as part of the officers' employment agreements.  Moreover, at
least with respect to Paul Tuft, these loans were made to finance
highly personal interests such as a divorce settlement, the
purchase of a house and a car, and a gift to the University of
the District of Columbia.  (Compl. ¶¶ 242-246).

---

[20] Count VI of the Complaint, alleging corporate waste
through the use of chartered airplanes provided by Tuft-Redman
Enterprises, presents a closer case than the other counts, though
not for the reason propounded by the Trust.  The more colorable
reason for finding corporate waste relating to Tuft-Redman
Enterprises would be DCHC's alleged failure to collect on a loan
made to Tuft-Redman Enterprises (a company created and owned by
Paul Tuft and Melvin Redman) to enable that company to purchase
time share interests in two aircraft.  (Compl. ¶¶ 162-164).  But
the Complaint does not indicate why DCHC failed to collect on the
loan or how much the loan totaled.  Absent some indication as to
the amount of the loan or good-faith allegation that the loan was
not pursued because Paul Tuft and Melvin Redman wanted to
maximize their profits from Tuft-Redman Enterprises, the court
cannot conclude that the failure to pursue this loan "constituted
an [act] to which no reasonable person not acting under
compulsion and in good faith could agree."  Telxon Corp., 792
A.2d at 976.

The court cannot fathom why DCHC would simply give away millions of dollars to its officers without receiving <u>anything</u> in return.  While the Defendants may be able to produce evidence of extenuating circumstances justifying DCHC's apparent charity, nothing in the Complaint gives this court any reason to conclude that a reasonable businessperson would approve of DCHC's practice in this regard.  Count VIII will not be dismissed for failing to allege corporate waste.  The court next turns to whether Count VIII (and also Count II) may be dismissed as to individual D & O Defendants on other grounds.

> 2. <u>Arguments raised by individual D & O Defendants</u>

> (a)  <u>Arguments raised by DCHC officers</u>

The D & O Defendants also urge dismissal of Counts II and VIII with respect to DCHC officers Erich Mounce, Susan Engelhard, Donna Talbot, Steve Dietlin, and Paul Tuft (in his capacity as an officer of DCHC) because the Complaint does not link those individual defendants in any way to the acts alleged in those counts.[21]  To recap, Count II alleges breach of fiduciary duty in using corporate charter jets instead of commercial air lines, (Compl. ¶¶ 186-188), while Count VIII alleges that DCHC's

---

[21] The D & O Defendants also move to dismiss Counts I and IV-VI with respect to the defendant officers.  As the court has already concluded that it must dismiss these counts with respect to <u>all</u> Defendants, there is no need to consider the merits of the defendant officers' separate arguments with respect to these claims.

forgiveness of $5.5 million in loans to DCHC executives constituted corporate waste.  (Compl. ¶¶ 222-224).

The Trust correctly points out that each officer of DCHC owed the same fiduciary duties of care and loyalty to the company as its directors.  See In re the Walt Disney Co., 2004 WL 2050138, *3 (Del. Ch. Sept. 10, 2004)).  But the scope of those duties is restricted necessarily to those activities within each officer's control.  Unless a specific defendant officer had the power to prevent DCHC from contracting with Tuft-Redman Enterprises or forgiving millions of dollars in loans to corporate executives, that officer cannot be held responsible for those actions.  Simply being an officer of the company is not enough.  Cf. Continuing Creditors' Comm. of Star Telecomm. Inc. v. Edgecomb, 2004 WL 2980736, *10 (D. Del. Dec. 21, 2004) ("Edgecomb") (dismissing fiduciary breach claims against corporate officers where little more than status as officers was alleged).

The Complaint is devoid of any allegations concerning the roles of Mr. Mounce, Ms. Talbot, and Ms. Engelhard with respect to Counts II and VIII.  It states only that Mr. Mounce and Ms. Talbot were vice-presidents of DCHC, (Compl. ¶¶ 22-24), and that Ms. Engelhard, in addition to being a vice-president of DCHC, was also its secretary and "[g]eneral [c]ounsel." (Compl. ¶ 24).  It does not indicate whether the three officer defendants were

responsible for corporate travel arrangements or the issuance or forgiveness of corporate loans. It does not suggest that the defendant officers could have stopped the challenged transactions had they wanted to do so. It simply lumps these defendants in with the (unnamed) officers and directors who were responsible for these transactions.[22]

Count VIII presents a closer case for Mr. Tuft and Mr. Dietlin only because the Complaint alleges that these officers were the beneficiaries of DCHC's generous lending practices. (Compl. ¶¶ 155-159, 242, 244).[23] But again, there is nothing in the Complaint specifying that either of these officers issued or could have issued the challenged loans (indeed, the Complaint does not even allege sufficient facts to conclude that the issuance of the loan by itself was anything other than "not fair" to DCHC, hardly an actionable offense). More importantly, there

---

[22] The Trust's reliance on Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871 (1990), and Conley v. Gibson, 355 U.S. 41 (1957) for the well-established rule that "general allegations embrace those specific facts that are necessary to support the claim," Lujan, 497 U.S. at 889 (quoting Conley, 355 U.S. at 45-46), is unhelpful here because the Complaint does not even make general allegations against the defendant officers.

[23] Paragraphs 152 through 154 of the Complaint allege that DCHC forgave $337,321.00 in loans to the other defendant officers, but the Complaint does not discuss these defendants in Count VIII. In any event, the Complaint does not state a claim for waste with respect to these defendants for the same reason that it does not state a claim against Mr. Tuft or Mr. Dietlin-- namely, it does not allege that the defendants were responsible for the forgiveness of their own loans.

is nothing in the Complaint indicating that Mr. Tuft or Mr. Dietlin authorized the forgiveness of their own loans or that they had the authority to do so.  Without these allegations, Count VIII must be dismissed with respect to Mr. Dietlin and Mr. Tuft (in his capacity as an officer of DCHC).

In contrast, the allegations made in Count II suffice to state a claim for breach of fiduciary duty against Paul Tuft. Unlike Count VI, which questions the substance of the D & O Defendants' decision to use charter flights (and which is being dismissed for the reasons discussed above), Count II alleges that the D & O Defendants breached their fiduciary duties of care to DCHC by failing to follow proper business practices in good faith in determining to use charter planes provided by Tuft-Redman Enterprises.  (Compl. ¶¶ 186-188).

