The decision below is hereby signed.  Dated:
September 21, 2006.

S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In re                                )
                                     )
GREATER SOUTHEAST COMMUNITY          )   Case No. 02-02250
HOSPITAL CORP., I, *et al.*,         )   (Chapter 11)
                                     )   (Jointly Administered)
            Debtors.                 )
_____    )
                                     )
SAM J. ALBERTS, TRUSTEE FOR          )
THE DCHC LIQUIDATING TRUST,          )
                                     )
            Plaintiff,               )
                                     )   Adversary Proceeding No.
       v.                            )   04-10459
                                     )
PAUL TUFT, *et al.*,                 )
                                     )
            Defendants.              )

DECISION REGARDING MOTIONS TO DISMISS SECOND AMENDED COMPLAINT

    This proceeding relates to the bankruptcy cases of Doctors

Community Healthcare Corporation ("DCHC") and affiliated debtors

who were its subsidiary hospital corporations.[1]  Sam J. Alberts,

_____

    [1]  The affiliated debtors are Greater Southeast Hospital
Corporation-I ("Greater Southeast Corp."), PACIN Healthcare-
Hadley Memorial Hospital Corporation ("Hadley Corp."), Michael
Reese Medical Center Corporation ("Michael Reese Corp."), Pine
Grove Hospital Corporation ("Pine Grove Corp."), and Pacifica of
the Valley Corporation ("Pacifica Corp.").

the trustee for the DCHC Liquidating Trust, seeks to recover $242

million from Paul Tuft, Steve Dietlin, Erich Mounce, Donna

Talbot, Susan Engelhard, Rebecca Parrett, and George Krauss,

former directors and officers of DCHC (collectively the "D & O

Defendants"),[2] and Epstein Becker & Green P.C. ("Epstein Becker")

and Kutak Rock LLP ("Kutak Rock"), who served as former counsel

to DCHC and its subsidiary hospital corporations.  Alberts

alleges that the D & O Defendants worked in tandem with Epstein

Becker and Kutak Rock (collectively the "Law Firm Defendants") to

further a Ponzi scheme perpetrated by National Century Financial

Enterprises ("NCFE"), who, along with its subsidiary entities

(the "NCFE Entities"), provided virtually all of the financing

for DCHC's acquisitions and the debtors' operations.[3]

    In a lengthy opinion reported as Alberts v. Tuft (In re

Greater Southeast Cmty. Hosp. Corp. I), 333 B.R. 506 (Bankr.

D.D.C. 2005), and accompanying order, the court granted in part

and denied in part various motions to dismiss Alberts's First

_____

    [2] Even though Melvin Redman was sued in the Second Amended
Complaint, the references in this decision to the "defendants"
and the "D & O Defendants" do not include Redman.  This
proceeding has been stayed as to Redman as explained in n.4,
infra, and the decision accordingly does not address the claims
against him.

    [3] All of the D & O Defendants except Parrett and Krauss are
protected by a partial release provided in the debtors' joint
plan of reorganization.  The plan caps the liability for the
former defendants at $10 million.  The court will refer to these
defendants as the "Partially Released Defendants" where necessary
to distinguish them from Parrett and Krauss.

Amended Complaint, but granted Alberts leave to amend his
complaint to correct certain technical pleading defects.
Alberts's Second Amended Complaint has once again prompted
multiple motions to dismiss raising numerous (and occasionally
overlapping) arguments concerning a labyrinthine complaint.

I

The court described the pertinent background facts in this
case in some detail in its previous opinion regarding the
defendants' earlier motions, and will not recapitulate them here.
See In re Greater Southeast Cmty. Hosp. Corp. I, 333 B.R. at 514-
15.  Suffice to say, Alberts is the trustee of the DCHC
Liquidating Trust, an entity created pursuant to the debtor's
plan of reorganization and charged with prosecuting all causes of
action formerly belonging to DCHC or its affiliated debtors.

In the instant proceeding, Alberts alleges that the D & O
Defendants breached their fiduciary duties of care and loyalty by
allowing DCHC and its subsidiary hospitals to undertake
additional debt in a fiscally irresponsible manner and by
misusing corporate assets.  He further alleges that the Law Firm
Defendants either aided and abetted some of these fiduciary
breaches or committed malpractice by signing off on various
opinion letters that contained factual statements the Law Firm
Defendants knew or should have known to be false and that allowed
the debtors and the NCFE Entities to close on their transactions.

3

In its prior opinion, the court dismissed almost all of the
counts alleged in the First Amended Complaint against the D & O
Defendants because the complaint did not connect those defendants
to the decisions made by DCHC's subsidiaries or the allegedly
wasteful decisions made by DCHC itself.  Id. at 522-27.  Only
Count II of the First Amended Complaint, in which Alberts alleged
that the D & O Defendants breached their fiduciary duties of care
and loyalty by allowing Tuft and Redman to use corporate charter
jets instead of commercial air lines, survived the defendants'
motions to dismiss, and that count survived only with respect to
Tuft in his capacity as an officer.  Id. at 527.[4]  The court also
dismissed all of Alberts's claims against DCHC's former directors
because those claims alleged breaches of the fiduciary duty of
care and DCHC's directors were shielded from liability for

---

[4] Count II also survived as to Redman, id. at 527 n.24, but
this decision does not address the claims against Redman.  Redman
and his wife filed for bankruptcy relief in the District of
Arizona, forcing Alberts to file a separate adversary proceeding
in that court.  Alberts v. Redman (In re Redman), Adv. Pro. No.
05-00313 (Bankr. D. Ariz.).  By a twist of fate, that adversary
proceeding has been transferred to this court so that it can
resolve a motion to approve a settlement agreement reached by the
Redmans and Alberts.  Alberts v. Redman (In re Redman), Adv. Pro.
No. 06-10040 (Bankr. D.D.C.).  The court's determination of the
reasonableness of that agreement will almost certainly turn at
least in part on the conclusions reached in the instant decision
because the allegations made against Redman in the complaint
against him mirror those made against the D & O Defendants in
this proceeding.  Nonetheless, the fact remains that Redman is
protected by the automatic stay arising from his own bankruptcy
case unless and until Alberts successfully moves for relief from
the stay in the Arizona bankruptcy court.

fiduciary breaches of that nature under the terms of the articles of incorporation of DCHC's predecessor.  Id. at 527-28.

With respect to the Law Firm Defendants, the court held that Alberts could pursue a cause of action for malpractice based on the Law Firm Defendants' allegedly negligent preparation of opinion letters used by DCHC to secure additional financing from the NCFE Entities, but concluded that he could not pursue a claim against those defendants based on business advice given by the Law Firm Defendants because attorneys owe no special duty of care with respect to financial advice.  Id. at 528-31.[5]  Finally, the court preserved Alberts's fraudulent conveyance claims, which are premised on the same underlying facts as his malpractice claim. Id. at 531-32.[6]

Because Alberts filed his First Amended Complaint prior to

---

[5]  The court pondered whether the Law Firm Defendants' failure to warn DCHC of the breaches of fiduciary duty allegedly committed by its officers and directors could itself be construed as malpractice, but held that the question was moot because Alberts did not allege properly that the D & O Defendants breached any fiduciary duties relating to the financing provided by the NCFE Entities.  In re Greater Southeast Cmty. Hosp. Corp. I, 333 B.R. at 530.  The court dismissed Alberts's "aiding and abetting" count for the same reason.  Id. at 529.

[6]  In reaching these conclusions, the court rejected the Law Firm Defendants' affirmative defenses of res judicata and judicial estoppel, In re Greater Southeast Cmty. Hosp. Corp. I, 333 B.R. at 532-34, held that Alberts could invoke the protections of 11 U.S.C. § 108(a) to extend the deadline to raise his claims of breach of fiduciary duty and malpractice, id. at 534-38, and declined to consider whether Alberts was barred from asserting malpractice claims against the Law Firm Defendants under the doctrine of in pari delicto.  Id. at 538-39.

the filing of the D & O Defendants' motions to dismiss, the court
granted him leave to amend his complaint with respect to those
defendants.  The court also invited the Law Firm Defendants to
file a motion for a more definite statement pursuant to Fed. R.
Civ. P. 12(e) (as incorporated by Fed. R. Civ. P. 7012)--an
invitation the Law Firm Defendants eventually accepted.
Following the filing of the Second Amended Complaint, which
included Alberts's response to the Law Firm Defendants' Rule
12(e) motions, the defendants filed the instant motions.

## II

The legal standard governing the defendants' motions is the
same as that in the last go-round.  Under Fed. R. Civ. P.
12(b)(6) (as incorporated by Fed. R. Bankr. P. 7012), the court
must dismiss the Second Amended Complaint if it "fail[s] to state
a claim upon which relief can be granted," but the "complaint
need only set forth 'a short and plain statement of the claim,'
Fed. R. Civ. P. 8(a)(2), giving the defendant fair notice of the
claim and the grounds upon which it rests."  Kingman Park Civic
Ass'n v. Williams, 348 F.3d 1033, 1040 (D.C. Cir. 2003).
"However, the court need not accept inferences drawn by
plaintiffs if such inferences are unsupported by the facts set
out in the complaint."  Kowal v. MCI Communications Corp., 16
F.3d 1271, 1276 (D.C. Cir. 1994). Finally, affirmative defenses
"may be raised by pre-answer motion under Rule 12(b) when the

6

facts that give rise to the defense are clear from the face of the complaint." Smith-Haynie v. District of Columbia, 155 F.3d 575, 578 (D.C. Cir. 1998).

Because the claims alleged by Alberts against the Law Firm Defendants depend in part on the viability of his claims against the D & O Defendants, the court will look to the propriety of the latter claims before assessing the sufficiency of his claims against Epstein Becker and Kutak Rock. Before proceeding any further, however, the court must address the theory of harm espoused by Alberts (i.e., that the defendants increased the debtors' insolvency) in light of the Third Circuit's recent decision in Seitz v. Detweiler, Hershey & Associates, P.C. (In re CitX Corp.), 448 F.3d 672 (3d Cir. 2006).

A.   Deepening Insolvency Revisited

Many of the claims raised by Alberts assume that DCHC and its subsidiary companies were harmed by the progressive increase in the companies' debt during the tenure of the D & O Defendants. Because the debtors were insolvent for much of this time (according to Alberts, some of them were never solvent), the main victim of the defendants' conduct was not DCHC, but its creditors, whose chances of recovering on their claims lessened with each new debt. Alberts lacks standing to pursue causes of action held by the debtors' individual creditors. See In re Greater Southeast Cmty. Hosp. Corp. I, 333 B.R. at 517-21. Thus,

7

he must articulate an injury separate and apart from the mere existence of the debtors' debt to pursue the instant proceeding.

Alberts attempts to resolve this dilemma by resorting to the theory of damages known as "deepening insolvency."  This theory holds that the acquisition of debt by an insolvent corporation can harm the corporation as well as its creditors by making it more difficult for the corporation to run a profitable business without resorting to bankruptcy.  See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 349-50 (3d Cir. 2001) ("Lafferty").[7]  It also forces companies to expend their resources in the repayment of debt, thereby heightening the risk of corporate dissolution through a chapter 7 or so-called "liquidating chapter 11" bankruptcy case.  Id.

The parties argued at length in the previous round of briefing about the validity and nature of the deepening

---

[7]  The harm occurs only where the corporation lacks the assets or income to pay off the loan.  As at least one commentator has noted, a company's acquisition of debt, by itself, is a "balance sheet neutral" transaction for the company because the company receives cash or other assets equal to the debt incurred (not accounting for interest).  See generally Sabin Willett, The Shallows of Deepening Insolvency, 60 Bus. Law. 549 (2005).  The harm to the corporation comes from the artificial prolongation of the defective business model employed by the company, which ultimately causes the company to go further "into the red" rather than dissolve or reorganize itself to be a productive, profitable business.  Where the corporation is capable of paying off the loan, there is no undue prolongation of the company's current business model at the expense of its future potential and therefore no real "deepening" of the company's insolvency.  See In re Greater Southeast Cmty. Hosp. Corp. I, 333 B.R. at 523 n.17.

insolvency theory.  Ultimately, this court, relying heavily on
the Lafferty decision as well as Chief Judge Bernstein's decision
in Kittay v. Atlantic Bank of New York (In re Global Serv. Group,
LLC), 316 B.R. 451 (Bankr. S.D.N.Y. 2004), and District Judge
Kaplan's decision in Bondi v. Bank of America Corp. (In re
Parmalat), 383 F. Supp. 2d 587 (S.D.N.Y. 2005), held that the
deepening of an insolvent corporation's debt could be harmful to
the corporation as well as its creditors, but declined to
recognize a separate tort to address this harm when other, pre-
existing causes of action work just as well.  In re Greater
Southeast Cmty. Hosp. Corp. I, 333 B.R. at 516-17.

Since the court issued its opinion in October, the Third
Circuit has had occasion to reflect on its ruling in Lafferty.
In CitX, the Third Circuit considered whether an accountant for
an internet company could be held liable for the deepening
insolvency of the company where the accountant was allegedly
negligent in his review of the company's finances.  448 F.3d at
674.  The Third Circuit clarified that, notwithstanding its
descriptions of deepening insolvency as a "type" or "theory" of
injury in Lafferty, id. at 677 (quoting Lafferty, 267 F.3d at
349), it had never held that deepening insolvency was "a valid
theory of damages for an independent cause of action."  Id. at
677.  The court also concluded that "a claim of negligence cannot
sustain a deepening[]insolvency cause of action."  Id. at 681.

9

These conclusions give the court serious pause.[8]  Although
CitX involved different facts,[9] and although the decision is not
binding on this court, the Third Circuit's reinterpretation of
Lafferty contradicts the conclusions reached by this court in its
earlier opinion, thereby calling into question the court's
reliance on that case in that opinion.  The court has therefore
been especially careful in its review of the CitX decision.

Having conducted this review, the court remains convinced
that it reached the right result in its prior opinion.  There is
no way to make sense of Lafferty without concluding that the
deepening of a company's insolvency can be harmful; otherwise,
the Lafferty court could not have concluded that fraudulent

_____

[8]  Epstein Becker filed a line attaching the CitX decision
on May 31, 2006, but neither it nor any other defendant has moved
for reconsideration of the court's prior opinion.  The court's
consideration of the CitX decision is made out of an abundance of
caution and a desire to ensure that the court reaches the right
result and provides the parties with a sufficient understanding
of its views regarding the vexatious topic of deepening
insolvency.

[9]  In CitX, the debtor company's accountant supposedly
deepened the debtor's insolvency by approving financial
statements that allowed the debtor to solicit funds from
investors despite its financial distress, which allowed the
struggling company to continue operating and, through the
subsequent machinations of its management, acquire more debt.
The Third Circuit found this theory of harm too attenuated to
state a claim for negligence, concluding that "[a]ny increase in
insolvency (i.e., the several million dollars of debt incurred
after the $1,000,000 investment) was wrought by CitX's
management, not by [the defendant]."  CitX, 448 F.3d at 677.  In
contrast, Alberts alleges that the D & O Defendants, with the
assistance of the Law Firm Defendants, directly increased the
debt load of the debtors.

10

conduct leading to the deepening of a company's insolvency
constitutes tortious activity.  Nor is this court aware of any
common law principle holding that an injury sustained as a result
of one tort (fraud) is somehow not an injury when it is caused by
a different tort (negligence), as the CitX court seems to
suggest.  The cause of an injury might determine whether a tort
occurred, but it does not determine whether the injured person
suffered an injury in the first place.

     The court is equally unmoved by the Third Circuit's decision
to restrict recoveries for deepening insolvency to actions
involving fraud.  If deepening insolvency were treated as a
separate cause of action rather than as a theory of harm, it
would make sense to require a higher threshold of scienter than
mere negligence lest the tort expose directors and third parties
to a standard of care that they otherwise would never have owed
in the first place.  Cf. Drabkin v. L & L Constr. Associates,
Inc. (In re Latin Inv. Corp.), 168 B.R. 1, 4-5 (Bankr. D.D.C.
1993).[10]  CitX attempted to resolve this inherent problem (i.e.,
the danger that the scienter requirement for the "tort" of

_____

     [10]  If a third party gives advice that encourages corporate
management to deepen the corporation's insolvency, the third
party ought to be held responsible for an independent tort of
deepening the corporation's insolvency only if that third party
knows that her advice will further a tort.  See Restatement
(Second) of Torts § 876(b) and comment d.  To the extent that the
court suggested in Latin Investment that knowledge of a
fraudulent (versus negligent) tortious act is required, it went
too far.  168 B.R. 1 at 4-5.

deepening insolvency would be unduly broad) by imposing a fraudulent intent requirement instead.