Mr. Tuft was the President and CEO of DCHC at the time of these transactions, (Compl. ¶ 19), and he was the co-founder and majority owner of Tuft-Redman Enterprises.  (Compl. ¶¶ 162, 171-72).  As alleged in the Complaint, he (along with Mr. Redman)[24] made the decision to use Tuft-Redman Enterprises rather than travel on commercial carriers even though he knew commercial

---

[24] In addition to the allegations set forth above, the Complaint also alleges that Mr. Redman negotiated the start-up loan to Tuft-Redman Enterprises while he was still an officer and director at DCHC.  (Compl. ¶ 163).  Perhaps not surprisingly, the D & O Defendants do not even attempt to argue that Mr. Redman should be exempt from liability under Count II.

flights were cheaper and without obtaining approval from the
board of directors.  (Compl. ¶¶ 168-169).  These allegations may
not support a claim for waste, but they do state a claim for
breach of the fiduciary duties of care and loyalty to DCHC as an
officer of DCHC.  Count II will be dismissed with respect to Mr.
Mounce, Ms. Talbot, Ms. Engelhard, and Mr. Dietlin, but not with
respect to Mr. Tuft.

(b)  Arguments raised by the DCHC directors

In addition to the claims already dismissed, the defendant
directors seek dismissal of Counts II-III and VIII under the
limitation of liability clause in Article VI of the certificate
of incorporation for Capital America Healthcare Corporation, the
corporate predecessor of DCHC.  (D & O Memo. at 20-22; Parrett
Memo. at 12-14; Krauss Memo. at 6-7).[25]  This clause insulates
the directors of the corporation from personal liability except
for "(I) any breach of the [d]irector's duty of loyalty to the
[c]orporation or its stockholders, [or] (ii) acts or omissions
not in good faith or which involve intentional misconduct or a

_____

[25] Contrary to the Trust's contentions, the court can take
judicial notice of DCHC's articles of incorporation in the
context of a motion to dismiss under Rule 12(b)(6).  See Kaempe
v. Myers, 367 F.3d 958, 963 (D.C. Cir. 2004); Sparrow v. United
Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000); see also,
e.g., Grassmueck v. Barnett, 281 F. Supp. 2d 1227, 1232 (W.D.
Wash. 2003) (taking judicial notice of Delaware articles of
incorporation in motion to dismiss breach of fiduciary claim
because the articles are "certified public records" kept by the
Secretary of State).

knowing violation of law . . . ."  (D & O Memo. Exh. A).

All of the remaining counts alleged against the defendant
directors are barred by this clause.  Counts II and III allege
that the D & O Defendants "were grossly negligent" in their
failure to "inform themselves of all material information
reasonably available to them" concerning DCHC's arrangement with
Tuft-Redman Enterprises and its forgiveness of millions of
dollars in loans made to DCHC officers.  (Compl. ¶¶ 188-189, 197-
199).  Count VIII alleges that the defendants engaged in
corporate waste, a form of negligence so extreme that it
circumvents the business judgment rule.  See Edgecomb, 385 F.
Supp. 2d at 465 (waste claim barred by exculpatory clause statute
unless breach of duty of loyalty is also alleged).  These are
exactly the types of claims that the immunity clause was designed
to prevent.  See Malpiede v. Townson, 780 A.2d 1075, 1095 (Del.
2001) (purpose of exculpatory clause statute was "to permit
stockholders to adopt a provision in the certificate of
incorporation to free directors of personal liability in damages
for due care violations"); see generally Dennis J. Connolly,
Second Circuit Says Exculpation Provisions Apply to Trust Claims
Against Directors, 24 Am. Bankr. L.J. at 26 (September 2005)
(recounting the history and purpose of exculpation clauses in

Delaware certificates of incorporation).[26]

The Trust relies on Periera v. Cogan, 2001 WL 243537

(S.D.N.Y. March 8, 2001) ("Periera I"), modified by Pereira v.

Cogan, 294 B.R. 449 (S.D.N.Y. 2003) ("Periera II"), for the

proposition that exculpatory clauses like the one at issue here

do not apply to a bankruptcy trustee (whether appointed by

statute or created pursuant to a plan of reorganization) because

the trustee's suit would inure to the benefit of third-party

creditors, not the corporation that agreed to the clause.  (D & O

Opp. at 33) (citing Pereira I, 2001 WL at **11-12).  But the

Second Circuit reversed Pereira I and Periera II on this exact

point in Pereira v. Farace, 413 F.3d 330 (2d Cir. 2005), noting

that "[a]lthough corporate officers and directors owe fiduciary

duties to creditors when a corporation is insolvent in

fact, . . . these duties do not expand the circumscribed rights

---

[26] Theoretically, Mr. Tuft's and Mr. Redman's obvious
conflicts of interest with respect to DCHC's contract with Tuft-
Redman Enterprise and forgiveness of their own loans makes them
"interested" parties subject to actions for breach of the
fiduciary duty of loyalty.  See Cede & Co. v. Technicolor, 634
A.2d 345, 361 (Del. 1993) ("[T]he duty of loyalty mandates that
the best interest of the corporation and its shareholders takes
precedence over any interest possessed by a director, officer or
controlling shareholder and not shared by the stockholders
generally.").  But "[t]o allege a breach of the duty of loyalty
based on actions or omissions of the [b]oard, the [p]laintiff
must 'plead facts demonstrating that a majority of a board that
approved the transaction in dispute was interested and/or lacked
independence.'" Edgecomb, 2004 WL at *9 (quoting Orman v.
Cullman, 794 A.2d 5, 23 (Del. Ch. 2002)) (emphasis added by the
court in Edgecomb).  The Complaint does not allege that necessary
fact.

of the <u>trustee</u>, who may only assert claims of the bankrupt
corporation, not its creditors." Id. at 342 (emphasis in
original).  Delaware state and federal courts have reached the
same conclusion.  See Prod. Res. Group, LLC v. NCT Group, Inc.,
863 A.2d 772, 792-94 (Del. Ch. 2004) ("plain terms" of Delaware
statute authorizing exculpation clauses "apply to all claims
belonging to the corporation itself, regardless of whether those
claims are asserted derivatively by stockholders or by
creditors"); Edgecomb, 2004 WL at **11-12 (barring continuing
creditors' committee from recovery for breach of duty of care
under Product Resolution Group).

Because the Complaint alleges only that Ms. Parrett and Mr.
Krauss served as directors of DCHC, Counts II-III and VIII will
be dismissed with respect to them in their entirety.  Counts III
and VIII will also be dismissed with respect to Mr. Tuft, but
Count II will not be dismissed in its entirety with respect to
him because it alleges breach of fiduciary duties by Mr. Tuft as
an officer.  While he may be immunized from this claim in his
status as a director, he is liable for any breach of fiduciary
duty relating to his work as an officer at DCHC.  See Pereira II,
294 B.R. at 534.