The Lafferty court, however, did not fix its star upon the notion that deepening insolvency was a tort. Instead, it concluded that the accumulation of debt by an insolvent entity could, in certain circumstances, be harmful to the corporation. Lafferty, 267 F.3d at 349-50.[11] These injuries can occur as a result of management's negligence just as easily as they can due to management's fraud, and management (unlike a third party with no special relationship to the company) owes a duty of care to its corporate client. The link made by the CitX court between deepening insolvency and fraudulent intent is therefore an arbitrary one unless one makes the equally arbitrary determination that deepening insolvency is a (hitherto unknown) tort of its own, in which case officers and directors who, without engaging in fraud, breach--even grossly breach--their

---

[11] The Lafferty court described this harm as follows:

> [T]he incurrence of debt can force an insolvent corporation into bankruptcy, thus inflicting legal and administrative costs on the corporation. . . . When brought on by unwieldy debt, bankruptcy also creates operational limitations which hurt a corporation's ability to run its business in a profitable manner. . . . In addition, prolonging an insolvent corporation's life through bad debt may simply cause the dissipation of corporate assets.

Lafferty, 267 F.3d at 349-50 (citations omitted).

duty of care in a harmful manner would be insulated from their wrongdoing.

Rather than attempt to "discover" a separate common law tort which must then be neutered, this court prefers to treat deepening insolvency as the theory of harm that it was always meant to be, and will rely on other, more established (not to mention less convoluted) common law causes of action to ascertain whether the defendants in this case have engaged in a legal wrong for which Alberts is entitled to recover. Unless and until this court is told differently by a higher court in its own circuit, deepening insolvency will remain a viable theory of damages in this jurisdiction regardless of whether the injury occurred as a result of negligence or fraud.

This is not to suggest that the damages sought by Alberts are an accurate gauge of the injuries suffered by the debtors due to their alleged deepening insolvency. Alberts seeks to recover for "the increased amount of insolvency suffered by the [d]ebtors" (Compl. ¶ 370). This calculation might have represented a fair valuation of the harm caused to the <u>creditors</u> of DCHC (assuming that the debt was never repaid), but Alberts has no standing to protect creditors' interests. Instead, he will need to prove that DCHC and its subsidiary corporations were actually harmed by the defendants' allegedly excessive borrowing

habits, and then quantify that harm.[12]  The damages arising from
these injuries (if proven) may be larger or smaller than the
amount of excess debt acquired by the debtors, but they will
almost certainly not be the same.[13]

    B.   Claims Against the D & O Defendants

    Having resolved the question of harm, the court now turns to
the allegations of wrongdoing against the D & O Defendants.
Unlike the First Amended Complaint, where Alberts attempted to
hold each and every D & O Defendant liable for any and all of the

---

   [12]  Put another way, Alberts will need to quantify the
impact of the debt accumulated by the debtors due to the
defendants' actions on the debtors' business operations, not the
amount of debt incurred.  Specifically, he will need to show that
the debtors' chances of falling into bankruptcy increased due to
the defendants' actions (and then quantify the costs of
bankruptcy for the debtors), that the defendants' conduct
prevented the debtors from performing in a profitable manner (and
then quantify the cost to the debtors caused by that impairment),
or that the defendants' actions forced the debtors to dissipate
corporate assets that would have been retained otherwise (and
then quantify the value of those assets).  As the court noted in
Latin Investment, these calculations "pose serious problems" for
a plaintiff like Alberts, 168 B.R. at 5, "but should not in
[themselves] affect the decision as to dismissal."  Id.  Although
Alberts does not spell out the specific harms caused by the
debtors' excessive deepening insolvency (see, e.g., Compl.
¶¶ 240-292 (referring only to proximate injury); id. at ¶ 319
("injury this significant debt would cause")), the court can
infer such harms for purposes of the defendants' motions from the
alleged fact that the debtor filed bankruptcy only after its
debts reached massive levels.

   [13]  If the evidence shows that the debtors would have been a
failure no matter how well DCHC's management behaved (an
admittedly unlikely prospect given that all but one of the
debtors have successfully reorganized), Alberts may not be able
to recover anything at all.

wrongs allegedly done to any of the debtors, the Second Amended
Complaint is much more precise.  Nevertheless, the D & O
Defendants' arguments, if completely successful, would result in
the dismissal of all counts against them with the exception of
Count II as it applies to Tuft, which this court has already
concluded is a valid claim.

      1.   <u>Claims relating to the debtors' deepening
insolvency</u>

Count I of the Second Amended Complaint seeks to impose
liability on various D & O Defendants for their alleged breaches
of their duty of care in driving DCHC and its subsidiary
hospitals deeper into debt to the NCFE Entities, but is limited
to those D & O Defendants who allegedly breached their fiduciary
duties as officers of the various debtors.  Count III, alleging
breach of the fiduciary duty of loyalty, also relates to the
funding provided by the NCFE Entities, but includes Parrett and
Krauss, who served only as directors for DCHC, as well as other
D & O Defendants in their capacities as officers and as
directors.  The D & O Defendants move to dismiss both counts with
respect to every named defendant.

      (a)   <u>Breach of the fiduciary duty of care
(Count I)</u>

"The directors of Delaware corporations have a triad of
primary fiduciary duties: due care, loyalty, and good faith."

15

Emerald Partners v. Berlin, 787 A.2d 85, 90 (Del. 2001).[14]  "With respect to the obligation of officers to their own corporation and its stockholders, there is nothing in any Delaware case which suggests that the fiduciary duty owed is different in the slightest from that owed by directors."  David A. Drexler et al., Del. Corp. Law and Practice § 14.02 (Rel. No. 16, 2003) (quoted in In re Walt Disney Co., 2004 WL 2050138, *3 (Del. Ch. Sept. 10, 2004)).  Thus, officers as well as directors may be liable for harms suffered by a corporation if the harm was caused by an officer's breach of fiduciary duty.  See, e.g., Stanziale v. Nachtomi (In re Tower Air, Inc.), 416 F.3d 229, 239-41 (3d Cir. 2005) (holding that complaint properly alleged claims for breach of fiduciary duty by corporation's officers as well as its directors).

"[G]ross negligence is the applicable legal standard for a corporate director's breach of the duty of care under Delaware law."  Official Comm. of Unsecured Creditors of Teu Holdings, Inc. v. Kemeny (In re Teu Holdings, Inc.), 287 B.R. 26, 32 (Bankr. D. Del. 2002) (citing Brehm v. Eisner, 746 A.2d 244, 259 (Del. 2000)).  This standard "appears to be synonymous with engaging in an irrational decisionmaking process."  In re Tower

---

[14]  Because DCHC was incorporated in Delaware, the fiduciary duties of its officers and directors are defined by the laws of that jurisdiction.  See Pagonis v. Donnelly, 929 F. Supp. 459, 460 (D.D.C. 1995).

Air, Inc., 416 F.3d at 241.  It "signifies more than ordinary inadvertence or inattention[,]" Jardel Co. v. Hughes, 523 A.2d 518, 530 (Del. 1987), but "is nevertheless a degree of negligence, while recklessness connotes a different type of conduct akin to the intentional infliction of harm."  Id.

"In Delaware, the merits of a business decision are considered separately from the process used to reach that decision."  In re Tower Air, Inc., 416 F.3d at 240.  "Due care in the decisionmaking context is process due care only."  Brehm, 746 A.2d at 264 (emphasis in original).  "The [threshold] question is whether the process employed [in making the decision] was 'either rational or employed in a good faith effort to advance corporate interests.'"  In re Teu Holdings, Inc., 287 B.R. at 33 (quoting In re Caremark Int'l, Inc., 698 A.2d 959, 967 (Del. Ch. 1996)) (emphasis in original).

Alberts repeatedly alleges that Tuft, Talbot, and Mounce signed documents in their capacity as officers of the various debtors without fully informing themselves of the consequences of those actions and at a time when the defendants knew or should have known that their actions would harm the companies they purported to represent (Compl. ¶¶ 239-62, 264-67, 269-73, 275-91).  Viewed in isolation, these allegations are perhaps too conclusory to support a cause of action for breach of fiduciary duty.  But there is plenty of detail in earlier paragraphs, which

17

describe at length the circumstances surrounding and consequences of the actions taken by these defendants.

For example, paragraphs 42 through 74 of the complaint describe the incurring of debt by DCHC subsidiary Hadley Corp., under the aegis of Tuft and Talbot, resulting in a negative net equity position for Hadley Corp. of $46 million by July of 2001 (Compl. ¶ 72) compared to a purchase price of $8.8 million in 1992 (Compl. ¶ 42).  First, Hadley Corp. allegedly decided to sell certain equipment and then lease that equipment back from NCFE at a cost of $6,980,475.00 in required payments over 60 months as a means of repaying $3,300,000.00 due to NCFE--an arrangement that required Hadley Corp. to pay over time $3,680,475.00 more than the $3,300,000.00 in debt originally owed (Compl. ¶¶ 46-47).  After all but 8 months were left on the first equipment lease (that is, after all but $930,730.00 of the $6,980,475 in monthly payments had come due), Hadley Corp. extended the lease at a cost of $3,206,522.40 in required payments over 60 months, a net additional cost of $2,275,792.40 (that is, $3,206,522.40 less $930,730.00) (Compl. ¶ 48).  In sum, Hadley Corp. incurred $5,956,267.40 <u>more</u> debt through its two lease agreements with NCFE than it owed prior to the signing of

those agreements.[15]  Even without taking into account that the

effective interest rates that the lease-back payments represented

appear to have been exceedingly high,[16] the complaint can be read

as alleging that the increased debt obligations, when combined

with other debts incurred, served artificially to prolong an

unprofitable operation well past the point of insolvency, and to

drive Hadley Corp. deeper and deeper into insolvency.

Second, Hadley Corp. allegedly sold its accounts receivables

to an NCFE subsidiary in exchange for advances on those

receivables (Compl. ¶ 50).  The NCFE subsidiary charged "Program

Costs" as well as incidental fees relating to its administration

of the funding program.[17]  Rather than pay off the difference

between the amounts advanced by the NCFE subsidiary and the

amounts collected on the receivables (which could never totally

satisfy the debt owed to the NCFE subsidiary due to the Program

---

[15]  Hadley Corp. entered into a separate lease agreement
with an NCFE subsidiary at a cost of $130,403.28 (Compl. ¶ 59).
This agreement was also amended for an additional cost of
$169,596.72 (Compl. ¶ 60).

[16]  For example, the first lease back arrangement's required
payments equate to $3.3 million required to be repaid over 5
years with interest at a rate exceeding 34.6% per annum.  By
March 31, 1999, the amount of principal owed, assuming lease
payments had been kept current, would have stood at roughly
$820,250.00.  The required payments under the second lease back
arrangement equate to $820,250.00 repaid over 5 years with
interest at a rate exceeding 76% per annum.

[17]  Alberts alleges that the NCFE Entities charged on 12% of
their purchase commitments per annum in "Program Costs" and
another 1% per annum in "commitment fees" (Compl. ¶ 52).

Costs and incidental fees), Hadley Corp. sat by while successive
NCFE Entities assumed Hadley Corp.'s debt and then entered new
agreements with the successor entities to continue the funding
program (Compl. ¶¶ 57-58, 61).  Indeed, Alberts alleges that the
agreements were extended and expanded from an initial purchase
commitment of $2.5 million to a final commitment of $209.7
million, more than forty times the balance of Hadley Corp.'s
accounts receivable and more than ten times its yearly net
revenues (Compl. ¶¶ 63-64).[18]

Third, between October 14, 1999, and July 16, 2001, Hadley
Corp. allegedly borrowed funds from NCFE Entities on three
occasions, and the most plausible reading of the complaint is
that these loans started at $7,585,986.00, with each loan rolled
over into the next loan, and with the loan balance standing at
$7,503,332.60 in July of 2001 when the last loan was made (Compl.
¶¶ 68-69, 71).[19]  The first loan from NCFE was secured by Hadley
Corp. and DCHC common stock; the second note included a cross-
obligation clause making all of Hadley Corp.'s affiliates liable
for Hadley Corp.'s debts (Compl. ¶ 70).  These loans were

---

[18]  Bearing in mind that Hadley Corp. was not repaying its
debt, and assuming an aggregate purchase of $209.7 million by the
NCFE Entities, the 13% per annum in fees owed would have
resulted, in a one-year period, in an additional $27,261,000
being owed to the NCFE Entities, more than three times the $8.8
million purchase price of Hadley Hospital.

[19]  However, the complaint might be read as alleging that
three separate loans aggregating $20,153,650.00 were made.

20

undersecured because all of the debtors, including Hadley Corp., were insolvent by this point in time.

Alberts alleges similar and, in some instances, more egregious conduct with respect to the other debtors.  He alleges that all of DCHC's subsidiaries entered into accounts receivables funding agreements with the NCFE Entities like the ones entered into by Hadley Corp., only that, with respect to Pacifica Corp., the NCFE Entities extended at least $19,800,000.00 more than the accounts receivables provided in available collateral.[20]  He alleges that Pine Grove Corp. borrowed $3,806,663.89 directly from the NCFE Entities,[21] that Michael Reese Corp. borrowed upwards of $50 million from the NCFE Entities (when the hospital itself was worth less than $40 million),[22] that Greater Southeast

---

[20]  The $19,800,000 figure is composed of the $16.3 million and $3.5 million figures derived from, respectively, paragraphs 80 and 81 of the Second Amended Complaint.

[21]  Pine Grove Corp. allegedly purchased Pine Grove Hospital for only $4.9 million (Compl. ¶ 88).  The direct loans made by NCFE alone would have consumed approximately 78% of the hospital's total value.

[22]  Alberts alleges that Michael Reese Corp. borrowed $4 million from one of NCFE's subsidiaries outright, then issued a cognovit promissory note in the amount of approximately $1.2 million to the same subsidiary that was amended less than seven months later to increase the liability on the note to $50 million (Compl. ¶¶ 117, 122-23).  Alberts also alleges that Michael Reese Corp. obtained a $2,765,000.00 letter of credit through the machinations of NCFE and obtained a $12 million loan and $2 million line of credit from third party lenders in exchange for a subordination of claims held by one of the NCFE Entities (Compl. ¶¶ 124 and 125).

Corp. borrowed $26 million from the NCFE Entities, and that DCHC itself borrowed $5 million directly from NCFE and entered into a $75 million revolving promissory note with one of the NCFE Entities (Compl. ¶¶ 93, 96, 101, 104, 117, 122-23, 134, 141, 143-45).  Finally, he alleges that all of the debtors except for Pine Grove Corp. executed equipment leases similar to the leases executed by Hadley Corp.  For example, in the case of Michael Reese Corp., equipment was sold for $10.8 million and leased back for 60 monthly payments aggregating $14,381,677.00--a net loss of $3,581,677.00 (Compl. ¶ 115)--around the same time that Tuft executed a cross-default agreement in favor of NCFE Entities making Michael Reese Corp. liable for the debts of all of its affiliates (Compl. ¶ 116).[23]

According to Alberts, the NCFE Entities advanced approximately $216 million to the debtors pursuant to accounts receivables funding agreements when the value of the debtors' accounts receivables was approximately $42 million at the time of the Greater Southeast Community Hospital ("Greater Southeast")

---

[23]  The equipment lease represents $10.8 million required to be repaid over 60 months at an interest rate of 11.9% per annum. Although that may not have been an excessive interest rate, the amount of debt payments must be considered in light of the additional debt that management was causing Michael Reese Corp. to incur.  Alberts alleges that Michael Reese Corp. also executed separate "leaseback" agreements with the NCFE Entities totaling $1,891,312.10, but he does not list the value of the equipment, leaving the court to guess as to whether and to what extent Michael Reese Corp. might have suffered a loss through these agreements (Compl. ¶¶ 119, 126).

purchase, made fraudulent payments to the debtors of almost $280 million based on intentionally erroneous valuations of the debtors' accounts receivables, and overfunded DCHC and its subsidiaries with uncollateralized advances totaling $486 million by July of 2002 (Compl. ¶¶ 138, 147, 149). The debtors' joint insolvency allegedly ballooned from a net deficit of $205 million on December 1, 1999, to a staggering $460 million as of December 31, 2002 (Compl. ¶¶ 151-54). Because many of the notes executed by individual debtors made those debtors liable for the debts of all the DCHC subsidiaries, the deepening insolvency of the debtors as a whole increased the liability of each individual debtor.