C.    Claims Against the Law Firm Defendants

Counts XI-XXI of the Complaint are directed towards the Law
Firm Defendants.  The court has already ruled that Counts XI-XII

38

and XV should be dismissed.  (See section II.A, supra).  Count

XIII must also be dismissed because it alleges only that the Law

Firm Defendants aided and abetted the D & O Defendants' breach of

fiduciary duties with respect to funding from the NCFE Entities

and the Complaint does not properly state a claim for breach of

fiduciary duty against the D & O Defendants in that regard.  (See

section II.B.1(a), supra).  The only remaining counts are for

legal malpractice (Count XIV) and fraudulent conveyances (Counts

XVI-XXI).

     1.   Legal malpractice claim (Count XIV)

    "District of Columbia law requires a legal malpractice

plaintiff to establish (1) the existence of an attorney-client

relationship; (2) the applicable standard of care; (3) a breach

of that standard of care; and (4) a legally cognizable harm."

Belmar v. Garza (In re Belmar), 319 B.R. 748, 752-53 (Bankr. D.C.

2004); accord Forti v. Ashcraft & Gerel, 864 A.2d 133, 138 (D.C.

2004). The Trust alleges that the Law Firm Defendants breached

their professional duties of care to the Debtors "by (1) failing

to inform the Debtors of the consequences associated with the

Debtors' deepening insolvency; and (2) negligently preparing

opinion letters that allowed NCFE to perpetuate a Ponzi scheme

and overfund the Debtors." (Compl. ¶¶ 312-313).[27]

The Trust's first proffered basis for liability (failure to inform the Debtors of the "consequences" of deepening insolvency) fails as a matter of law because it does not allege a failure of the Law Firm Defendants within the scope of the attorney-client relationship. Although the Complaint properly alleges an attorney-client relationship with the Law Firm Defendants, the scope of that relationship does not include <u>business</u> advice given to the Debtors.[28] Rather, the Law Firm Defendants had an obligation to exercise reasonable care only with respect to their <u>legal</u> advice. <u>See</u> <u>Kansas Public Employees Ret. Sys. v. Kutak Rock</u>, 44 P.3d 407, 416-18 (Kan. 2002); 3 R. Mallen & J. Smith, Legal Malpractice § 1.1 (2005 ed.) ("The test to distinguish malpractice from other wrongs is whether the claim primarily

---

[27] The Trust alleges elsewhere in the Complaint that "Epstein Becker also failed to close the Greater Southeast transaction in a timely manner, resulting in further liability to the Debtors, as found by this Court," (Compl. ¶ 140), but does not allege that Epstein Becker acted negligently or was the proximate cause of the untimely closing. The court is left to wonder whether the Trust simply forgot to expand upon this vague allegation or decided to abandon it. Either way, the allegation is too ambiguous to survive Epstein Becker's motion to dismiss. <u>See</u> <u>Shapiro, Lifschitz & Schram, P.C. v. R.E. Hazard</u>, 24 F. Supp. 2d 66, 73 (D.D.C. 1998) ("[L]egal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness.").

[28] This is an additional ground for dismissing Count XIII to the extent that Count XIII (aiding and abetting breach of fiduciary duty) rests on the failure of the Law Firm Defendants to inform the Debtors of the consequences associated with the Debtors' deepening insolvency.

40

concerns the quality of the <u>legal</u> services.") (emphasis added).[29]

The Trust attempts to dress up its allegations on this point by connecting them to its deepening insolvency and breach of fiduciary duty claims against the D & O Defendants. But a company's acquisition of additional debt, by itself, is not a legal wrong, and therefore has no "consequences" for the company of a legal nature. And the Complaint, while flush with allegations about the misdeeds of DCHC's directors and officers, does not (1) allege properly any harm to DCHC as a result of the D & O Defendants' purported breaches of fiduciary duty, (2) allege properly that the deepening insolvency of DCHC's subsidiary hospital corporations was caused by breaches of fiduciary duty by the directors and officers of those corporations; or (3) allege properly that the D & O Defendants should be held responsible for the deepening insolvency of the subsidiary hospital corporations. Absent such allegations, there

---

[29] Even assuming that Epstein Becker and Kutak Rock advised the Debtors on business matters on a regular basis, (<u>see</u> Compl. ¶¶ 28, 44, 71, 74, 84, 92, 94, 106), that advice was not legal in nature and would not receive the special protections accorded legal advice. <u>See</u> <u>Boca Investerings P'ship v. U.S.</u>, 31 F. Supp. 2d 9, 11 (D.D.C. 1998) ("communications made by and to . . . in-house lawyer with respect to business matters, management decisions or business advice are not protected by the [attorney-client] privilege"). An attorney who provides bad business advice, even advice given on retainer, is no more liable for legal malpractice than a doctor who is paid for such advice would be for medical malpractice, or, for that matter, an attorney who provides bad medical advice to a client would be for legal malpractice.

was no foreseeable <u>legal</u> harm for the Law Firm Defendants to
report.

The second basis for liability advanced by the Trust
("negligently preparing opinion letters" (Compl. ¶¶ 312-313))
stands on stronger ground.  The Complaint states in pertinent
part:

> Over the years of representation, Epstein
> Becker provided a number of legal opinions to
> NCFE on behalf of the Debtors.  The legal
> opinions were drafted in accordance with
> NCFE's requests and, in some cases, were
> initially drafted by NCFE.  The legal
> opinions allowed NCFE to perpetuate a Ponzi
> scheme.
>
> . . .
>
> At various times during its representation of
> the Debtors, Kutak Rock prepared opinion
> letters to facilitate financing through NCFE,
> including the opinion letters associated with
> the purchase of Michael Reese.  These opinion
> letters were largely drafted by NCFE.  NCFE
> designed the opinion letters to show to
> credit reporting agencies so that NCFE could
> perpetrate a Ponzi scheme.

(Compl. ¶¶ 129, 145).

Other paragraphs allege that Epstein Becker authored an
opinion letter to NPF X, Inc. (Greater Southeast's primary lender
and an NCFE subsidiary) containing assumptions which the author
knew to be false.  (Compl. ¶ 133).  Another letter was sent that
same day to NPF XII, Inc. and NPFS, Inc.  (Compl. ¶ 134).  These
NCFE spin-offs overfunded Greater Southeast, thereby deepening
its insolvency.  (Compl. ¶ 112).