Any reasonable businessperson worth her salt would have carefully considered the obvious negative consequences of incurring additional debt of the magnitude acquired by each and every one of the debtors, yet this is precisely what Tuft, Talbot, and Mounce allegedly failed to do when they signed the agreements and notes--some of which required the issuance of patently false "solvency certificates" (Compl. ¶¶ 62, 78, 81, 83, 100, 133, 241, 249-50, 257)--that plunged the debtors deeper and

deeper into insolvency.[24]  Moreover, many of these alleged

actions were taken at a time when the debtors' relationship with

NCFE was described by others associated with the debtors as

"incestuous" and "a black hole" (Compl. ¶ 161).

Such conduct, if it actually occurred, cannot be excused as

"ordinary inadvertence or inattention," Jardel Co., 523 A.2d at

530, but rather constitutes gross negligence of the highest

order.[25]  Alberts alleges facts sufficient to state a claim for

breach of the fiduciary duty of care by Tuft, Talbot, and Mounce.

Because Alberts has stated a claim for breach of the

fiduciary duty of care with respect to Tuft, Talbot, and Mounce,

---

[24]  Ordinarily, the fiduciary duties of the director or
officer of a wholly-owned subsidiary corporation run to the
parent corporation, not the subsidiary itself.  Trenwick America
Litig. Trust v. Ernst & Young LLP, 2006 WL 2333201, *27 (Del. Ch.
Aug. 10, 2006) ("Trenwick").  Once the subsidiary corporation
is insolvent, however, those duties transfer to the subsidiary and
its creditors.  Claybrook v. Morris (In re Scott Acquisition
Corp.), 344 B.R. 283, 286-88 (Bankr. D. Del. 2006); accord
Trenwick, 2006 WL at *28 & n.96.

[25]  The D & O Defendants argue that a corporation's
directors and officers are under no affirmative obligation to
force a company into bankruptcy and liquidate.  The court agrees
that directors and officers have no "blanket duty to liquidate
upon insolvency[] untempered by the business judgment rule,"
Official Comm. of Unsecured Creditors of RSL Com Primecall, Inc.
v. Beckoff (In re RSL Com Primecall, Inc.), 2003 WL 22989669, *8
(Bankr. S.D.N.Y. Dec. 11, 2003), but a director or officer who
behaves so irresponsibly as to breach a fiduciary duty is not
protected by the business judgment rule.  Emerald Partners, 787
A.2d at 91.  Under those circumstances, the court has an
obligation to ascertain whether the transactions entered into by
the defendants were fair to the debtors, and, if not, hold the
defendants responsible for the damages arising from their
misconduct.

the business judgment rule does not apply, at least at this stage

of the proceeding.  Emerald Partners, 787 A.2d at 91.[26]  Assuming

that Alberts can produce evidence in support of his allegations,

the burden will rest with these three defendants to show that the

transactions caused by their actions were "entirely fair" to the

respective debtors.  Id.; accord Williams v. Geier, 671 A.2d

1368, 1384 (Del. 1996); Cede & Co., 634 A.2d at 361.

Susan Engelhard presents a more complicated situation.

Unlike the other defendants named in Count I, Engelhard is not

alleged to have violated any fiduciary duties by "failing to

inform herself" of the consequences of the debtors' deepening

insolvency, nor does Alberts allege that she failed to stop these

transactions due to some oversight on her part or out of any

self-interest (which would have stated a claim for breach of the

fiduciary duty of loyalty).  Instead, Alberts finds fault in

Engelhard's failure to stop the transactions causing the debtors'

deepening insolvency from occurring after reviewing the documents

---

[26]  "The business judgment rule is a presumption that 'in
making a business decision the directors [and officers] of a
corporation acted on an informed basis, in good faith and in the
honest belief that the action taken was in the best interests of
the company [and its shareholders]'."  Emerald Partners, 787 A.2d
at 90 (quoting Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)).
"The rule posits a powerful presumption in favor of actions taken
by the directors [and officers] in that a decision made by a
loyal and informed board [and the corporation's officers] will
not be overturned by the courts unless it cannot be 'attributed
to any rational business purpose.'"  Cede & Co. v. Technicolor,
Inc., 634 A.2d 345, 361 (Del. 1993).

consummating those transactions (Compl. ¶¶ 274, 292), without alleging that she failed to inform herself of the consequences of her decision or overlooked critical aspects of that decision. This amounts to a challenge to the <u>substance</u> of her decision not to prevent the company from acquiring more debt--a challenge that the business judgment rule does not permit.[27]

It might seem counterintuitive to conclude that Tuft, Talbot, and Mounce, who are alleged to have failed to consider the consequences of the debtors' accumulation of debt while insolvent, are not protected by the business judgment rule, while Engelhard, who is alleged to have considered these consequences and permitted the transactions anyway, would be protected. But this just underscores how narrow Alberts's claim truly is. Alberts does not allege that Tuft, Talbot, and Mounce breached their fiduciary duties by causing the debtors to acquire additional debt while insolvent; he alleges that they breached their fiduciary duties by engaging in this conduct without fully considering the impact of their actions. It is their alleged

---

[27] Engelhard may be dismissed on an alternative ground as well. Other than making the conclusory allegation that Engelhard failed to stop the transactions, Alberts fails to allege facts establishing that Engelhard's powers and duties as an officer gave her control of the transaction, thereby enabling her to prevent the transaction. As discussed in part II.B.2, <u>infra</u> ("Other claims of breach of fiduciary duty"), this court already held that with respect to Counts II and IV a breach of fiduciary duty does not lie unless the officer had the power to prevent the transaction. <u>In re Greater Southeast Cmty. Hosp. Corp. I</u>, 333 B.R. at 526.

procedural shortcomings, not the wisdom of their substantive decisions, that make out a claim for breach of the fiduciary duty of care.

If Alberts cannot produce any evidence after the close of discovery that Tuft, Talbot, and Mounce failed to inform themselves adequately of the consequences of their decisions to sign the various instruments that allegedly deepened the debtors' insolvency, his claims against them for breach of the fiduciary duty of care will be susceptible to a motion for summary judgment because the business judgment rule will apply. For today, his allegations are sufficient. The court will dismiss Count I with respect to Susan Engelhard, but not with respect to Paul Tuft, Donna Talbot, or Erich Mounce.[28]

(b)   Breach of the fiduciary duty of loyalty (Count III)

"Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests." Guth v. Loft, Inc., 5 A.2d 503, 510 (Del. 1939).

---

[28] One question that cannot be resolved at this stage in the proceeding is whether any of the named defendants could have actually prevented these transactions from occurring in their capacity as officers. If the documents allegedly signed by Tuft, Talbot, and Mounce were done at the behest of the board of directors for their respective companies, it could be argued that the actions of these defendants in their capacity as officers were not the cause of the harm suffered by the debtors. For now, the court must take Alberts at his word when he alleges that each of the named defendants could have stopped the transactions consummated by their signatures had that been their desire.

Instead, "the best interest of the corporation and its
shareholders [must] take precedence over any interest possessed
by a director, officer[,] or controlling shareholder and not
shared by the shareholders generally." Cede & Co., 634 A.2d at
361.  For that reason, "Delaware law distinguishes between the
duty of loyalty and the duty of care." Graham v. Taylor Capital
Group. Inc. (In re Reliance Sec. Litig.), 91 F. Supp. 2d 706, 732
(D. Del. 2000).

"A breach of loyalty claim requires some form of self-
dealing or misuse of corporate office for personal gain." Id.
"The classic example . . . is when a fiduciary either appears on
both sides of a transaction or receives a personal benefit not
shared by all shareholders." In re Walt Disney Co. Derivative
Litig., 2005 WL 2056651, *33 (Del. Ch. Aug. 9, 2005).  In
addition, consciously making a decision that is not in the
corporation's best interests--abdicating one's directorial
duties--is a breach of the fiduciary duty to act in good faith,
see In re Walt Disney Co. Derivative Litig., 2006 WL 1562466,
**26-27 (Del. June 8, 2006), which is just another permutation of
the fiduciary's duty of loyalty. Cede & Co., 634 A.2d at 363.
In this case, Alberts alleges that the D & O Defendants engaged
in self-dealing in their capacities as officers and directors of
various debtors.

(i)   <u>Breach of duty of loyalty by officers</u>

In Count III of the Second Amended Complaint, Alberts alleges essentially the same bad acts by Tuft, Talbot, and Mounce in their capacity as officers for the various debtors that he alleged in Count I, but adds the new allegation that these defendants intentionally abdicated their fiduciary duties to the debtors in favor of the NCFE Entities.  The D & O Defendants argue that Count III should be dismissed in its entirety because Alberts fails to plead the necessary element of self-dealing. They argue that Count III seeks to hold the named defendants responsible for their failure to inform themselves of necessary information, which states a claim for negligence rather than disloyalty.  <u>See</u> part II.B.1.a, <u>supra</u>.

The court finds this reading of the Second Amended Complaint unduly narrow.  Earlier in the complaint, Alberts alleges that "DCHC and the [s]ubsidiaries operated through a centralized cash management system whereby receivables collected at the operating affiliate level were immediately swept up to DCHC," where they were used to "pay [DCHC's] management expenses" (Compl. ¶ 39). He then alleges that "these funds also went to pay[] the undue loans and other improper consideration" received by some of the D & O Defendants (Compl. ¶ 39), which meant that "[w]ithout NCFE, the D & O Defendants could not have received such excessive salaries, bonuses[,] and gift loans" (Compl. ¶ 40).  In other

29

words, the debtors' management benefitted personally from the very same loans that harmed the debtors themselves.

Viewed against the backdrop of these earlier allegations, Alberts's refrain that the defendant officers named in Count III "abdicat[ed] [their] responsibilities in favor of NCFE" (Compl. ¶ 315) suggests that the officers acted intentionally and for their own financial benefit: the act of prioritization itself requires intent. And while Alberts's description of the officer defendants' failures to inform themselves is typically associated with breach of care allegations, the description as a whole could be read to allege that the officer defendants refused to consider the effects of their actions on the debtors because of their own selfish interests, a conscious act of disloyalty that amounts to an abdication of directorial duties. Whether framed as a breach of the duty of loyalty or the duty of good faith, count III states a cause of action with respect to Tuft, Talbot, and Mounce in their role as officers of the various debtors.

(ii) <u>Breach of duty of loyalty by directors</u>

"When a board of directors's loyalty is questioned, Delaware courts determine whether a conflict has deprived stockholders of a 'neutral decision-making body.'" <u>Cinerama, Inc. v. Technicolor, Inc.</u>, 663 A.2d 1156, 1170 (Del. 1995) (quoting <u>Oberly v. Kirby</u>, 592 A.2d 445, 467 (Del. 1991)). Consequently, "the [p]laintiff must 'plead facts demonstrating that a <u>majority</u> of a board that

approved the transaction in dispute was interested and/or lacked

independence'" to state a claim for breach of the fiduciary duty

of loyalty by a board member.  <u>Continuing Creditors Comm. of Star</u>

<u>Telecomm. Inc. v. Edgecomb</u>, 385 F. Supp. 2d 449, 460 (D. Del.

2004) ("<u>Edgecomb</u>") (emphasis in original).[29]  "[I]t is usually

necessary to show that the director was on both sides of a

transaction or received a benefit not received by the

shareholders" for a particular director to be considered

"interested."  <u>Id.</u>

     Alberts does not allege that a majority of the directors for

the various subsidiaries of DCHC were interested parties (or

_____

     [29]  Alberts takes issue with this rule, citing <u>Walt Disney</u>
for the proposition that "[w]here a director consciously ignores
his or her duties to the corporation, thereby causing economic
injury to its stockholders, the director's actions are either
'not in good faith' or involve 'intentional misconduct.'" <u>In re</u>
<u>Walt Disney Co. Derivative Litig.</u>, 825 A.2d at 290.  The quoted
language actually refers to the duties of a <u>hypothetical</u> director
in general, and does not imply that the rule set forth in
<u>Edgecomb</u> is wrong.  Nor is this rule some random bit of Delaware
<u>arcanum</u>.  It is an extension of the basic principle of tort law
that an alleged tortfeasor must be the proximate cause of the
harm alleged for liability to attach.
     It is of course conceivable that a single director could,
under the right circumstances, breach her fiduciary duty of
loyalty (<u>e.g.</u>, if an interested director concealed pertinent
information from disinterested members of the board prior to a
vote).  But most of the time, the only way that a director can
breach one of her fiduciary duties is by voting in a disloyal or
grossly negligent manner.  If one director votes in such a
manner, but the other directors vote in the same way without
compromising their fiduciary duties, then the one interested
director's vote is not the proximate cause of the harm caused by
the board's collective vote because the other, disinterested
directors would have voted the same way even if the interested
director had not voted at all.

31

consciously abdicated their fiduciary duties), nor does he
provide a list of those directors.[30]   Thus, his allegations
against Tuft in his capacity as a director for Hadley Corp.,
Pacifica Corp., Pine Grove Corp., Michael Reese Corp., and
Greater Southeast Corp. must fail (Compl. ¶¶ 315-19).[31]   Alberts
does allege, however, that "Krauss and Tuft, who were both
interested and lacked independence with respect to Kutak Rock and
NCFE respectively, always constituted a majority of the Board of
Directors of DCHC" (Compl. ¶ 312).   These allegations appear to
satisfy the Edgecomb requirement that a majority of a board be
interested.

    Appearances can be deceiving.   It is true that Alberts
alleges that a majority of the DCHC board was "always"
interested; however, the interests of the various directors and,
more importantly, the actions allegedly taken in pursuit of those

_____

    [30]   Alberts provides a list of directors and officers for
each debtor in his opposition to the Law Firm Defendants' motion
to dismiss, but the list is obviously either incomplete or wrong,
as it does not include Krauss, and in any event was not
incorporated by reference in the Second Amended Complaint.

    [31]   Alberts tried to avoid similar pleading deficiencies in
his First Amended Complaint by arguing that DCHC "dominated" its
subsidiaries and that the court should pierce the corporate veil
of these subsidiaries.   See In re Greater Southeast Cmty. Hosp.
Corp. I, 333 B.R. at 522.   The court rejected that argument
because the "facts" supporting the argument were presented in
Alberts's opposition to the D & O Defendants' motion to dismiss
the First Amended Complaint rather than in the complaint itself.
Id. at 523.   Notwithstanding this ruling, Alberts has once again
omitted the factual allegations necessary to warrant a piercing
of the corporate veil.

32

interests are not entirely the same as between Tuft and Krauss. Alberts alleges that Krauss violated his fiduciary duty of loyalty, first, "by sending legal transactional work to Kutak Rock . . . only because of his affiliation with that firm" (Compl. ¶ 334).  Because Alberts does not allege that a controlling majority of DCHC's board of directors held a self-serving interest in contracting with Kutak Rock for the performance of legal work, this aspect of Count III must be dismissed as to Krauss.

Alberts further alleges that "Krauss approved NCFE-financing agreement after financing agreement while a board member of DCHC, <u>creating substantial business for Kutak Rock</u>, but without considering the consequences that those agreements had on DCHC." (Compl. ¶ 226) (emphasis added).  These facts suffice to permit an inference that Krauss was an interested party with respect to the NCFE Entities' lending practices.  Alberts alleges that Tuft violated his fiduciary duty of loyalty by executing various notes securing loans from NCFE in favor of his own financial interests in seeing NCFE's wishes satisfied (Compl. ¶ 320).  Accordingly, both Tuft and Krauss were interested parties regarding the NCFE loans such that the board's decisions regarding those loans were

not by a disinterested majority.[32]

The allegation against Krauss regarding his approval of NCFE financing fails to state that Krauss knowingly or intentionally disregarded the consequences of his conduct out of his own self-interest.  The closest Alberts comes to making this latter allegation is in Count III, where he alleges that Krauss "abdicated his responsibilities to DCHC in favor of Kutak Rock" (Compl. ¶ 334), but this "abdication" concerns Krauss's decision to "send[] legal transactional work to Kutak Rock" (Compl. ¶ 334) (emphasis added), not his decision to vote in favor of "financing agreement after financing agreement" so that he could generate legal work.