Taken together, these allegations state a claim for legal malpractice. According to the Complaint, the Law Firm Defendants prepared opinion letters in their capacity as attorneys for all of the Debtors, not just DCHC.[30] The Trust alleges that these opinions were prepared in a manner incommensurable with the reasonable standard of care employed by a professional attorney, and supports that assertion with specific facts. Finally, it alleges that these opinions allowed the NCFE Entities to perpetuate a Ponzi scheme that required the overfunding of the Debtors, thereby deepening their insolvency. While these

---

[30] The Complaint alleges that Epstein Becker "advised DCHC in a variety of capacities regarding the acquisition of Greater Southeast," (Compl. ¶ 106), and that "Kutak Rock advised DCHC" concerning the purchase of other hospitals, (Compl. ¶¶ 44, 72, 74, 86, 94), but it also alleges that "Epstein Becker has represented DCHC and its predecessors and affiliates in a variety of legal and business matters dating back at least to 1994," (Compl. ¶ 28), and that "Kutak Rock has acted as a de facto general counsel for DCHC and its predecessors and affiliates since the early 1990[s]." (Compl. ¶ 29) (all emphasis added). Other parts of the Complaint allege that Epstein Becker "provided legal advice to the Debtors for several years," (Compl. ¶ 129), that "[o]ver the years of representation, Epstein Becker provided a number of legal opinions to NCFE on behalf of the Debtors," (Am. Compl. ¶ 130), that "Kutak Rock began providing advice to the Debtors in 1992," (Compl. ¶ 141), and that "Kutak Rock also provided letters to the Debtors' auditors to allow the Debtors to continue to operate and obtain financing." (Compl. ¶ 144) (all emphasis added).

allegations are far from precise,[31] they suffice at this stage to
allege a claim by the Debtor hospitals for malpractice.

    2.  <u>Fraudulent conveyance claims</u>

    The Trust also seeks to recover payments made to the Law
Firm Defendants under §§ 544 and 548 of the Bankruptcy Code
because "[t]he Debtors made the transfer of legal fees to Epstein
Becker and Kutak Rock without receiving a reasonable equivalent
value." (Compl. ¶¶ 328, 339; <u>see also id.</u> at ¶ 347).[32]  These
claims are largely duplicative of Count XIV in all but one

---

    [31] The most troubling aspect of the allegations is that they
refer repeatedly to "the Debtors" collectively, without
establishing (1) that harms suffered by one debtor harmed the
others or (2) that opinion letters prepared by the Law Firm
Defendants were written <u>after</u> the law firms were retained by the
specific debtor harmed by those opinions.  Because the Complaint
is so unclear on this point, the court would view favorably a
motion from the Law Firm Defendants for a more definite statement
under FED. R. CIV. P. 12(e).  But the allegations as currently
written do not necessarily preclude the Trust from succeeding on
its malpractice claim; accordingly, the court will not dismiss
the claim at this time.

    [32] Under § 548 of the Bankruptcy Code, the trustee may avoid
any transfer by the debtor within one year before the debtor's
bankruptcy petition if the debtor "received less than a
reasonably equivalent value in exchange for such transfer or
obligation[] . . . and was insolvent on the date that such
transfer was made or such obligation was incurred . . . ."  11
U.S.C. § 548(a)(1)(B).  Section 544 allows the trustee to invoke
the fraudulent transfer laws available to any holder of an
unsecured claim allowable under § 502 of the Bankruptcy Code.
<u>See</u> 11 U.S.C. § 544(b)(1).  The Trust invokes Arizona's
Fraudulent Transfer Act, which is identical in most respects to §
548 except that it is not restricted to transfers made within the
year prior to the debtor's bankruptcy filing.  <u>See</u> Ariz. Rev. St.
§§ 44-1004, 44-1005.  Section 550 allows the trustee to recover
property avoided under sections 544 or 548.  <u>See</u> 11 U.S.C. §
550(a).

important respect--fraudulent conveyance actions (at least under
§ 548) have been held to be immune to the defense of <u>in pari
delicto</u>.  <u>See</u> <u>McNamara v. PFS (In re Personal & Business Ins.
Co.)</u>, 334 F.3d 239, 245-247 (3d Cir. 2003) (distinguishing
actions brought by a trustee under § 548 from actions under § 541
because § 548 permits a court to consider the appointment of an
innocent party (<u>i.e.</u>, the trustee)).

    The Law Firm Defendants do not challenge the Trust's
allegations that (1) the Debtors transferred legal fees to the
Law Firm Defendants within one year of filing their bankruptcy
petition, and (2) that the Debtors were insolvent at the time of
that transfer.  (Compl. ¶¶ 347-348).  Rather, they argue
strenuously that the fraudulent conveyance counts, which were not
in the Complaint as originally drafted, were not raised in a
timely manner.  The Trust concedes that Counts XVI-XXI were not
pled within two years of the Debtors' bankruptcy petition as
required by 11 U.S.C. § 546(a)(1)(A), but argues that the claims
"relate back" to the earlier filing date of the original
Complaint under FED. R. CIV. P. 15(c).  Under that rule, a claim
asserted for the first time in an amended pleading is deemed to
have been pled at the time of the original complaint if "the
claim or defense asserted in the amended pleading arose out of
the conduct, transaction, or occurrences set forth or attempted
to be set forth in the original pleading . . . ."

As the court previously noted, Counts XVI-XXI are premised on the same facts that support the Trust's malpractice claim. The only additional fact pled in the later counts is that the Debtors paid the Law Firm Defendants for their services. To the extent this "new" fact could not have been inferred from the original complaint, it merely "build[s] on previously alleged facts [that] relate back to the original complaint." <u>Purcell v. MWI Corp.</u>, 254 F. Supp. 2d 69, 75 (D.D.C. 2003). The court concludes that Count XVI-XXI were pled in a timely manner under Rule 15(c).

Kutak Rock argues that its legal fees must be presumed to have been "reasonable equivalent value" for its work because the Trust does not allege that its fees were excessive or that it failed to perform the work billed. (KR Memo. at 17-18).[33] It cites <u>Interco Sys., Inc. V. Bondario, Insero & Co.</u>, 202 B.R. 188 (Bankr. W.D.N.Y. 1996), for the proposition that "the payment of professional fees or expenses to professionals or others who perform the services or provided the goods at the request of the

---

[33] In addition, Kutak Rock argues that Counts XVI-XXI are not pled with the specificity required by Federal Rule of Civil Procedure 9(b). But the Trust alleges constructive, not actual, fraud in the transfer of legal fees, and "[t]he pleading of constructive fraud, as opposed to actual fraud, must only comply with Rule 8(a) because scienter is not an element . . . ." <u>Sec. Inv. Protection Corp. v. Stratton Oakmont, Inc.</u>, 234 B.R. 293, 319 (Bankr. S.D.N.Y. 1999). In any event, the allegations supporting Count XIV, which are incorporated by the Trust into its fraudulent conveyance counts, satisfy either standard.

corporation and charged a reasonable rate is not avoidable as a

fraudulent conveyance under [s]ection 548(a)(2)(B)(i) . . . ."