Nevertheless, it suffices that Krauss had a self-interest even though he is not alleged to have consciously acted on that self-interest in voting to approve NCFE financings:

> [W]here a self-interested corporate fiduciary
> has set the terms of a transaction and caused
> its effectuation, it will be required to
> establish the entire fairness of the
> transaction to a reviewing court's
> satisfaction.

Mills Acquisition Co. v. Macmillan, Inc., 559 A.2d 1261, 1279 n.27 (Del. 1989) (quoting AC Acquisitions v. Anderson, Clayton & Co., 519 A.2d 103, 111 (Del. Ch. 1986) (internal citations

---

[32] Parrett and Krauss dispute Alberts's allegation that Tuft and Krauss together constituted a majority of DCHC's board, but that is a factual argument better left for resolution at the summary judgment stage.

omitted)).[33]  As the Delaware Supreme Court explained in

Weinberger v. UOP, Inc., 457 A.2d 701 (Del. 1983):

> When directors of a Delaware corporation are
> on both sides of a transaction, they are
> required to demonstrate their utmost good
> faith and the most scrupulous inherent
> fairness of the bargain. . . . The
> requirement of fairness is unflinching in its
> demand that where one stands on both sides of
> a transaction, he has the burden of
> establishing its entire fairness, sufficient
> to pass the test of careful scrutiny by the
> courts.

Id. at 710 (citations omitted).  "In such circumstances, a

director cannot be expected to exercise his or her independent

business judgment without being influenced by the [favorable or]

adverse personal consequences resulting from the decision."

---

[33]  Although much of the Delaware case law on breach of the
fiduciary duty of loyalty by directors arises in the context of
actions to set aside mergers or other transactions, breaches of
fiduciary duty are addressed in equity even when damages are the
ultimate appropriate form of relief, Harman v. Masoneilan Int'l,
Inc., 442 A.2d 487, 499-500 (Del. 1982), and the rules regarding
application of the "entire fairness" requirement do not appear to
vary depending on the form of relief ultimately imposed.

Rales v. Blasband, 634 A.2d 927, 936 (Del. 1993).[34]  All that is

necessary is that the director is aware of his self-interest, and

that is fairly inferred from the complaint in the case of Krauss.

There are other problems with the allegations made against

Tuft in his capacity as a director at DCHC.  Alberts refers only

to supposedly burdensome lending arrangements executed by Tuft in

his capacity as president of DCHC (Compl. ¶ 320), and alleges

elsewhere in the Second Amended Complaint that Tuft was

authorized by the DCHC corporate bylaws to execute at least one

of these agreements without board approval (Compl. ¶ 144).

Nevertheless, it is possible to construe the allegations against

Tuft as stating that he violated both his duties as a director

and as an officer or violated one or the other in the

alternative.  Count III will not be dismissed against Tuft.

That leaves Rebecca Parrett, the final ex-DCHC director

named in Count III.  At the relevant times, Parrett was a

director of NCFE (Compl. ¶ 228).  Alberts alleges that she was

---

[34] See also Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984),
overruled on other grounds by Brehm, 746 A.2d at 253 (for
business judgment rule to apply "directors can neither appear on
both sides of a transaction nor expect to derive any personal
financial benefit from it in the sense of self-dealing"); Guth v.
Loft, Inc., 5 A.2d 503, 510 (Del. 1939) ("The rule that requires
an undivided and unselfish loyalty to the corporation demands
that there shall be no conflict between duty and self-
interest."); cf. Harman v. Masoneilan Int'l, Inc., 442 A.2d at
500 n.25 (in contrast to a claim of deceit or fraud, a claim for
breach of fiduciary duty does not require an actual intent to
deceive when one is placed in an advantageous position to
another).

appointed to DCHC's board of directors "to ensure that the DCHC Board of Directors complied with the demands and concerns of NCFE, whether or not those demands and concerns were consistent with the best interests of DCHC" (Compl. ¶ 227).  This falls short of alleging that Parrett viewed that as the purpose and acted pursuant to that purpose, but as a director of both corporations, she had a duty to act in the best interests of both corporations.  Alberts further alleges that Parrett harmed DCHC by (1) approving the purchase of Greater Southeast Community Hospital "through its subsidiary, Greater Southeast Corp, including various NCFE-financing agreements related thereto," (2) approving the sale of real property from DCHC to NCFE, and (3) "approving a limited cognovit guaranty for the debts of a DCHC affiliate to an NCFE Entity" (Compl. ¶ 228).

This is the second time that Alberts has found fault in Parrett's alleged vote in favor of the purchase of Greater Southeast Community Hospital.  The court dismissed this claim in the First Amended Complaint because the purchase of Greater Southeast Community Hospital, by itself, could not have harmed any of the debtors unless Alberts alleged that the hospital was not worth its purchase price.  In re Greater Southeast Cmty. Hosp. Corp. I, 333 B.R. at 523 n.17.  Despite giving Alberts the opportunity to amend his complaint, this crucial detail is still missing.

Instead, Alberts now alleges that the "asset purchase agreement" for the Greater Southeast purchase "included onerous terms and unreasonable fees" (Compl. ¶ 330).  The only agreements described earlier in the complaint regarding the purchase are the agreements with NCFE regarding the financing of the purchase. The primary financing agreement was between Greater Southeast Corp. and NCFE, not DCHC and NCFE (Compl. ¶ 134).  As the court has noted on several occasions now, the directors of DCHC cannot be held responsible for the actions of DCHC's subsidiaries absent factual allegations that would allow the court to pierce the corporate veil.  See n.31, supra.  Allegations concerning decisions made by Greater Southeast Corp. about the purchase cannot give rise to a claim against Parrett for breaching her duty of loyalty to DCHC, the only debtor of which she was a director.

However, DCHC was involved in the Greater Southeast purchase by way of its collateralized guaranty and stock pledge agreement (Compl. ¶ 135).[35]  Alberts further alleges that the D & O Defendants (including Parrett) "could have stopped the NCFE Entities from loaning money to DCHC and the Subsidiaries" and that they "knew or should have known that further loans would

---

[35]  It may be inferred that execution of those instruments was a predicate to the purchase being financed by NCFE, and presumably it is in that sense that Alberts alleges (Compl. ¶ 228) that Parrett approved the purchase as a director of DCHC.

38

harm DCHC through, among other things, the cross collateralization of debts" (Compl. ¶ 236).

While those allegations do not go so far as to allege that Parrett knew (as opposed to merely should have known) that the loans would harm DCHC, and thus does not establish that Parrett knowingly favored NCFE to the detriment of DCHC, Parrett's self-interest (as a board member of NCFE) requires that she show the entire fairness of any DCHC transaction with NCFE that she voted to approve (and that a disinterested majority of the DCHC board did not approve).[36]  Accordingly, Alberts has established a breach of loyalty with respect to Parrett's votes as a DCHC director regarding decisions relating to NCFE.

Parrett claims that pursuant to the settlement agreement executed by the debtors and the NCFE Entities (and their respective creditors' committees) incident to the confirmation of the plan in the debtors' bankruptcy cases (the "Settlement Agreement"), the debtors and their creditors released her from the claims now asserted against her.  Alberts contends that the Settlement Agreement released Parrett only from claims asserted against her in her capacity as a director of NCFE.  Paragraph 8

---

[36]  Alberts does not need to allege facts establishing a lack of entire fairness.  See part II.B.1.c, infra.  It is thus premature to address whether lack of knowledge of the adverse consequences of a transaction is relevant to the "entire fairness" inquiry or to the nature of damages to be awarded if the transactions was not entirely fair.

of the Settlement Agreement, provided in relevant part:

> The DCHC Debtors . . . hereby release . . .
> (y) the NCFE Debtors and each of their
> former . . . directors, . . . parent
> corporation(s), subsidiary corporation(s),
> any affiliate corporation(s), and any
> division(s), and each of their respective
> successors and assigns (but only in such
> respective capacities) and (z) [certain
> others]. . . of and from all . . . causes of
> action whatsoever of every name, nature, and
> description . . . .

(Emphasis added).

The use of "and" twice in the opening part of the clause (y)
list of released entities requires as a matter of plain meaning
that there are two sets of released entities: first,
"former . . . directors, . . . parent corporation(s), subsidiary
corporation(s), any affiliate corporation(s), and any
division(s)," and, second, each of the first set's "respective
successors and assigns (but only in such respective capacities)."
In other words, as a matter of grammar, the clause "only in such
respective capacities" modifies only the second set of released
entities--the successors and assigns of the first set of released
entities.  Accordingly, the language is plain and unambiguous.
See United States v. Ron Pair Enterprises, Inc., 489 U.S. 235,
242-43 (1989) (interpreting the effect of a comma on whether a
statutory provision was plain and unambiguous).  Beyond that, the
second use of the word "respective" (in the phrase "but only in
such respective capacities") can be read as referring to the

40

first use of the word "respective (in the phrase "respective
successors and assigns"), thus reinforcing the plain and
unambiguous meaning of the limitation.  The Settlement Agreement
elsewhere used limiting parentheticals that were more explicit in
specifying who was excluded from prior language.  For example,
clause (z) of paragraph 8 listed as released entities:

> the NCFE Committees and their attorneys,
> advisors and agents and each of the members
> of the NCFE Committees (but only in their
> capacity as members of the NCFE
> Committees)[.]

However, that does not suffice to surmount the plain meaning of
clause (y), arising from ordinary principles of grammar, as
restricting the critical clause "but only in such respective
capacities" to successors and assigns.  Indeed, the limiting
parenthetical in clause (z) applies only to the preceding
subgroup, thus reinforcing the interpretation of the limiting
parenthetical in clause (z) as applying only to successors and
assigns.  Furthermore, the limiting paragraph in clause (y) only
serves to reinforce the notion that the parties were aware of the
need to limit their releases to the capacity by which a released
entity was described if the release was to be limited to that
capacity.

The natural reading of clause (y) is thus that the
successors and assigns of the first set of released entities were
to be released only in their capacities as successors and

41

assigns, but that the release of the first set of released

entities (the NCFE Entities and former directors of the NCFE

Entities) was not so limited, and thus applied to whatever

capacity in which such entities might be sued.  The limitation of

the release in the case of the second set of released entities

was necessary to make clear that such an entity (for example, a

company acquiring the assets of NCFE) would not escape DCHC

claims that existed against such a successor or assign

independent of the entity's status of being a successor or

assign.  Moreover, the phrase "but only in such respective

capacities" would not make sense when applied to a "subsidiary

corporation" or a "division" (which are both part of the first

set of entities listed in clause (y)).

Furthermore, when it came to NCFE Entities releasing DCHC

debtors and their former directors, paragraph 11 of the

Settlement Agreement included language identical in pertinent

part to paragraph 8, but added a proviso that "the foregoing does

not release . . . claims . . . against any

former . . . directors . . . of the NCFE Debtors."  That proviso

would have been unnecessary had the language "but only in such

respective capacities" been applicable to the release of DCHC

debtors and their former directors as well as to the release of

their successors and assigns.

The parties, in other words, viewed the language "but only

42

in such respective capacities" in paragraph 11 as inapplicable to released directors, with the consequence that, in the absence of a proviso to the contrary, the NCFE debtors' release of a DCHC director released the director even if he was sued as an NCFE director (a director of a debtor granting the release).  The mirror-image language in paragraph 8 must be construed the same way: the DCHC debtors' release of a former director of NCFE released the director even if the director was sued as a DCHC director (a director of a debtor granting the release).  This interpretation of paragraph 8 is particularly required because paragraph 10 of the Settlement Agreement acknowledged that the DCHC debtors had consulted with legal counsel and "execute[d] this Agreement[] with the intent of effectuating the extinguishment of the [released claims] and <u>of having this release be interpreted as broadly as possible</u>" (emphasis added).

Finally, Alberts does not dispute that if Parrett is held liable for her acts as a DCHC director, NCFE would be required to indemnify Parrett.  Because NCFE was entitled to a release "as broad[] as possible," it is doubtful that the parties intended that NCFE be exposed to indemnification claims arising from DCHC claims against Parrett as a DCHC director that would indirectly expose it to a DCHC claim.  The intention that there was to be no such potential for indemnification claims is demonstrated by the inclusion in paragraph 11 of the proviso that NCFE retained the

43

right to sue a released director of DCHC to the extent it sued
him as a director of NCFE as contrasted with paragraph 8, which
did not include a similar provision preserving a right in DCHC to
sue a released NCFE director if it sued the director as a
director of DCHC.  NCFE naturally would have viewed paragraph 8
as releasing Parrett fully such that there were no longer any
claims against Parrett that could impose an indemnification
obligation on NCFE.[37]  For all of the foregoing reasons, the
Settlement Agreement released Parrett from any claims against
her.

(c)  Statute of limitations

    The Partially Released Defendants argue that most if not all
of the wrongdoing allegedly committed by Tuft, Talbot, and Mounce
in Counts I and III fall outside the three-year statute of
limitations for breach of fiduciary duty actions in the District

---

    [37]  Additionally, interpreting the Settlement Agreement as
fully releasing Parrett is consistent, at least in the case of
the disloyalty claim, with the spirit of the release of Parrett
as a director of NCFE.  The disloyalty claim against Parrett
arises from her simultaneously being a director of NCFE, the very
capacity for which even Alberts concedes there was a release, and
for which there was no carve-out when Parrett might be sued as a
director of DCHC.

of Columbia.  D.C. Code § 12-301(8) (2001).[38]  Alberts tries to

get around this obstacle to liability by relying on the so-called

"adverse domination" doctrine.[39]  "Under the doctrine, a cause of

action will be tolled during the period that a plaintiff

corporation is controlled by wrongdoers."  Resolution Trust Corp.

v. Gardner, 798 F. Supp. 790, 795 (D.D.C. 1992) ("Gardner").

    Gardner applied the adverse domination rule using federal

common law rules of accrual and tolling to resolve a federal

question case.  Id. at 794 n.4.  Although a subsequent district

court decision relied on Gardner in applying the rule to an

action arising under District of Columbia law, see BCCI Holdings

(Luxembourg), S.A. v. Clifford, 964 F. Supp. 468, 480-81 & n.9

(D.D.C. 1997) ("BCCI Holdings"), it is unknown whether D.C.

---

[38]  Alberts suggests that other states' statutes of
limitations might apply to some of the conduct alleged in his
complaint, but "[b]ecause the District of Columbia choice-of-law
rules treat statutes of limitations as procedural, the rules
require application of the District of Columbia statute of
limitations."  Jin v. Ministry of State Security, 254 F. Supp. 2d
61, 68 (D.D.C. 2003) (citing A.I. Trade Fin., Inc. v. Petra Int'l
Banking Corp., 62 F.3d 1454, 1458 (D.C. Cir. 1995)); see also
DiCello v. Jenkins (In re Int'l Loan Network, Inc.), 160 B.R. 1,
17 (Bankr. D.D.C. 1993) (applying forum state's choice-of-law
rules).  Even if the rules were considered substantive, the
applicable statute of limitations would be that of Delaware,
which also bars filings more than three years after an alleged
breach of fiduciary duty occurs.  Pagonis, 929 F. Supp. at 460;
10 Del. Code § 8106.

[39]  Alberts also argues that the statute of limitations in
this case was tolled by the so-called "continuing tort" doctrine.
The court does not need to address this argument because of its
ruling on Alberts's adverse domination argument.

courts would recognize the doctrine as an exception to the running of the statute of limitations.  The court concludes that they would for two reasons.

First, the theory of adverse domination has been accepted in an impressive number of jurisdictions.  See Gardner, 798 F. Supp. at 794-95 (collecting cases).[40]  This list includes Maryland, which shares its common law with the District of Columbia.  West v. United States, 866 A.2d 74, 79 n.1 (D.C. 2005).  In Hecht v. Resolution Trust Corp., 635 A.2d 394 (Md. 1994), the Maryland Court of Appeals held that "the doctrine of adverse domination is not inconsistent with Maryland legislation or with the previous decisions of this [c]ourt" in applying the rule to the facts before it.  Id. at 406.  The court based its conclusion in part by looking at "Maryland agency law," id. at 405, and cited Lohmuller Bldg. Co. v. Gamble, 154 A. 41 (1931), a case decided before the D.C. Court of Appeals was a twinkle in Congress's eye. Hecht, 635 A.2d at 405.  This suggests that the principles informing the court's decision in Hecht have the same force in the District of Columbia.