Id. at 194 (quoted in KR Memo. at 17).  But that is not all that

Interco says.  On the same page quoted by Kutak Rock, the court

clarifies that

> Certainly, if the facts and circumstances
> indicate that a payment of professional fees
> or other expenses by a corporation was for
> services or goods which solely benefitted a
> third party, whether it be a principal,
> officer or employee, and had no reasonable,
> good faith business judgment benefit to the
> corporation, that payment would be avoidable
> under [s]ection 548 because of a lack of
> reasonably equivalent value . . . .

Id. (emphasis added), cf. Inv. Bankers, Inc. v. Davis,

Gillenwater & Lynch, 136 B.R. 1008, 1021 (D. Colo. 1990)

(granting avoidance of payment to law firm where part of payment

was for work actually performed for individual directors of

debtor rather than debtor itself).

The Complaint is replete with allegations that the Law Firm

Defendants engaged in practices, including preparation of

negligent or fraudulent opinion letters, that benefitted only the

NCFE Entities and (indirectly) the Defendants.  (See section

II.C.1, supra).  It strains credulity to suggest that the Debtors

received any value, let alone "reasonably equivalent" value, for

services that were performed so poorly as to rise to the level of

a breach of professional duty.  The court declines to adopt a per

se rule insulating law firms that have engaged in malpractice

from avoidance actions.

     3.   Res judicata and judicial estoppel

The Law Firm Defendants argue that the Trust is barred from bringing any action against them under the doctrines of res judicata and judicial estoppel. Res judicata, or claim preclusion, "prevents parties from relitigating issues they raised or could have raised in a prior action on the same claim." NextWave Personal Communications Inc. v. FCC, 254 F.3d 130, 143 (D.C. Cir. 2001). "The three elements of res judicata are: (I) a final judgment on the merits in the first action; (ii) the present claim is the same as a claim that was raised or that might have been raised in the first proceeding; and (iii) the party against whom res judicata is asserted was a party or in privity with a party in the previous case." Jacobsen v. Oliver, 201 F. Supp. 2d 93, 102-03 (D.D.C. 2002) (citing Allen v. McCurry, 449 U.S. 90, 94 (1980)). An order confirming a plan of reorganization is a "final judgment" for purposes of res judicata. See FDIC v. O'Donnell, 136 B.R. 585, 588 (D.D.C. 1991).

The Law Firm Defendants contend that this court's order confirming the Debtor's Plan bars the Trust's suit because it resolved conclusively any claims that were raised or could have been raised between the parties. (KR Memo. at 40-42; EBG Memo. at 43-52). They claim that under Browning v. Levy, 283 F.3d 761

(6th Cir. 2002), and D & K Properties Crystal Lake v. Mut. Life
Ins. Co. of N.Y., 112 F.3d 257 (7th Cir. 1997), the Plan's
reservation of rights clause, which specifically mentions
possible actions against the Law Firm Defendants, is too vague to
be enforced.[34]

Unlike the clause at issue here, Browning and D & K
Properties concerned blanket reservation of rights clauses that
did not even name potential defendants.  But even if these cases
were on point, the court would not follow them because it finds
the reasoning animating those decisions to be flawed.  The
Browning court reasoned that it could not honor a blanket
reservation clause in a plan "because it did not enable the value
of [the debtor's] claims to be taken into account in the
disposition of the debtor's estate," Browning, 283 F.3d at 775-
76, while the D & K Properties court refused honor a blanket
reservation clause because "[t]o hold otherwise would eviscerate
the finality of a bankruptcy plan containing such a reservation."

---

[34] Although the Trust does not raise the point, the court
fails to see how Kutak Rock is entitled to raise the defense of
res judicata at all as it was not a party in interest with
respect to the Plan.  See LJM Co-Investment, L.P. v. Dodson (In
re LJM Co-Investment, L.P.), 327 B.R. 786, 792 (Bankr. N.D. Tex.
2005) (res judicata does not apply where party asserting the
defense was not a party-in-interest to confirmation of the plan
of reorganization).  The only objection Kutak Rock could make is
if the Plan provisions did not confer upon the Trust the right to
prosecute any claims against Kutak Rock.  But the provisions of
the Plan clearly did create such rights for the Trust.  (Plan §§
1.50, 1.53, 6.6(c)).

D & K Properties Crystal Lake, 112 F.3d at 761.  But as numerous
bankruptcy courts have pointed out, it would be far more onerous
and detrimental to the confirmation process to require "a
specific description of every claim the debtor intends to
pursue." Katz v. I.A. Alliance Corp. (In re I Appel Corp.), 300
B.R. 564, 569 (S.D.N.Y. 2003) (noting that such a rule "could
entail months or years of investigation and a corresponding delay
in the confirmation of the plan of reorganization"); accord In re
Worldwide Direct, Inc., 280 B.R. 819, 823 (Bankr. D. Del. 2002);
In re Weidel, 208 B.R. 848, 851-54 (Bankr. M.D.N.C. 1997).

Moreover, any party-in-interest concerned about "hidden"
claims can object to the language in reservation of rights clause
before confirmation or invoke the doctrine of judicial estoppel
should the debtor mislead creditors in any way.  Indeed, a
creditor's failure to challenge a plan's reservation of rights
clause at that time is itself binding under res judicata and §
1141 of the Bankruptcy Code.  See 11 U.S.C. § 1141(a) (provisions
of confirmed plan of reorganization "bind . . . any
creditor . . . whether or not such creditor . . . has accepted
the plan"); In re Weidel, 208 B.R. 848, 852-53 (Bankr. D. Minn.
1997) (creditor is bound under § 1141(a) to follow retention of
rights provision in plan even if provision is vague).  For all
these reasons, the court declines to accept the unduly strict
reading of the Browning and D & K Properties courts.

The Law Firm Defendants also argue that the Trust is barred from raising any claims against them under the doctrine of judicial estoppel.  "Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." Pegram v. Herdrich, 530 U.S. 211, 228 n.8 (2000).  The purpose of the rule is "to protect the integrity of the judicial process . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment[.]"  New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001) (internal quotations and citations omitted).  "[J]udicial estoppel is an equitable doctrine invoked by a court at its discretion."  Id. (internal quotation and citation omitted).

The Law Firm Defendants argue that the Trust should be judicially estopped from asserting claims against them because the Trust (or, more precisely, its predecessor in interest) (1) knew of its claims and failed to disclose them accurately and specifically; and (2) concealed the nature and scope of the claims so as to secure support for confirmation from creditors that would not benefit from the Trust's distributions.  This may turn out to be the case, but there is nothing in the Complaint that supports these allegations.  See U.S. v. Martin-Baker Aircraft Co., 389 F.3d 1251, 1261 (D.C. Cir. 2004) (court's inquiry is limited to "the allegations in the complaint").  The

argument is not ripe on a motion to dismiss under Rule 12(b)(6).