_____

[40]  See also, e.g., In re American Cont'l Corp./Lincoln Savings and Loan Sec. Litig., 794 F. Supp. 1424, 1453 (D. Ariz. 1992); Loranger Mfg. Corp. and the Comm. of Unsecured Creditors of Loranger Mfg. Corp. v. PNC Bank (In re Loranger Mfg. Corp.), 324 B.R. 575, 581-82 (Bankr. W.D. Pa. 2005); Resolution Trust Co. v. Scaletty, 891 P.2d 1110, 1112 (Kan. 1995); Resolution Trust Co. v. Grant, 901 P.2d 807, 814 (Okla. 1995); Clark v. Milam, 452 S.E.2d 714, 718 (W. Va. 1994).

Second, the court finds the rationale behind the adverse domination rule, particularly as set forth by the Maryland Court in Appeals in <u>Hecht</u>, to be persuasive.  As the <u>Hecht</u> court explained:

> A corporation can act only through its agents. . . . And notice to an officer or agent is notice to the corporation "where the officer or agent in the line of his duty 'ought, and could reasonably be expected, to act upon or communicate the knowledge to the corporation.'" . . . In an adverse domination situation the agent cannot reasonably be expected to act upon or communicate knowledge of his own wrongdoing to the corporation. Therefore, in most cases, corporate board members and officers control the corporation and constitute an insuperable barrier to a corporation's ability to acquire the knowledge and resources necessary to bring suit against the directors and officers.

<u>Id.</u> (quoting <u>Int'l Bankers Life Ins. Co. v. Holloway</u>, 368 S.W.2d 567, 580 (Tex. 1963) (quoting 3 William M. Fletcher, <u>Fletcher</u>

<u>Cyclopedia of Corporate Law</u> § 793 (Perm. Ed. 1986))).[41]

In other words, the doctrine serves as a practical extension of long-established principles of agency law. "Because, in most cases, the defendants' control of the corporation will make it impossible for the corporate plaintiff independently to acquire the knowledge and resources necessary to bring suit," the adverse domination rule "presumes that actual notice will not be available until the corporate plaintiff is no longer under the

_____

[41] There is some authority for the proposition that the imputation of an agent's knowledge is an irrebuttable presumption under D.C. common law, which "cannot be avoided by showing that the agent did not in fact communicate his knowledge." <u>Bowen v. Mount Vernon Sav. Bank</u>, 105 F.2d 796, 799 (D.C. Cir. 1939); <u>accord</u> <u>Kramer-Tolson Motors, Inc. v. Horowitz</u>, 157 A.2d 625, 626 (D.C. 1960). This rule undercuts the notion that the same common law would recognize a presumption <u>against</u> imputation based on the theory that a majority of a corporation's board of directors would not give actual notice of their wrongdoing to the corporation. Nonetheless, even courts construing the imputation principle to be "irrebuttable" refuse to apply it when the agent acts outside the scope of her authority. <u>See</u> <u>Bowen</u>, 195 F.2d at 799 ("Where an agent common to two parties betrays one in favor of the other the second, of course, cannot charge the first with the agent's knowledge."); <u>NB Specialty Products, Inc. v. BMR, Inc.</u>, 1987 WL 13963, *8 n.3 (D.D.C. July 6, 1987) (agent acting outside scope of authority "is not irrebuttably presumed to know what its purported agent was doing"). Wrongdoing for personal gain unquestionably falls outside the scope of an agent's authority.

Whether described in terms of the likelihood of actual notice to the corporate principal or in terms of the agent's scope of authority, the general rule of imputation in the District of Columbia, as in Maryland, is that knowledge is not imputed if the agent is acting in a manner adverse to the interests of the principle. Therefore, the same reasons that argue in favor of a presumption of adverse interest when a majority of the company's board engages in wrongdoing should apply regardless of the rationale underlying the general imputation doctrine.

48

control of the erring directors." Id.  "This prevents the
culpable directors from benefitting from their lack of action on
behalf of the corporation." Id. at 408.

The Partially Released Defendants fall back on the argument
that the doctrine of adverse domination should not be applied in
this case regardless of its general validity.  They may be right
eventually, though not for the reasons advanced.  The Partially
Released Defendants argue that Alberts fails to allege that the
D & O Defendants "have been active participants in wrongdoing or
fraud, rather than simply negligent," FDIC v. Dawson, 4 F.3d
1303, 1312 (5th Cir. 1993) ("Dawson"), when in fact Count III of
the Second Amended Complaint describes "active . . . wrongdoing"
in some detail.  It is not clear from the Second Amended
Complaint, however, that Alberts can prevail on this point
because he fails to name all of the necessary parties in
describing this "wrongdoing."

Under Hecht, the adverse domination presumption cannot be
invoked unless a majority of the board of directors is interested
in concealing the directors' and officers' harmful conduct.  See
Hecht, 635 A.2d at 408 (adopting the "disinterested majority"
version of the adverse domination doctrine).  This is because
"actual notice of a claim will not be possible until the
corporate plaintiff is no longer under the control of the

[interested] board members." Id. at 405.[42]  Once a disinterested
majority of directors arrive on the scene, normal laws of agency
apply, and the directors' knowledge is imputed to their corporate
principal.  Id. at 408.

Alberts does not allege that most of the directors for
DCHC's subsidiary companies were a party to the D & O Defendants'
alleged wrongdoing.  Instead, he conflates the separate corporate
identities of the various debtors as though they were a single
corporation under DCHC's control and argues that a majority of
DCHC's directors were "interested" (Compl. ¶ 312).  But without
any allegations that would permit the court to pierce the
debtors' corporate veils, there is no basis for the court to
treat these actions as occurring against one defendant.  See
Trenwick, 2006 WL at *22 (holding that a "[l]itigation [t]rust
may not assert claims on behalf of [subsidiary corporation]
against [the parent corporation's] board of directors without
piercing [the parent corporation's] veil in some manner").

If the instant proceeding were at the summary judgment
stage, Alberts's failure to adduce these facts would foreclose
his use of the adverse domination rule.  Fortunately for him, the
case is not yet at that point, and Alberts is not required by the
Federal Rules of Civil Procedure or their bankruptcy analog to

---

[42]  Correspondingly, the board as a whole will continue to
act outside the scope of its agency so long as a majority of the
board is adversely interested to the corporate principal.

plead exceptions to affirmative defenses raised by defendants in
a motion to dismiss.  <u>Deckard v. Gen. Motors Corp.</u>, 307 F.3d 556,
550 (7th Cir. 2002); <u>Dawson</u>, 4 F.3d at 1308.  The court will
defer ruling on the validity of the statute of limitations
defense at least until Alberts has a chance to provide affidavit
and documentary evidence in support of his adverse domination
theory.

2.    <u>Other claims of breach of fiduciary duty</u>

Counts II and IV of the Second Amended Complaint are breach
of duty and waste claims specific to Tuft and Dietlin.[43]  Count
II alleges that these defendants violated their fiduciary duties
of care by allowing DCHC to enter into contracts with a private
air line created by Tuft and Redman (the eponymous Tuft-Redman
Enterprises) to provide on-demand chartered transportation, and
(in the case of Dietlin) by failing to enforce the loan agreement
between DCHC and Tuft-Redman Enterprises.  Count IV alleges that

---

[43]  Count II also names Redman as a defendant, but the
automatic stay in place in Redman's own bankruptcy case
forecloses any consideration of it at this time.  <u>See</u> n.4, <u>supra</u>.

DCHC engaged in "corporate waste"[44] by forgiving millions of
dollars in loans to various DCHC officers, and seeks to hold Tuft
and Dietlin responsible for this waste.  The Partially Released
Defendants argue that these counts should be dismissed with
respect to Dietlin because (in their view) he is not alleged to
have been responsible for either of these decisions.

The court attempted to make clear in its prior opinion what
allegations must be made to state a claim against Tuft and
Dietlin for breach of fiduciary duty and waste:

> Unless a specific defendant officer had the
> power to prevent DCHC from contracting with
> Tuft-Redman Enterprises or forgiving millions
> of dollars in loans to corporate executives,
> that officer cannot be held responsible for

---

[44] As set forth in the court's prior opinion:

> This theory of fiduciary breach refers to "an
> exchange of corporate assets for
> consideration so disproportionately small as
> to lie beyond the range at which any
> reasonable person might be willing to
> trade.'" White v. Panic, 783 A.2d 543, 554
> (Del. 2001) (quoting Brehm v. Eisner, 746
> A.2d 244, 263 (Del. Ch. 2000)). "To prevail
> on a waste claim . . . , the plaintiff must
> overcome the general presumption of good
> faith by showing that the board's decision
> was so egregious or irrational that it could
> not have been based on a valid assessment of
> the corporation's best interests." Id. at
> 554 n.36.  "[T]he decision must go so far
> beyond the bounds of reasonable business
> judgment that its only explanation is bad
> faith." Stanziale v. Nachtomi (In re Tower
> Air, Inc.), 416 F.3d 229, 238 (3d Cir. 2005).

In re Greater Southeast Cmty. Hosp. Corp. I, 333 B.R. at 524.

> those actions.  Simply being an officer of
> the company is not enough.
> . . .
> [T]here is nothing in the [First Amended]
> Complaint specifying that either [Tuft or
> Dietlin] issued or could have issued the
> challenged loans . . . .  More importantly,
> there is nothing in the [First Amended]
> Complaint indicating that Mr. Tuft or Mr.
> Dietlin authorized the forgiveness of their
> own loans or that they had the authority to
> do so.  Without these allegations, [Alberts's
> corporate waste claim] must be dismissed with
> respect to Mr. Dietlin and Mr. Tuft . . . .

In re Greater Southeast Cmty. Hosp. Corp. I, 333 B.R. at 526.

The court went on to conclude that Count II of the First
Amended Complaint stated a claim for breach of fiduciary duty
against Tuft because it alleged that Tuft "made the decision to
use Tuft-Redman Enterprises rather than travel on commercial
carriers even though he knew commercial flights were cheaper and
without obtaining approval from the board of directors."  Id. at
527.  It dismissed Count II with respect to Dietlin for the same
reason that it dismissed the corporate waste count in totum:
Alberts did not allege proximate cause.

The court addresses Count IV of the Second Amended Complaint
first.  This count is more specific in its description of Tuft's
and Dietlin's wrongdoing than its analog in the First Amended
Complaint.  As to Tuft, Alberts repeatedly alleges that the DCHC
president issued and forgave loans to himself and other D & O
Defendants totaling millions of dollars for no consideration

whatsoever (Compl. ¶¶ 202-12).[45]  These new allegations in Count

IV suffice to state a claim against Tuft for corporate waste.

Contrary to the Partially Released Defendants' contentions,

Alberts does not need to take the extra step of spelling out the

obvious implication of his allegation that these loans were

forgiven--the term "forgiven" itself implies that the loans were

released <u>gratis</u>, and Alberts describes the forgiven loans

---

[45]  Alberts does not allege that Tuft issued loans without
regard to whether they could be repaid.  Instead, he alleges that
the approved loans "were not supported by valid consideration"
(Compl. ¶¶ 207-08).  The court gives no credence to these
conclusory legal assertions, particularly given the elementary
principle of contract law that a borrower's promise of repayment
is itself valid consideration for a loan.  <u>Restatement (Second)
of Contracts</u> § 71 and comment c.  Tuft can only be held
responsible for the forgiveness of loans, not their mere
issuance, although the damages caused by the wasteful act of
forgiveness may amount to the total amount of the loan itself.
Thus, allegations that Tuft approved loans to his stepdaughter
and older brother do not state a claim for corporate waste
because there is no good faith allegation that the loans were
forgiven (Compl. ¶ 212).
    Another deficient aspect of Alberts's waste allegations,
though not one flagged by the D & O Defendants, is that many of
the allegations made by Alberts refer vaguely to the fact that
certain loans "were forgiven" without ever specifying who forgave
the loans.  It is the court's job to adjudicate the D & O
Defendants' motion, not write it, so the allegations will stand
for now, but if Alberts cannot produce any evidence demonstrating
that Tuft was responsible for the forgiveness of the loans that
he issued after the completion of the discovery process, he will
be susceptible to summary judgment for the amounts listed in
connection with such allegations.

elsewhere as "gifts" (Compl. ¶ 344).[46]   A decision to simply wash
away a multi-million dollar debt is about as "exceptionally one-
sided" as a business decision can get.   White, 783 A.2d at 554.

    As regards Dietlin's liability under Count IV, paragraph 213
of the Second Amended Complaint states in pertinent part:

> Steve Dietlin, as DCHC CFO, was in charge of
> providing the paperwork for these "officer
> loans," including the promissory note, the
> check, the loan payment schedule[,] and,
> ultimately, the loan forgiveness schedule.
> As CFO, he was also responsible for ensuring
> that the required payments under the
> promissory notes were made, and, if they were
> not, Mr. Dietlin was responsible for
> enforcing the default provisions of the
> promissory notes, including late payment
> charges and default interest rate provisions.
> Steve Dietlin ignored those responsibilities.
> Upon information and belief, he did not
> enforce these notes against any of the
> borrowing parties.   Mr. Dietlin created
> promissory note after promissory note, with
> the full knowledge that many, if not all of

---

[46]   The Partially Released Defendants cite White and In re
Walt Disney Co. Derivative Litig., 2005 WL 2056651 (Del. Ch. Aug.
9, 2005), for the proposition that loans issued or payments made
to corporate officers do not suffice to state a claim for waste
unless the claimant can allege specific facts demonstrating that
no consideration was received for these transactions.   Neither
White nor Walt Disney involved the forgiveness of multi-million
dollar loans: in White, the alleged corporate waste was the
issuance of a loan to a corporate officer, not its forgiveness,
see White, 783 A.2d at 554-55, while Walt Disney did not involve
corporate loans to officers at all.   See In re Walt Disney Co.
Derivative Litig., 2005 WL at **38-39 (holding that payment of
non-fault termination package was not wasteful where directors
believed it to be in company's best interest to terminate
president but grounds did not exist to terminate the CEO for
cause).   It is the (alleged) fact that certain loans were
forgiven by Tuft that is tantamount to a transfer of property for
no consideration and therefore wasteful.   See n.45, supra.

> them, would never be repaid.  CFO Deitlin
> recognized that this lending practice was
> wrong, yet he continued to do it.

These allegations suffice to state a claim against Dietlin for breach of his fiduciary duty of care, albeit not as to all aspects of the loan transactions.  Alberts does not set forth a claim for corporate waste against Dietlin because he fails once again to allege that Dietlin authorized the forgiveness of these loans.  Further, Alberts has not alleged sufficient facts to establish a viable claim that Dietlin is liable for executing the loan papers and failing to object to the continued making of loans.  Alberts's allegations fail to establish that in so acting Dietlin was not simply implementing decisions of superiors that he lacked responsibility or authority to decline to follow or to question.  Nothing in the complaint, therefore, establishes that Dietlin's duties and powers required him not to execute the loan papers or required him to object to the continued making of loans.

However, Alberts's allegations concerning Dietlin's delinquent oversight and pursuit of those loans sets forth a claim for breach of the fiduciary duty of care.[47]  Alberts may have applied the wrong legal theory in describing Dietlin's conduct, but he has alleged facts that, if true, are worthy of

---

[47]  That Dietlin had no oversight and enforcement responsibility if a loan was forgiven does not relieve him of the duty to oversee and enforce the loan before it was forgiven.

legal recourse.  Similarly, in Count II of the Second Amended

Complaint, Alberts alleges that Dietlin "oversaw the financial

side of DCHC" (Compl. ¶ 343), but never attempted to collect on

the loan between DCHC and Tuft-Redman Enterprises, breaching his

duty to consider the best interests of DCHC (Compl. ¶ 305).  That

states a viable claim against Dietlin.