    C.   <u>Affirmative Defenses Common to All Defendants</u>

Finally, all of the Defendants assert that (1) the Trust's claims are untimely under the applicable statute of limitations; and (2) the Trust's claims are barred in their entirety by the doctrine of <u>in pari delicto</u>. The court considers each defense in turn.

    1.   <u>Statute of limitations</u>

Under District of Columbia law, claims for breach of fiduciary duty and for legal malpractice must be raised within three years of the victims's discovery of the breach. D.C. Code Ann. § 12-301(8) (2001). A bankruptcy trustee is granted an additional two years from the filing of the bankruptcy petition in which to raise a claim on behalf of the estate assuming that the statute of limitations did not expire prior to the petition. <u>See</u> 11 U.S.C. § 108(a); <u>Rothenberg v. Ralph D. Kaiser Co. (In re Rothenberg)</u>, 173 B.R. 4, 11 (Bankr. D.D.C. 1994). The Trust alleges that Epstein Becker prepared negligent opinion papers as late as December 30, 1999 (it does not specify a time with respect to Kutak Rock), and Count II of the Complaint alleges wrongful conduct by Paul Tuft beginning in July of 2001, so the claims were still viable to some degree on the Debtors' petition date. The only question is whether they remained viable for

another two years under § 108(a).[35]

Section 108(a) states:

> (a) If applicable nonbankruptcy law, an order
> entered in a nonbankruptcy proceeding, or an
> agreement fixes a period within which the
> debtor may commence an action, and such
> period has not expired before the date of the
> filing of the petition, the trustee may
> commence such action only before the later of
> --
>     (1) the end of such period, including
> any suspension of such period occurring on or
> after the commencement of the case; or
>     (2) two years after the order for
> relief.

11 U.S.C. § 108(a).

"[T]he purpose of the two year extension granted by section
108 is to preserve the interests of the debtor's estate." Natco
Indus., Inc. v. Fed. Ins. Co., 69 B.R. 418, 419 (S.D.N.Y. 1987).
The extension applies not only to the trustee, but also to a
debtor-in-possession pursuant to 11 U.S.C. § 1107(a). See In re
Rothenberg, 173 B.R. at 11 (collecting cases). Courts have also
concluded that other estate representatives can invoke the
protections of § 108(a). See, e.g., Coliseum Cartage Co. v.
Rubbermaid Statesville, Inc., 975 F.2d 1022, 1025 (4th Cir. 1992)

_____

[35] The Trust also claims that the statute of limitations was
tolled in this case by the "continuous misrepresentation" rule.
(LF Opp. at 63-64). The court declines to rule on that issue
because the only allegations of impropriety that state a claim
for malpractice fall within the three-year window prior to the
Debtor's bankruptcy petition and the court concludes, for the
reasons set forth below, that the Trust may invoke § 108(a) as a
representative of the estate.

(agents of both trustees and debtors-in-possession can invoke §
108(a)); Official Comm. of Creditors of Corell Steel v. Fishbein
& Co., P.C., 1992 WL 196768, *3 & n.6 (E.D. Pa. Aug. 10, 1992)
(creditors' committee can invoke § 108(a) where it is "standing
in the shoes" of the debtor); Rudin v. Tax Comm'n of City of N.Y.
(In re Olympia & York Maiden Lane Co., LLC), 233 B.R. 662, 666-67
(Bankr. S.D.N.Y. 1999) (state court equity receiver appointed
pre-petition could invoke § 108(a)).

Epstein Becker urges this court to limit the applicability
of § 108(a) to statutory trustees and debtors-in-possession under
a "plain language" analysis of the section.  The court is mindful
that "Congress 'says in a statute what it means and means in a
statute what it says there . . . .'" Hartford Underwriters Ins.
Co. v. Union Planters Bank (In re Hen House Interstate, Inc.),
530 U.S. 1, 6 (2000) (quoting Conn. Nat'l Bank v. Germain, 503
U.S. 249, 254 (1992)).  But the court also knows that "statutory
construction is a holistic endeavor," Official Comm. of Unsecured
Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 559 (3d
Cir. 2003) ("Cybergenics") (quoting U.S. Savings Ass'n of Tex. v.
Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 371
(1988)), and that "bankruptcy courts are equitable tribunals that
apply equitable principles in the administration of bankruptcy
proceedings."  Id. at 567.

With these principles in mind, there can be little doubt
that "[t]his is one of those rare instances in which it is
appropriate to reject a <u>literal</u> application of the statute
because it would produce an absurd result that is demonstrably at
odds with the general intent of Congress . . . ." <u>In re Shin</u>, 306
B.R. 397, 410 (Bankr. D.D.C. 2004).[36]  Section 108(a)'s mandate
is to "preserve the interests of the debtor's estate." <u>Natco
Indus., Inc.</u>, 69 B.R. at 419.  In this case, by virtue of the
Debtors' Plan, the Trust succeeded to the powers of a trustee or
debtor-in-possession.  Nothing in § 108(a) suggests that the
Trust cannot "stand in" for the debtor-in-possession or trustee
where under that provision the Trust stands in for the trustee
regarding the pursuit of claims of the estate that are the
subject of § 108(a).  <u>See Cybergenics</u>, 330 F.3d at 558
(permitting creditors' committee to file derivative suit under §
544(b) of the Bankruptcy Code at least in part because suit was
brought in the name of reluctant trustee for the benefit of the
entire estate, not by one specific creditor for that creditor).