On the other hand, Alberts's inclusion of Dietlin in the

remainder of Count II (alleging breach of the fiduciary duty of

care in entering into an airline contract with Tuft-Redman

Enterprises and utilizing its expensive on-demand chartered

transportation) is woefully unsupported by the facts alleged

therein.  Alberts alleges only that Dietlin "negotiated the loan

for DCHC" and "draft[ed] the loan agreement between DCHC and

Tuft-Redman Enterprises" (Compl. ¶¶ 215, 305).[48]  This

allegation, by itself, does not state a claim for breach of the

fiduciary duty of care.  To do that, Alberts would need to allege

in good faith that Dietlin failed to fully inform himself of the

consequences of his decision to negotiate or draft such a loan or

otherwise carried out his duties as CFO in a grossly negligent or

---

[48]  Alberts alleges that the chartering of flights from
Tuft-Redman Enterprises "was often made by Mr. Tuft" (Compl.
¶ 219), but he never alleges that Dietlin chartered those
flights.  Although Alberts alleges that Dietlin oversaw the
financial side of DCHC, he does not allege sufficient facts to
establish that this placed a duty to inquire as to the
wastefulness of Tuft's decision to Tuft-Redman Enterprises upon
Dietlin.

disloyal way.  Alberts has already had one chance to amend his

complaint to correct this error and has chosen not to do so.

Further, Alberts does not allege that Dietlin made the decision

for DCHC to enter into the transaction with Tuft-Redman, and he

has once again failed to establish that Dietlin was not simply

implementing the instructions of superior officers who decided to

enter into the transaction between DCHC and Tuft-Redman.

    C.    <u>Claims Against the Law Firm Defendants</u>

    Alberts asserts essentially four causes of action against

the Law Firm Defendants based on the same conduct: legal

malpractice (Counts VI and VII),[49] a claim in the alternative for

aiding and abetting breach of fiduciary duties (Count V),[50] a

--------

    [49]   In Count VII, entitled "Breach [o]f Fiduciary Duty--
Violation [o]f D.C. Rules [o]f Professional Conduct and the
Nebraska Code of Professional Responsibility," Alberts alleges
that the Law Firm Defendants violated the D.C. and Nebraska rules
of professional conduct.  This is really just argument in support
of Alberts's malpractice count (Count VI), and will be treated as
such.  To the extent that the count sets forth allegations that
could serve as a basis for a separate cause of action, the court
will dismiss the count because Alberts did not obtain leave from
the court to amend his complaint in this fashion.  Fed. R. Bankr.
P. 7015(a); <u>Williams v. Spring/United Mgmt. Co.</u>, 232 F.R.D. 388,
391 (D. Kan. 2005)

    [50]   Alberts does not state that Count V is pled in the
alternative, but that is the only sensible interpretation of his
complaint.  The aiding and abetting count is largely duplicative
of the malpractice count(s).  It is useless unless the Law Firm
Defendants are found not to owe a duty of care to the debtors to
prevent the alleged misconduct of the D & O Defendants, in which
case they might still be liable for knowingly assisting the D & O
Defendants in the latter defendants' breach of their fiduciary
duties.

claim for the recovery of fraudulent transfers under 11 U.S.C.
§§ 544, 548, and 550 (Counts VIII-XIII), and separate requests
for disallowance or equitable subordination of claims filed by
the Law Firm Defendants (Counts XIV and XV).  All of the claims
turn on the Law Firm Defendants' allegedly negligent preparation
of opinion letters used to obtain financing from the NCFE
Entities and alleged failure to adequately warn the debtors of
the consequences of their deepening insolvency.  The Law Firm
Defendants dispute each and every claim, including a few that
survived their last round of motions to dismiss.

1.   <u>Legal malpractice claims (Counts VI and VII)</u>

(a)   <u>Legal advice</u>

Alberts alleged in his First Amended Complaint that the Law
Firm Defendants were negligent in their representation of the
debtors in part because they failed to advise the debtors of the
consequences of their deepening insolvency.  The court held that
these allegations did not state a claim for malpractice because
law firms owe no duty to their clients to provide sound business
advice and because Alberts did not plead facts that would allow
the court to infer that DCHC's officers and directors breached
their fiduciary duties with respect to overfunding by the NCFE
Entities.  <u>In re Greater Southeast Cmty. Hosp. Corp. I</u>, 333 B.R.
at 529-30.  Such allegations might have supported an inference
that the Law Firm Defendants committed malpractice by failing to

59

inform the debtors of those breaches of fiduciary duty.  Id.

Alberts now alleges facts that state a claim for breach of
fiduciary duty by at least some of the D & O Defendants with
respect to the debtors' deepening insolvency.  See part II.B.1,
supra.  Alberts does not, however, state that the Law Firm
Defendants knew or should have known that certain D & O
Defendants breached their fiduciary duties when they approved
allegedly harmful transactions with the NCFE Entities.  Instead,
he alleges only that the Law Firm Defendants knew or should have
known of the effects of the debtors' deepening insolvency.  As
the court explained in its prior opinion, "a company's
acquisition of additional debt, by itself, is not a legal
wrong . . . ."  In re Greater Southeast Cmty. Hosp. Corp. I, 333
B.R. at 530.  Deepening insolvency is not a tort, and a law
firm's knowledge that a corporate transaction is going to deepen
the corporation's insolvency does not mean that the law firm
knows that the corporation's fiduciaries are breaching their
duties of care or loyalty in approving such transactions.  Ergo,
the failure to advise the debtors of the consequences of
acquiring excess debt is not malpractice.

(b)  Opinion letters

The bulk of the allegations made by Alberts against the Law
Firm Defendants concerns opinion letters allegedly prepared by
the defendants that were necessary for the debtors to close on

60

various lending arrangements reached between them and the NCFE
Entities.  The allegations as re-stated in the Second Amended
Complaint are a far cry from the sensational accusations made in
the First Amended Complaint that the letters were basically
written by the NCFE Entities, see In re Greater Southeast Cmty.
Hosp. Corp. I, 333 B.R. at 530, which this court held to state a
claim for malpractice in its prior decision.  Id.

While Alberts relies upon the ruling of the court in its
prior decision to justify his malpractice claim, the Law Firm
Defendants look to the reasoning of that decision in arguing for
dismissal.  They urge the court to view the alleged errors in the
opinion letters as errors relating to business advice, which does
not fall within the scope of the attorney-client relationship.
See id. at 529.  They also argue that the errors in the opinion
letters provided by the Law Firm Defendants could not have been
the proximate cause of the debtors' deepening insolvency.

The letters in question fall into three categories.  First,
there are three letters prepared by Kutak Rock that, according to
Alberts, should not have been prepared without prior notification
to the corporate clients for each letter of the harms arising
from the decisions of the corporations' respective fiduciaries to
deepen the insolvency of the companies (Compl. ¶¶ 194-96).  The
court has said it before and will say it again: lawyers are not
responsible for the business decisions of their clients.  See

61

<u>Kan. Public Employees Ret. Sys. v. Kutak Rock</u>, 44 P.3d 407, 416-18 (Kan. 2002).  They may have a duty to inform corporate clients of any fiduciary breaches committed by the company's officers and directors, but they are neither obligated nor expected to second-guess the business judgments made by those fiduciaries, and it bears repeating that deepening insolvency itself does not constitute a tort.

Second, there are two letters prepared by Epstein Becker that purport to rely on factual assumptions that Epstein Becker allegedly knew or should have known were wrong, which Alberts characterizes as a breach of Epstein Becker's duty of care (Compl. ¶¶ 168, 172).  The court disagrees.  When a lawyer prepares legal opinions on the basis of assumed or hypothesized facts, she puts her client and anyone else reading the opinion on notice that she is not vouching for the veracity or accuracy of those facts.  That is the point of warning the reader that the facts are assumed in the first place.  No reasonable person could rely on such "facts."

Finally, Alberts alleges that there are several letters stating that the opinion's author had no reason to suspect that the information contained in the various certificates and agreements underlying each loan was inaccurate when the author knew or should have known that the information in those documents was false (Compl. ¶ 174 (relating to one letter prepared by

Epstein Becker), id. at ¶¶ 192, 197 (relating to several letters
prepared by Kutak Rock)).  These allegations have more bite to
them.  If an attorney certifies that certain facts are accurate
to the best of the attorney's knowledge when the attorney knew or
should have known that the facts were wrong, and her client
subsequently relies upon those facts to the client's detriment,[51]
the attorney is responsible for that harm.  In this respect, and
in this respect alone, the opinion letter "prong" of Alberts's
malpractice claim survives the Law Firm Defendants' motions to
dismiss unless an affirmative defense mandates dismissal.[52]

---

[51]   Epstein Becker contends that the debtors could not have
relied upon its opinion letters because the letters were written
for NCFE or one of its subsidiaries.  The letters may have been
written for NCFE, but Epstein Becker was acting as counsel for
the debtors when it wrote them, and both sides allegedly relied
upon them to close the transactions that deepened the debtors'
insolvency.  Epstein Becker's suggestion that the debtors could
not have relied upon the facts certified in these letters because
the debtors themselves knew that this certification was in error
is virtually indistinguishable from its in pari delicto argument,
which the court addresses below.

[52]   To be sure, if the malpractice claim were to survive
the affirmative defenses discussed later, Alberts would have a
tough row to hoe.  He would need to show that the Law Firm
Defendants did not exercise a reasonable standard of care in
reviewing the documents described in the supposedly erroneous
opinion letters, that the debtors relied on this specific
guarantee to close their deals with NCFE and its subsidiaries
(i.e., that the deals could not have closed had these
certifications not been there), and that these transactions
actually impaired the business operations of the debtors to some
degree.  This task might or might not prove to be possible in the
long run, but the court's duty under Rule 12(b)(6) is to
determine whether Alberts could succeed at trial, not
prognosticate whether he will succeed.

(c)   <u>Other conduct</u>

Finally, Alberts alleges that Epstein Becker "sponsored" the "misleading and false" testimony of NCFE CEO Lance Poulsen at a hearing before this court on November 11, 1999, and that Epstein Becker "assist[ed]" the D & O Defendants in their pursuit of a contract with the District of Columbia for millions of dollars that inured to the benefit of the D & O Defendants through their self-serving use of those funds (Compl. ¶¶ 175-80, 182-83).[53] There are no allegations that Epstein Becker knew that Poulsen's testimony was false or that it knew that the D & O Defendants were wasting their fiduciary's money, and therefore no allegations of wrongdoing.

In sum, Count VI survives the Law Firm Defendants' motions to dismiss (unless barred by one of the affirmative defenses discussed below) but only with respect to allegations concerning the preparation of those select opinion letters described above. All other allegations relating to the Law Firm Defendants' supposed malpractice will be dismissed.

2.   <u>Aiding and abetting breach of fiduciary duty
(Count V)</u>

In Count V of the Second Amended Complaint, Alberts alleges

---

[53]   Alberts also alleges that Epstein Becker employed Francis Smith, the former executive director of the D.C. Control Board, at DCHC's direction, and that DCHC actually paid Smith's salary (Compl. ¶ 181). Although the court finds this alleged arrangement puzzling, the necessary allegations of harm arising from the relationship are missing.

that the Law Firm Defendants aided the D & O Defendants in the
breach of the latter defendants' duties of care and loyalty to
the debtors.  "Aiding and abetting the breach of fiduciary duty
occurs when the defendant 'knows that the other's conduct
constitutes a breach of duty and gives substantial assistance or
encouragement to the other' nonetheless."  <u>Ehlen v. Lewis</u>, 984 F.
Supp. 5, 10 (D.D.C. 1997) (quoting <u>Halberstam v. Welch</u>, 705 F.2d
472, 477 (D.C. Cir. 1983)).  When the underlying tort is breach
of fiduciary duty, the third party must have "knowingly
participated in and substantially assisted the fiduciary's breach
of trust" through "affirmative conduct."  <u>Overseas Private Inv.
Corp. v. Industrial de Pesca, N.A., Inc.</u>, 920 F. Supp. 207, 210
(D.D.C. 1996).  "'[A]ssisting[] and failure to prevent[] are not
the same thing.'"  <u>Id.</u> (quoting <u>EEOC v. Illinois</u>, 69 F.3d 167,
170 (7th Cir. 1995)); <u>see also</u> <u>Ivanhoe Partners v. Newmont Mining
Corp.</u>, 535 A.2d 1334, 1344 (Del. 1987) (knowing participation in
breach of fiduciary duty required).

Although paragraph 353 of the Second Amended Complaint
alleges that the Law Firm Defendants "knowingly assisted and
participated in the[] breaches [of fiduciary duty] through their
representation of and action taken on behalf of DCHC and the
other Debtors whom they represented," that allegation falls short
of alleging that the Law Firm Defendants knew that the D & O
Defendants were breaching their fiduciary duties.  The court has

already noted that while Alberts alleges repeatedly that the Law

Firm Defendants "knew or should have known" about the debtors'

insolvency and the effects of the NCFE Entities' lending

practices on that insolvency--which does not equate to knowledge

of the commission of a tort because deepening insolvency alone is

not a tort--he never alleges that the Law Firm Defendants knew

that the D & O Defendants were breaching their fiduciary duties

(or engaged in any other tortious activity) when they decided to

sign off on the allegedly harmful loans and agreements.  See part

II.C.1.a, supra (holding that such lack of knowledge bars a

malpractice claim for failure to advise the debtors regarding

their deepening insolvency).  Without that necessary element,

Count V must be dismissed.

> 3.   Fraudulent conveyance and disallowance claims
>       (Counts VIII-XV)

Counts VIII-XV of the Second Amended Complaint are based on

the same factual allegations that underpin Alberts's malpractice

and aiding and abetting claims.  The counts state a claim only

insofar as they refer to the third category of opinion letters

referenced above, but not with respect to the first category,

which involved only a failure to advise the client of the

insolvency effects of transactions, or the second category,

which, the court concluded, could not support a claim for

malpractice because no reasonable person could have relied upon

the allegedly erroneous assumptions of fact contained therein,

and which contained no erroneous opinion of law.[54]

By and large, the Law Firm Defendants move to dismiss these counts only to the extent that the court dismisses Alberts's malpractice claim.[55]  The only novel argument is Kutak Rock's contention that Count XV should be dismissed to the extent that it seeks equitable subordination of Kutak Rock's claim against the debtors pursuant to 11 U.S.C. § 510(c).

"Under 11 U.S.C. § 510(c)(1), the court may apply principles of equitable subordination to 'subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim.'"  In re Garfinckels, Inc., 203 B.R. 814, 825 (Bankr. D.D.C. 1996).  Alberts must plead three elements to warrant relief under § 510(c):

> (1) the claimant must have engaged in some
> type of inequitable conduct;
> (2) the misconduct must have resulted in
> injury to the creditors or conferred an
> unfair advantage on the claimant; and
> (3) equitable subordination of the claim must
> not be inconsistent with the provisions of

---

[54] Because Alberts only alleges a breach of a duty of care in the preparation of certain opinion letters, those same letters are the only possible basis for the recovery of attorneys' fees under § 544 and § 548.  Consequently, the only fees that could be recovered pursuant to those statutes would be those fees deriving from the generation of the contested letters.

[55] Epstein Becker requests a more definite statement from Alberts with respect to Count XIV.  In light of the instant decision, which winnows the allegations against Epstein Becker significantly, it should be easier for Epstein Becker to understand what allegations are made against it.  The court will deny the request at this time.

the Bankruptcy Code.

Id.

Alberts pleads each of these elements.  Assuming arguendo
that Kutak Rock breached its duty of care and caused the debtors
to increase their debt load in a manner disproportionate to the
assets and income available for repayment of that debt, Kutak
Rock injured the debtors' other creditors by increasing the
likelihood that they would never be repaid while at the same time
expanding the size of its own claim against the debtors through
the creation of additional legal work.[56]  Alberts may not be
entitled to sue on behalf of the estate's creditors, but that
does not mean that these creditors are not victims of Kutak
Rock's alleged wrongdoing as well.  The court will not dismiss
the request for equitable subordination to the extent that it is
based on allegations establishing malpractice.[57]

---

[56] Accordingly, the equitable subordination remedy may
apply to a larger amount of fees than the fees that would be
disallowed based on malpractice.

[57] Counts XIV and XV were not a part of the First Amended
Complaint, nor were they added by leave of the court.  The court
would be within its rights to strike them.  See note 46, supra.
But as there is no time limit on Alberts's right to request
disallowance or subordination of the Law Firm Defendants' claims,
the court sees no benefit in dismissing the counts given that
Alberts would then need to either amend his complaint yet again
or commence another adversary proceeding, further entangling the
court and the parties in procedural red tape.