Statutes ought to be interpreted in a manner that avoids
absurd results.  It makes no sense that an estate's state law

---

[36] <u>Cf. United States v. River Coal Co., Inc.</u>, 748 F.2d 1103,
1107 (6th Cir. 1984) (although post-petition interest "did not
accrue 'within three years preceding bankruptcy,' a condition of
nondischargeability under § 17 of the [Bankruptcy] Act," such
interest was nevertheless nondischargeable as the underlying tax
itself was nondischargeable).

claims could have been pursued by "the trustee" by virtue of §
108(a) until the fall of 2004 but that this power disappeared
into the ether when these same claims vested in a liquidating
trust pursuant to 11 U.S.C. § 1123(b)(3)(B) as successor to the
trustee under a plan confirmed in the spring of 2004.  When §
108(a) refers to "the trustee['s]" pursuit of claims, it only
makes sense to view that provision as entailing a successor to
the trustee's power to pursue such claims to benefit creditors.
In other words, § 108(a) ought to apply when there has been a
confirmed plan vesting identified claims in a successor who is
acting at the behest of creditors (or who is a successor by
reason of a negotiated acquisition of such claims from the estate
as part of the confirmed plan, which the creditors were able to
evaluate with respect to the benefits conferred upon them).[37]

The Law Firm Defendants also argue that (1) all of the
property of the estate re-vested in the Debtors when the Plan

---

[37] A different result is justified when a case is dismissed.
Upon dismissal, claims of the estate re-vest in the debtor unless
otherwise ordered.  11 U.S.C. § 349(b)(3).  However, such a
debtor does not obtain the claims by reason of a confirmed plan
that identified such claims and was designed to confer a benefit
on creditors by virtue of the claims' continued pursuit.  The
trustee's avoidance powers (which are analogous to the trustee's
rights under § 108(a), and which could be vested in a liquidating
trust under a plan pursuant to § 1123(b)(3)(B)) disappear upon a
dismissal (and, unless the court orders otherwise for cause,
transfers avoided are reinstated under § 349(b)(1) and judgments
under § 550 to recover avoided transfers are vacated under § 349
(b)(2)).  A debtor in a dismissed case, in other words, is not
treated as a successor to a trustee's pursuit of claims of the
estate for the benefit of creditors.

went into effect on April 4, 2004, thus foreclosing any future use of § 108(a) by the Reorganized Debtors, and that (2) the Trust, as an assignee of the Reorganized Debtors, cannot invoke § 108(a) any more than the Reorganized Debtors could.  Their position is buttressed by a line of cases holding that "[w]hile a debtor-in-possession is entitled to § 108's tolling period, . . . a [reorganized] debtor is not," Cunningham v. Healthco, Inc., 824 F.2d 1448, 1460 (5th Cir. 1987), because reorganized debtors "are not subject to the control of the bankruptcy court and are not fiduciaries of their creditors." Natco Indus., Inc., 69 B.R. at 419; see also U.S. Am. Bank v. C.I.T. Constr. Inc. Of Tex., 944 F.2d 253, 259-60 (5th Cir. 1991) (barring creditor from invoking § 108(a) because the creditor brought the suit "solely to advantage itself").

The court does not find the reasoning behind these cases to be entirely persuasive.  The premise of their holdings is that a reorganized debtor's claims cannot benefit the creditors of the former debtor-in-possession once those creditors' claims against the estate are discharged.  See C.I.T. Constr. Inc. of Texas, 944 F.2d at 260 ("Post-confirmation debtors are not entitled to the tolling provisions of § 108(a) because their interests diverge from those of the creditors of the bankruptcy estate.").  But a discharge is granted only where there is payment under a plan of reorganization, and creditors of the debtor-in-possession can

demand a higher payment based on the ability of the reorganized

debtor to recover assets post-confirmation.  In this respect,

even a reorganized debtor's claims can be said to benefit her

former creditors because those claims increase the leverage of

the debtor's creditors in negotiating plan payments.[38]

Even if the court were to accept the reasoning of the courts

in C.I.T. Construction, Cunningham, and Natco Industries, the

rule laid out in those cases actually cuts against the position

taken by the Law Firm Defendants.  Under § 1141(b) of the

Bankruptcy Code, "[e]xcept as otherwise provided in the plan [of

reorganization] or the order confirming the plan, the

confirmation of a plan vests all of the property of the estate in

the debtor."  11 U.S.C. § 1141(b) (emphasis added).  As the

C.I.T. Construction court explained:

> If the reorganization plan or confirmation
> order places the debtor's recovery under the
> control of the bankruptcy court, . . .
> [courts] have characterized the debtor as a
> "debtor-in-possession" for the purposes of §
> 108, which means the debtor acts for the
> benefit of all creditors of the estate and
> thus benefits from the application of §
> 108(a).

944 F.2d at 260 n.11.

---

[38] Conceivably, a debtor could conceal certain potential
claims from her creditors and then assert them post-confirmation.
But as noted above, a reorganized debtor would not be able to
assert a claim that was intentionally "hidden" from her creditors
under the doctrine of judicial estoppel.  See section II.C.2,
supra.

For example, the Fifth Circuit held in <u>Cunningham</u> that a
post-confirmation debtor could still invoke the protections of §
108(a) as a debtor-in-possession where the debtor's plan provided
that half of any recovery from the debtor's litigation against
the defendant would be transferred to the plan's disbursing agent
because "[h]aving been expressly addressed in the plan, any
recoveries under the causes of action remain[ed] under the
supervision of the bankruptcy court."  824 F.2d at 1460.  In
contrast, the district court in <u>Natco Industries</u> held that §
108(a) was not available to a reorganized debtor whose plan did
not contemplate post-confirmation litigation because the debtor
"would reap the benefit of a provision designed to preserve the
estate as a whole pending bankruptcy proceedings."  69 B.R. at
420.  The basic principle underlying all of these decisions is
that the protections of § 108(a) cease to exist only when "any
recovery by [the debtor] . . . would vest solely in [the
debtor]."  <u>C.I.T. Constr. Inc. of Tex.</u>, 944 F.2d at 260.

Unquestionably, the Debtors would still be considered
debtors-in-possession under <u>Cunningham</u> if the Plan had directed
<u>them</u> to prosecute all unliquidated causes of action held by the
estate and then transfer the proceeds from the liquidation of
their claims to their creditors.  <u>See</u> <u>Cunningham</u>, 824 F.2d at
1460 (because "confirmation of the reorganization plan did not
vest [the debtors] with title to its causes of action, [the

debtors were] still [] [']debtor[s]-in-possession,['] and
therefore [were] entitled to the tolling provision of § 108") .
Instead, the Plan created a new entity, the Trust, to prosecute
and disburse unliquidated claims of the estate.  The Trust, as
successor representative of the estate, stands in the shoes of
the debtor-in-possession who, in turn, stands in the shoes of the
trustee under 11 U.S.C. § 1107.  As such, it is subject to the
same defenses that are applicable to a bankruptcy trustee and is
governed by the same statute of limitations provisions, including
§ 108(a).

Epstein Becker offers an alternative explanation for the
authority of the Trust that would render § 108(a) inoperative.
In its view, the Debtor was fully re-vested on the effective date
of the Plan, thereby foreclosing further protection under §
108(a), and then assigned certain claims to a third-party entity
(the Trust) whose beneficiaries happened to be the Debtors'
former creditors.  Assuming <u>arguendo</u> that this theory was
accurate, the Trust, as a contractual assignee of the fully-
vested and reorganized Debtors, would have no right to additional
time under § 108(a).[39]

---

[39] Epstein Becker does not suggest that the duality of
identities with respect to the Debtors' former creditors and the
Trust's beneficiaries was coincidence, but rather argues that the
former creditors chose to forego their rights as creditors in
exchange for confirmation of the Plan and a guaranteed pay-out
from the Trust.  Epstein Becker argues that it seeks only to hold
those former creditors to the terms of their "bargain."