68

4.  <u>Law Firm Defendants' affirmative defenses</u>

The court did not decide whether the affirmative defenses of timeliness and <u>in</u> <u>pari</u> <u>delicto</u> barred Alberts's claims against the Law Firm Defendants in whole or in part in its last opinion because those issues were not ripe for review.[58]  They are now, and the court is duty-bound to consider them, even at this (procedurally) early stage in the case.

(a)  <u>In pari delicto</u>

"[T]he legal principle of <u>in</u> <u>pari</u> <u>delicto</u> . . . holds that if the parties are in equal fault, the law will help neither of

---

[58] Although the court did not address the substance of the Law Firm Defendants' <u>in</u> <u>pari</u> <u>delicto</u> arguments, it did conclude that the D & O Defendants could not invoke the <u>in</u> <u>pari</u> <u>delicto</u> under Delaware state law because they were corporate insiders at the time of their wrongdoing.  <u>In re Greater Southeast Cmty. Hosp. Corp. I</u>, 333 B.R. at 538-39.  The court also noted that courts have held that causes of action arising under § 544 or § 548 of the Bankruptcy Code are not subject to the <u>in</u> <u>pari</u> <u>delicto</u> defense because these causes of action are created in the first instance by federal bankruptcy law and are not assumed by the estate representative pursuant to 11 U.S.C. § 541.  <u>Id.</u> at 531.  The defense is inapplicable to Alberts's request for equitable subordination of the Law Firm Defendants' claims for the same reason, but its applicability to Alberts' malpractice claims (and objections seeking disallowance of the Law Firm Defendants' claims based on malpractice) remains an issue.

them." <u>Wager v. Pro</u>, 575 F.2d 882, 884 (D.C. Cir. 1976).[59]  The

defense is "limited to situations where the plaintiff bore at

least substantially equal responsibility for his injury, and

where the parties' culpability arose out of the same illegal

act." <u>Pinter v. Dahl</u>, 486 U.S. 622, 632 (1988) (internal

quotation omitted).  In the corporate context, the wrongful

actions of an officer or director are imputed to the corporate

principal unless "the wrongdoing is done primarily for personal

benefit of the officer and is 'adverse' to the interest of the

company." <u>Baena v. KPMG LLP</u>, 2006 WL 1703822, *5 (1st Cir. June

22, 2006) (interpreting Massachusetts law); <u>accord</u> <u>BCCI Holdings</u>,

964 F. Supp. at 478.

(i)   "<u>Innocent successor" exception</u>

Alberts argues that he should not be subject to the defense

of <u>in pari delicto</u> because he is an innocent successor to the

debtors and his claim is on behalf of the debtors' creditors, not

the debtors themselves.  Virtually every circuit court that has

considered this argument has rejected it as contrary to 11 U.S.C.

---

[59]  Only the malpractice claims (and the objections to the
Law Firm Defendants' claims based on malpractice) remain at issue
with respect to the <u>in pari delicto</u> defense, and Alberts has not
disputed that District of Columbia law governs the defense in
that regard.  Although <u>Wager</u> is not binding authority on the
local courts of the District of Columbia, its formulation of the
<u>in pari delicto</u> doctrine comes from <u>Hunter v. Wheate</u>, 289 F. 604
(1923), which is controlling precedent for both federal and local
D.C. courts.  <u>Hunter v. Bortolussi</u>, 667 A.2d 1362, 1364 (D.C.
1995).

§ 541(a)(2), which vests in the representative of the estate "[a]ll interests of the debtor . . . as of the commencement of the case," thereby ensuring that the estate representative has no greater rights than those of the debtor pre-petition. See Baena, 2006 WL at **7-8; Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards, 437 F.3d 1145, 1150-52 (11th Cir. 2006) ("Edwards"); Grassmueck v. American Shorthorn Ass'n, 402 F.3d 833, 837 (8th Cir. 2005); Lafferty, 267 F.3d at 356-57; Terlecky v. Hurd (In re Dublin Sec.), 133 F.3d 377, 381 (6th Cir. 1997); Sender v. Buchanan (In re Hedged-Inv. Associates), 84 F.3d 1281, 1285 (10th Cir. 1996).[60]  These decisions accord with this court's own precedent.  See In re Psychotherapy and Counseling Center, Inc., 195 B.R. 522, 531-32 (Bankr. D.D.C. 1996) ("[T]he bankruptcy estate's rights are limited to those had by the debtor at petition, which are determined by reference to state and federal law."); In re Latin Inv. Corp., 168 B.R. at 5 ("Because the principals were stealing for the benefit of the debtor, their conduct would be imputed to the debtor, which would be estopped from suing other participants in the fraud.").

Alberts attempts to rebut this veritable mountain of precedent by relying on Tolz v. Proskauer Rose LLP (In re Fuzion

---

[60]  While it did not rule specifically on the § 541(a) issue, the Second Circuit has applied the in pari delicto defense to a bankruptcy trustee.  Official Comm. of Unsecured Creditors of Color Tile v. Coopers & Lybrand, LLP, 322 F.3d 147, 158-66 (2d Cir. 2003).

Technologies Group, Inc.), 332 B.R. 225 (Bankr. S.D. Fla. 2005), which held that the in pari delicto doctrine should not apply to bankruptcy trustees, see id. at 232-34, and a recent article condemning the application of the in pari delicto rule in the bankruptcy context. See generally Jeffrey Davis, Ending the Nonsense: The In Pari Delicto Doctrine Has Nothing to Do with What Is § 541 Property of the Bankruptcy Estate, 21 Emory Bankr. Dev. J. 519 (2004-2005). Fuzion Technologies was effectively overruled by the Eleventh Circuit in Edwards, and Professor Davis's article has been rejected by every court that has considered it.[61]  Nonetheless, the court will consider the merits of their respective positions.

In Fuzion Technologies, the bankruptcy court relied on Perma Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134 (1968), for the proposition that the in pari delicto doctrine was subject to a public policy exception. In re Fuzion Technologies Group, Inc., 332 B.R. at 233-34. In the bankruptcy court's view, "to raise the in pari delicto defense as a barrier to relief by bankruptcy trustees would thwart the important public purpose served by the framework of the bankruptcy code." Id. at 234.

_____

[61] See Edwards, 437 F.3d at 1152 (noting the "flawed arguments about legislative history" raised by Professor Davis in his article); Hill v. Gibson, Dunn & Crutcher, LLP (In re MS55, Inc.), 338 B.R. 883, 893 n.4 (Bankr. D. Colo. 2006) (noting that Professor Davis's analysis of § 541 "has been expressly rejected by the Tenth Circuit" and that "[t]he Tenth Circuit is joined by the Second, Third, Sixth, and Eleventh Circuits").

The court held that as a consequence the doctrine should not apply under the rule announced in Perma Life.[62]

The bankruptcy court's application of Perma Life in Fuzion Technologies turns the public policy exception on its head.  In Perma Life, the Supreme Court crafted an exception to the common law defense of in pari delicto to ensure that federal securities laws were upheld.  In other words, the Supreme Court held that federal priorities trumped common law doctrines.  In Fuzion Technologies, the court decided not to apply federal law (§ 541(a) of the Bankruptcy Code) based on its interpretation of general bankruptcy "policy."  This strikes the court as more of an effort to re-write the Code than to protect it from contrary

---

[62]  Professor Davis also advances a policy argument, though he justifies it in a different way.  He argues that "what is property of the estate remains a matter of federal law to be resolved in light of bankruptcy policy."  Davis, 21 Emory Bankr. Dev. J. at 537.  The court has no quarrel with the observation that the issue of whether rights created under non-bankruptcy law rise to the level of property of the estate under 11 U.S.C. § 541 is a federal question, see In re Guardian Realty Group, L.L.C., 205 B.R. 1, 4 (Bankr. D.D.C. 1997), but it does not follow that "courts are then empowered to view the in pari delicto defense in light of its effect on federal bankruptcy policy."  Davis, 21 Emory Bankr. Dev. J. at 538.  To the contrary, bankruptcy courts have an obligation to analyze the property interests of the estate, including causes of action, by reference to state law unless the Bankruptcy Code explicitly preempts it.  Nobelman v. Am. Sav. Bank, 508 U.S. 324, 329 (1993) ("In the absence of a controlling federal rule, we generally assume that Congress has left the determination of property rights in the assets of a bankruptcy's estate to state law.");  Butner v. United States, 440 U.S. 48, 54 (1979) (stating "the basic federal rule . . . that state law governs" the analysis of the property interests held by the estate).

common law doctrines.

The court also takes issue with the notion that applying the in pari delicto doctrine in a bankruptcy case somehow damages the public interest. Enforcement of the securities laws at issue in Perma Life benefitted the public at large as well as the plaintiff because those laws discourage specific types of conduct harmful to large segments of the population. The malpractice and related causes of action asserted by Alberts benefit the estate's creditors, who already have the ability to sue a third party defendant on their own or together by using the class action procedures set forth in Fed. R. Civ. P. 23.

If anything, overlooking the requirements of § 541(a) would only provide an incentive for companies that would otherwise stand in pari delicto with respect to third parties to file for bankruptcy. Congress has made clear, particularly through its enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8 (generally effective Oct. 17, 2005) ("BAPCPA"),[63] that bankruptcy should be an option of last resort. See H.R. Rep. No. 109-31 at 2 n.1 (2005), as reprinted in 2005 U.S.C.C.A.N. 88, 89 n.1 ("Bankruptcy is a moral

---

[63] As its title implies, BAPCPA was enacted primarily to stem perceived abuses of the bankruptcy process by consumer debtors, but the approach adopted by the court in Fuzion Technologies and advanced by Alberts here would presumably apply with equal force to consumer debtors in chapter 7 (or, for that matter, chapter 11).

as well as an economic act. . . . It is a decision not to
reciprocate a benefit received, a good deed done on the promise
that you will reciprocate." (quoting <u>Bankruptcy Reform: Joint
Hearing Before the Subcomm. on Commercial and Administrative Law
of the House Comm. on the Judiciary and the Subcomm. on
Administrative Oversight and the Courts of the Senate Comm. on
the Judiciary</u>, 106th Cong. 98 (1999) (statement of Prof. Todd
Zywicki))).[64]  Any reading of the Bankruptcy Code that makes
bankruptcy more appetizing to a potential debtor than what the
text of the Code explicitly permits should be viewed with
skepticism.[65]

     This court will not turn a blind eye to the laws actually

---

     [64]  Although BAPCPA went into effect after this adversary
proceeding commenced, and therefore does not apply to the instant
dispute, it is helpful to the court in ascertaining Congress's
understanding of the goals and priorities of the Bankruptcy Code.

     [65]  For example, a person with a large but potentially
manageable secured debt load and a potential action against a
third party subject to the defense of <u>in pari delicto</u> might very
well choose to file for bankruptcy relief to allow the trustee to
pursue the otherwise barred cause of action (at no cost to the
debtor), use the recovery from that action to pay off a portion
of the claims against the estate, and exit bankruptcy with a
lighter secured credit load than when she began.  Similarly, a
corporate debtor-in-possession could use the availability of an
otherwise barred cause of action to leverage the acquiescence of
creditors to a plan of reorganization, making it easier for the
debtor-in-possession to emerge fully reorganized on favorable
terms.  The point is that permitting an estate representative to
do what the debtor could not prior to filing for bankruptcy may
very well benefit the wrongdoing <u>debtor</u> as well as the estate's
creditors.  The court fails to see any public good in permitting
what amounts to a perversion of the <u>in pari delicto</u> doctrine for
the sake of creditor expediency.

written by Congress out of misguided fealty to the imagined

policies informing it.  Just as "[t]he executor stands in the

shoes of the deceased and can have no greater rights than the

deceased himself," <u>In re Hanson</u>, 210 F. Supp. 377, 385 (D.D.C.

1962), so too is a representative of the estate bound by the same

defenses that would have succeeded against the debtor prior to

the "civil death" of bankruptcy.  The court knows of no federal

policy contravening this venerable common law rule, and declines

to invent one based on the ruminations of a single court or

commentator.[66]

   In addition to his public policy argument, Professor Davis

---

[66]  Professor Davis argues that "[t]wo important federal
policies are furthered" by the abolition of the <u>in pari delicto</u>
defense in bankruptcy cases: "fair treatment to creditors and
investors and the promotion of a high standard of business ethics
among the professionals who serve and participate in the affairs
of corporate managers."  Davis, 21 Emory Bankr. Dev. J. at 542.
As the court noted above, creditors and shareholders have the
ability to enforce their own rights against a third party who
harms the estate, so there are no fairness concerns there unless
one considers Fed. R. Civ. P. 23 to be unfair.  The value of
creditor expediency is a policy decision for Congress, not the
courts, to decide--a point this court made emphatically in its
prior opinion when it held that Alberts could not sue on behalf
of the estate's creditors due to the Supreme Court's ruling in
<u>Caplin v. Marine Midland Grace Trust Co.</u>, 406 U.S. 416 (1972).
   The latter "polic[y]" (good corporate governance) is a
potential reason not to impose the <u>in pari delicto</u> defense
against corporations <u>at</u> <u>all</u>, but it has nothing to do with
federal bankruptcy law.  Contrary to Professor Davis's
suppositions, the Bankruptcy Code was not written to protect
investors or creditors from the wrongdoing of their corporate
fiduciaries.  Such protections already exist at common law
through the "adverse interest" exception to corporate imputation,
which the court discusses at length below.

argues that courts construing § 541(a) to bar the "innocent

successor" defense by estate representatives do not effectuate

the intent of Congress as revealed by the legislative record.

This court agrees with the courts in <u>Edwards</u> and <u>Lafferty</u> that

the plain language of § 541(a) obviates the need for any inquiry

into the congressional record.  <u>See</u> <u>Edwards</u>, 437 F.3d at 1150-51;

<u>Lafferty</u>, 267 F.3d at 356.  The phrase "all legal or equitable

interests of the debtor in property" in § 541(a) embraces rights

only as they exist under non-bankruptcy law and subject to

limitations that non-bankruptcy law imposes on such rights, <u>see</u>

n.62, <u>supra</u>, including state law affirmative defenses to the

assertion of such rights.

Even if the court were to consider the legislative history

of § 541(a), it would conclude that the record as a whole

supports the plain language interpretation of that provision.

The Senate Report to the Bankruptcy Reform Act of 1978 is clear

on this point:

> Though [section 541] will include choses in
> action and claims by the debtors against
> others, <u>it is not intended to expand the
> debtor's rights against others more than they
> exist at the commencement of the case</u>.  For
> example, if the debtor had a claim that is
> barred at the time of the commencement of the
> case by the statute of limitations, then the
> trustee would not be able to pursue that
> claim, because he too would be barred.  <u>He
> could take no greater rights than the debtor
> himself had</u>.

S. Rep. No. 95-989 at 82 (1978), <u>as reprinted in</u> 1978

77

U.S.C.C.A.N. 5787, 5868 (emphasis added); <u>see also</u> H.R. Rep. No.

95-595 at 367-68 (1977), <u>as reprinted in</u> 1978 U.S.C.C.A.N. 5963,

6323 (same).

Professor Davis suggests that this passage was not meant to

apply to personal affirmative defenses.  He relies upon the

following floor remarks from Congressman Edwards:

> [A]s section 541(a)(1) clearly states, the
> estate is comprised of all legal or equitable
> interests of the debtor in property as of the
> commencement of the case.  To the extent such
> an interest is limited in the hands of the
> debtor, it is equally limited in the hands of
> the estate <u>except to the extent that defenses
> which are personal against the debtor are not
> effective against the estate</u>.

124 Cong. Rec. H11096 (daily ed. Sept. 28, 1978) (emphasis

added); <u>see also</u> <u>id.</u> at S17413 (daily ed. Oct. 6, 1978) (remarks

of Sen. DeConcini) (same).

Upon closer inspection, the remarks transcribed above do not

sustain their usage by Professor Davis.  They were made in the

context of an explanation of § 541(<u>d</u>) of the Bankruptcy Code,

which provides that property to which the debtor held legal but

not equitable title pre-petition becomes property of the estate

only to the extent of the debtor's pre-petition title.  The floor

statements clarified that "[t]o the extent such an interest is

limited in the hands of the debtor;" <u>i.e.,</u> is a legal interest

only, the estate is not bound by any defenses that could have

been asserted against the debtor's person.