But that is <u>not</u> what happened here.  The Debtors transferred
the Liquidating Trust Assets to the Trust because they were
required to do so under the terms of the Plan.  (D.E. No. 1636 at
¶ 4).  And the transferee of those assets was not some third-
party stranger to the proceedings; rather, it was a
"representative of the estate" under 11 U.S.C. § 1123(b)(3)(B)
with the right to retain and enforce the claims of the estate
only as delineated in the Plan.  <u>See</u> <u>Guttman v. Martin (In re</u>
<u>Railworks Corp.)</u>, 325 B.R. 709, 719 (Bankr. D. Md. 2005)
(litigation trust had standing under § 1123(b)(3) to prosecute
avoidance claim post-petition).  In short, every aspect of the
Debtor's arrangement with the Trust was a result of Plan
provisions designed to benefit the Debtors' creditors rather than
the Debtors themselves.

        The only reason that the Debtors cannot invoke § 108(a) is
because the Plan bifurcated the assets and debts of the estate
through the creation of the Trust.  Epstein Becker would
essentially punish certain unsatisfied creditors of the Debtors
for receiving distributions from a liquidating trust instead of
the Debtors themselves.  As a representative of the estate, the
Trust may rely on § 108(a).

        2.   <u>In pari delicto</u>

        Finally, the Law Firm Defendants argue at length that all
claims against them must be dismissed under the doctrine of <u>in</u>

pari delicto.   The D & O Defendants also reference the defense,
albeit in a footnote.   (D & O Memo. at 17 n.14).   "The doctrine
of in pari delicto provides that a plaintiff may not assert a
claim against a defendant if the plaintiff bears fault for the
claim."   Lafferty, 267 F.3d at 354.   According to the Law Firm
Defendants, the doctrine applies in this case because the
Complaint alleges that the DCHC directors and officers knew about
and actually solicited the Law Firm Defendants' alleged
malpractice and, as corporate fiduciaries, the directors' and
officers' knowledge is imputed to the company itself.   (Kutak
Rock Memo. at 22-23; EBG Memo. at 12-15).

While the court is not obligated to consider the D & O
Defendants' perfunctory argument at all because it was raised in
a footnote, it can dispense with the argument on the merits
easily enough.   Simply put, fiduciaries like the D & O Defendants
cannot assert the in pari delicto defense against claims for
breach of fiduciary duty.   See In re HealthSouth Corp.
Shareholders Litig., 845 A.2d 1096, 1107-08 & n.20 (Del. Ch.
2003) (collecting cases).

As for the Law Firm Defendants, their arguments are properly
raised but premature.   They presume that the directors and
officers of DCHC were also fiduciaries of DCHC's subsidiary
hospitals, an assumption not supported by any allegations in the
Complaint.   While the Law Firm Defendants might be able to show

62

at trial or on a motion for summary judgment that the DCHC
directors and officers owed such duties under a veil-piercing
analysis, they cannot succeed on such a claim at this stage in
the proceeding.  See Martin-Baker Aircraft Co., 389 F.3d at 1261.
At most, the Law Firm Defendants might be able to assert the
defense of in pari delicto with respect to claims arising from
damages to DCHC, but, as set forth above, the Trust does not
allege properly any such claim.  (See note 10, supra).  The Law
Firm Defendants cannot succeed on their in pari delicto defense
at this time.

III

For the foregoing reasons, the court concludes that it must
grant in part and deny in part the motions to dismiss filed by
the Defendants.  With respect to the D & O Defendants, the court
will dismiss all counts against all of the defendants with the
exception of Count II, which may be asserted against Paul Tuft
and Melvin Redman in their capacities as officers of DCHC.  With
respect to the Law Firm Defendants, the court will dismiss all
counts except for Count XIV insofar as it alleges malpractice
based on the Law Firm Defendants' negligent preparation of
opinion letters used by the NCFE Entities to overfund the Debtors
and Counts XVI-XXI, which state claims for fraudulent conveyances
under federal and Arizona state law.  The deepening insolvency
and strong-arm counts (Counts X-XII and XV) will be dismissed in

their entirety, with no leave to amend.

As to the remaining counts being dismissed, the court recognizes that many of the conclusions reached in this Opinion with respect to both the claims of the Trust and the affirmative defenses of the Defendants turn on specific defects in the Complaint that could be remedied through further amendment. The court also recognizes that the Trust amended its complaint before the D & O Defendants filed their motion to dismiss, and thus has not had an opportunity to amend the Complaint in response to the specific objections raised by those defendants. The court will therefore give the Trust an opportunity to amend its Complaint with respect to its allegations concerning the D & O Defendants.[40]

Finally, the court recognizes that the Law Firm Defendants in particular may not be able to answer fully the allegations in the Complaint regarding the opinion letters prepared by Epstein

---

[40] Regarding the Law Firm Defendants, the court is dismissing Count XIII (regarding aiding and abetting breach of fiduciary duty) because no breach of fiduciary duty by the D & O Defendants has yet been pled. Similarly, the court is dismissing the first prong of Count XIV (legal malpractice for "failing to inform the Debtors of the consequences associated with the Debtors' deepening insolvency") for failure to allege an identifiable legal harm which it would have been the responsibility of the Law Firm Defendants to report pursuant to legal services incident to their attorney-client relationship. The court will allow the plaintiff to incorporate in Counts XIII and XIV any new allegations against the D & O Defendants that would remove those bases for the dismissal of Count XIII and the first prong of Count XIV.

Becker and Kutak Rock (the second prong of Count XIV) until a more definite statement is given.  For that reason, and because amendments as to the D & O Defendants may necessitate a new response by the Law Firm Defendants as to Count XIII and the first prong of Count XIV, the court will grant the Law Firm Defendants an opportunity to file a motion for a more definite statement under FED. R. CIV. P. 12(e) before they are required to respond to the allegations regarding the second prong of Count XIV of the Complaint.[41]

An order follows.


[Signed and dated above.]

Copies to: All counsel of record.

_____

[41] In this regard, the Complaint alleges that the Law Firm Defendants prepared opinion letters, but does not say that each opinion letter was negligently prepared.  Official Form No. 9 (Complaint for Negligence) to the Federal Rules of Civil Procedure suggests that the Law Firm Defendants are entitled to more exact allegations than those provided by the instant Complaint.