78

These statements make sense when restricted to § 541(d).
That sub-section was written specifically to maintain the <u>status
quo</u> of bona fide secondary mortgage market transactions, where
the initial mortgagee would often retain title to the note and
the purchaser of the mortgage would record its interest in the
mortgage.  S. Rep. No. 95-989 at 83-84; <u>as reprinted in</u> 1978
U.S.C.C.A.N. at 5879-80.  As the <u>Edwards</u> court explained, "[i]n
the law of commercial paper, personal defenses are affirmative
defenses that may not be asserted against a holder-in-due
course."  437 F.3d at 1150.  The floor statements made by
Congressman Edwards and Senator DeConcini merely reflect this
principle of commercial law.

In contrast, Professor Davis's reading of these floor
statements as somehow applying to property of the estate in
general makes no sense at all.  Setting aside the fact that these
statements were made in reference to a different part of § 541,
the speakers articulate no rationale for distinguishing
"personal" affirmative defenses from "real" defenses outside the
commercial paper context.  They do not explain why the Senate and
House Judicial Committees felt it necessary to explain that a
representative of an estate in bankruptcy takes the debtor's
causes of action subject to all of the defenses thereto, yet
failed to mention that this rule only applied to certain
defenses.  They do not explain why Congress would set forth a

79

scheme different from that of common law inheritance and
assignment rights.  They are, in short, totally inapplicable to
§ 541(a).

Finally, Alberts asks the court to analogize the role of the
estate representative to that of a receiver appointed pursuant to
state law.  In Scholes v. Lehman, 56 F.3d 750 (7th Cir. 1995),
the Seventh Circuit held that the defense of in pari delicto
should not be applied to such an entity because "the appointment
of the receiver removed the wrongdoer from the scene."  Id. at
754.  Writing for the majority, Judge Posner explained this
reasoning further in memorable fashion:

> [T]he wrongdoer must not be allowed to profit
> from his wrong by recovering property that he
> had parted with in order to thwart his
> creditors.  That reason falls out now that
> [the wrongdoing agent] has been ousted from
> control of and beneficial interest in the
> corporations. . . . The appointment of the
> receiver removed the wrongdoer from the
> scene.  The corporations were no more [the
> agent's] evil zombies.  Freed from his spell
> they became entitled to the return of the
> moneys--for the benefit not of [the agent]
> but of innocent investors--that [the agent]
> had made the corporations divert to
> unauthorized purposes.  Put differently, the
> defense of in pari delicto loses its sting
> when the person who is in pari delicto is
> eliminated.

Id.

Scholes is easily distinguishable from the instant case
because a receiver is not subject to the restrictions of
§ 541(a).  Edwards, 437 F.3d at 1151; In re Hedged-Inv.

<u>Associates</u>, 84 F.3d at 1285 & n.5.  But the court is far from convinced that the "evil zombie" theory of <u>in pari delicto</u> holds water even with respect to court-appointed receivers.  To the extent that the theory applies only where the agent uses corporate resources for "unauthorized purposes," it is really just a colorful repackaging of the so-called "adverse interest" exception, not a "new" exception to the <u>in pari delicto</u> doctrine. <u>See</u> part II.C.4.a.ii, <u>infra</u>.  If the wayward agent does not hold interests adverse to the corporate principal, then her wrongdoing by definition benefits the supposedly "innocent" investors in the corporation as well.  In other words, the "evil zombie" approach of <u>Scholes</u> only makes sense insofar as it echoes the imputation rules already provided at common law.  It is either redundant or just plain wrong.

(ii) <u>Adverse interest exception</u>

"As a general rule, knowledge acquired by a corporation's officers or agents is properly attributable to the corporation itself." <u>BCCI Holdings</u>, 964 F. Supp. at 478.[67]  "No such presumption can arise, however, where the agent is dealing with the principal in the agent's own interest . . . and in such a

---

[67]  Unlike a state's statute of limitations, the <u>in pari delicto</u> defense is a type of "substantive" law subject to the District of Columbia's choice-of-law rules.  As neither party disputes the application of D.C. law, however, the court will apply that jurisdiction's common law.  <u>ABB Daimler-Benz Transp. (North America) v. Nat'l R.R. Passenger Corp.</u>, 14 F. Supp. 75, 88 (D.D.C. 1998).

case the doctrine does not apply." Fletcher, supra at § 819. At
the same time, "this presumption . . . should not be carried so
far as to enable the corporation to become a means of fraud or a
means to evade its responsibilities." Id. at § 821.[68]

This court is not the first to wrestle with the application
of the adverse interest exception to third-party actions where
the harm alleged is the deepening of a company's insolvency. In
Baena, the First Circuit considered the exact same issue in the
context of a litigation trustee's suit against the debtor's
accounting firm for unfair trade practices. 2006 WL at **1-2.
The court concluded that the exception did not apply:

> A fraud by top management to overstate
> earnings, and so facilitate stock sales or
> acquisitions, is not in the long-term

_____

[68] The diligent reader might wonder why the court does not
simply apply the "adverse domination" doctrine invoked with
respect to the D & O Defendants' statute of limitations argument.
See part II.B.1.c, supra. The short answer is that the adverse
domination rule is used solely for the purpose of determining
when a claim against a company's directors and officers accrue,
not for determining whether the company stands in pari delicto
with respect to a third party. See Martin Marietta Corp. v.
Gould, Inc., 70 F.3d 768, 772 (4th Cir. 1995).
The long answer is that the doctrines concern two different
relationships and two different types of injury. In determining
when a corporation first discovered its own injuries suffered at
the hands of its controlling fiduciaries, the court presumes that
the fiduciaries failed to actually inform their corporate
principal of the injury during their tenure because they have an
obvious (self-)interest in concealing the harm. In determining
when a corporation knew of its own wrongdoing against a third
party, a presumption of concealment makes no sense because the
wrongdoing may have benefitted the company in some sense. It
therefore falls upon the court to determine whether the company
did in fact receive some benefit from its own wrongdoing.

> interest of the company; but, like price-
> fixing, it profits the company in the first
> instance and the company is still civilly and
> criminally liable[.] . . . Nor does it matter
> that the implicated managers <u>also</u> may have
> seen benefits to themselves--that alone does
> not make their interests adverse.

<u>Id.</u> at *5 (emphasis in original).

<u>Baena</u> involved slightly different facts than those alleged

by Alberts.  In that case, the management of the debtor misstated

the debtor's earnings, thereby raising revenues from unknowing

investors and artificially preserving the company's existence.

<u>Id.</u>  The complaint did not allege that the debtor's management

acted out of self-interest, but rather "attempt[ed] primarily to

benefit . . . the company through their behavior."  <u>Id.</u> at *6.

In contrast, Alberts alleges that NCFE, not the debtors,

defrauded investors, and he alleges that the D & O Defendants

acted solely out of self-interest.

Nonetheless, the court finds the rationale advanced by the

court in <u>Baena</u> to be both applicable and persuasive in this case.

The crux of the First Circuit's ruling is that the bad acts

perpetrated by the debtor's management, while ultimately

injurious to the debtor itself, provided an immediate benefit to

the debtor at the expense of innocent third parties.  <u>Id.</u> at *5.

The harm suffered by the debtor was like the "harm" suffered by a

robber who is later caught and imprisoned for his criminal

misconduct: painfully real, but simply the price of having

enjoyed the temporary benefit of his ill-gotten gains.  By

accepting the benefits of its wrongdoing, the debtor (and its

shareholders, and its creditors) put itself on the hook for that

wrongdoing as well.

The same principle applies to this case.  The debtors

received hundreds of millions of dollars in financing from the

NCFE Entities at the expense of those entities' innocent

investors.  By Alberts's own admission, these infusions of cash

kept the debtors going long after they should have been dissolved

or reorganized.  They may have injured the debtors in the long

run, but the infusions provided a short-term benefit that the

debtors (and their shareholders, and their creditors) eagerly

accepted.  As Professor Fletcher explains in his treatise on

corporate law:

> When the act of an officer of a corporation
> constitutes a fraud upon a third person, or
> upon another corporation of which he or she
> is also an officer, the first-mentioned
> corporation is chargeable with notice of the
> nature of the transaction, although the fraud
> is perpetrated for the officer's own benefit,
> where the officer also represents the
> corporation in the transaction.  Fraud on
> behalf of a corporation is not the same thing
> as fraud against it.  Fraud against the
> corporation usually just hurts the
> corporation; the shareholders are the
> principal if not the only victims.  But the
> shareholders of a corporation whose officers
> commit fraud for the benefit of the
> corporation are beneficiaries of the fraud.
> The primary costs of a fraud on the
> corporation's behalf are borne not by the
> shareholders but by outsiders to the

corporation.

Fletcher, _supra_ at § 829 (footnotes omitted).

This principle forecloses application of the adverse
interest exception where the only harm alleged by the corporate
plaintiff is the deepening of that company's insolvency.  No
matter how much evidence of wrongdoing Alberts produces, there
simply are no set of facts under which a company that is harmed
by the artificial prolongation of its existence does not also
benefit to some degree by that same prolongation at the expense
of innocent third parties.[69]  The adverse interest exception does

---

[69]  As the First Circuit noted properly, the adverse
interest exception might apply where the corporate principal's
agent loots the corporation of all its assets, thereby depriving
the corporation of _any_ benefit from the fraud perpetrated against
innocent investors.  _Baena_, 2006 WL at *6.  But this is not a
looting case, and Alberts cannot show that the debtors received
no benefit from their dealings with the NCFE Entities.

not and cannot apply in this case.[70]

(iii)      <u>Other arguments</u>

Alberts makes other, less colorable arguments against the imposition of the <u>in pari delicto</u> defense in this case.  He argues that the doctrine only applies where the parties are at equal fault and that the Law Firm Defendants were somehow more at fault for the debtors' injuries than the D & O Defendants.  But the only alleged wrongdoing of the Law Firm Defendants was their facilitation of the misconduct of the debtors, who well knew that they were insolvent.  Based on the allegations in the Second Amended Complaint, the fault of the Law Firm Defendants could not have been greater than the fault of the debtors.  <u>In re Dublin Sec., Inc.</u>, 133 F.3d at 380.

---

[70] Appearances notwithstanding, this conclusion is consistent with the court's application of the adverse domination presumption to the statute of limitations defense raised by the Partially Released Defendants.  While the debtors' collusion with the NCFE Entities to defraud those entities' investors provided immediate benefits to the debtors, the (alleged) failure of Paul Tuft, Donna Talbot, and Erich Mounce to adequately inform themselves of the long-term consequences of that fraud or put the debtors' interests above their own did the debtors no favors.  It is this latter wrongdoing that is at stake where the statute of limitations is concerned, whereas the <u>in pari delicto</u> defense concerns harms against third parties.  It is this same difference in harms that has led courts to conclude that corporate insiders cannot invoke the <u>in pari delicto</u> defense with respect to their own wrongdoings.  <u>See In re HealthSouth Corp. Shareholders Litig.</u>, 845 A.2d 1096, 1107-08 & n.20 (Del. Ch. 2003) ("The reality that [the corporate debtor] itself might be liable to third-parties due to the failure of its managers . . . does not mean that [the debtor] has no right to seek recompense from those managers for the harm they caused it.").

Alberts also suggests that the Law Firm Defendants ought not be allowed to invoke the in pari delicto defense because lawyers owe a special duty of care to their clients.  Whatever one thinks of this notion as a policy argument, it is clearly not good law.  See id. (rejecting public policy argument in holding that legal malpractice claim was barred because the plaintiff was in pari delicto); accord Quick v. Samp, 697 N.W.2d 741, 745-48 (S.D. 2005); Evans v. Cameron, 360 N.W.2d 25, 29 (Wis. 1985); Tillman v. Shoffner, 90 P.3d 582, 584-86 (Okla. Ct. Civ. App. 2004).

Finally, Alberts points out that the defense of in pari delicto is factually intensive and cannot be resolved on a motion to dismiss.  Ordinarily, the court would agree, but in this case there are no set of facts under which the debtors would not be subject to the defense because the very harm that they allegedly suffered at the hands of the Law Firm Defendants (i.e., the deepening of the debtors' insolvency) presupposes imputable wrongdoing by the debtors' management.  The court will dismiss the remaining portions of Counts VI and VII (the malpractice claims) by applying the defense of in pari delicto.  Any objection by Alberts in Counts XIV and XV to the Law Firm Defendants' claims that is based solely on malpractice is

similarly barred by the defense of in pari delicto.[71]

       (b)   Timeliness

At this point, aside from Counts XIV and XV (seeking disallowance or subordination of claims) as limited by the court's discussion above, the only claims in the Second Amended Complaint that remain are Counts VIII-XIII, which seek to avoid and recover payments of attorneys' fees to the Law Firm Defendants for their allegedly negligent preparation of opinion letters under federal and state fraudulent conveyance laws.  See 11 U.S.C. §§ 544, 548, 550.  These claims may not be subject to the defense of in pari delicto, see McNamara v. PFS (In re Personal & Bus. Ins. Agency), 334 F.3d 239, 245-47 (3d Cir. 2003), but they are bound by special restrictions of their own, most notably a statute of limitations not subject to the continuous misrepresentation doctrine.

Section 548 of the Bankruptcy Code allows a representative

---

    [71]  Like his affirmative malpractice claim held pursuant to 11 U.S.C. § 541, Alberts's state law defenses available to him pursuant to 11 U.S.C. § 558, including the defense of malpractice, are limited by the in pari delicto defense. However, Counts XIV and XV survive as disallowance claims to the extent that they are based on a ground not turning solely on malpractice (namely, an implicit objection under 11 U.S.C. § 502(d) for failure to disgorge a conveyance avoidable under §§ 544 or 548 based on inadequate value having been given for the conveyance because of malpractice).  Counts XIV and XV also survive as equitable subordination claims notwithstanding the court's ruling with regards to Alberts's malpractice claim because equitable subordination, unlike disallowance of a claim, depends on bankruptcy rather than state law.

of a debtor's estate (in this case, Alberts) to avoid certain transfers of interests by the debtor if those transfers were "made or incurred on or within one year before the filing of the date of the petition . . . ." 11 U.S.C. § 548(a)(1).[72] Section 544 of the Bankruptcy Code allows an estate representative to invoke the fraudulent conveyance laws of any state available to any creditor of the estate. Alberts invokes Arizona's Fraudulent Transfer Act, which extinguishes any claim for relief not raised "within four years after the transfer was made or the obligation was incurred." Ariz. Rev. St. § 44-1009. This latter time limitation is a separate statute of limitations, whereas the one-year period set forth in § 548 is an element of the claim that must be pled by Alberts.

Alberts does not allege that the debtors paid the Law Firm Defendants for their allegedly defective letters within one year of the petition date. Consequently, his cause of action under § 548 must be dismissed. The timeliness of Alberts's claims under Arizona's Fraudulent Transfer Act (as incorporated by § 544) will require disposition at a later stage because they are an affirmative defense that need not be addressed in the Second Amended Complaint. The two counts involving § 548, Counts XII-

---

[72] As part of BAPCPA, Congress amended § 548 to permit an estate representative to pursue transfers made within two years of the petition date, but this case pre-dates the effective date of that amendment.

XIII,[73] and the objections in Counts XIV and XV based on § 502(d)

in conjunction with § 548 will be dismissed in their entirety,

but counts VIII-XI (seeking avoidance and recovery under 11

U.S.C. §§ 544 and 550) will not be dismissed.  Counts XIV-XV will

not be dismissed to the extent that Alberts's equitable

subordination claims and § 502(d) objections to claims based on

avoidability under § 544.[74]

III

In light of the foregoing analysis, the court will grant in

part and deny in part the defendants' motions to dismiss.  As

Count I is the only count levied against Susan Engelhard and the

court has concluded that it fails to state a claim against her,

the court will dismiss the Second Amended Complaint in its

entirety with respect to her.  Finally, the court will stay Count

II with respect to Melvin Redman unless and until Alberts

successfully moves for relief from the automatic stay in Redman's

bankruptcy case.

An order follows.

---

[73] Count XIII is not limited to conveyances avoided under
§ 548, but Counts IX and XI already seek recovery of conveyances
avoided under § 544.  Accordingly, Count XIII will be dismissed
as surplusage to the extent it addresses conveyances avoided
under § 544.

[74] Similarly, Alberts's claims for equitable subordination
and disallowance under § 502(d) are unaffected by the affirmative
defense of in pari delicto; however, objections to claims in
Counts XIV and XV based solely on the Law Firm Defendants'
alleged malpractice will be dismissed.

[Signed and dated above.]


Copies to: All counsel of record.