The document below is hereby signed.

Signed: August 09, 2010.



_____
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re )<br><br>GREATER SOUTHEAST COMMUNITY )<br>HOSPITAL CORP., I, *et al.*, )<br><br>          Debtors. )<br>_____ )<br>            )<br>SAM J. ALBERTS, TRUSTEE FOR )<br>THE DCHC LIQUIDATING TRUST, )<br>          )<br>          Plaintiff, )<br>          )<br>        v.        )<br>          )<br>PAUL TUFT, *et al.*, )<br>          )<br>          Defendants. )| Case No. 02-02250<br>(Chapter 11)<br>(Jointly Administered)<br><br><br><br><br><br><br>Adversary Proceeding No.<br>04-10459<br><br>**Not for Publication in<br>West's Bankruptcy Reporter** |

MEMORANDUM DECISION AND ORDER REGARDING MOTION OF EPSTEIN
BECKER & GREEN P.C. FOR EXCESS EXPENSES AND ATTORNEYS' FEES

The claims against it having been dismissed, one of the

defendants in this adversary proceeding, Epstein Becker & Green

P.C., has moved for an award of attorneys' fees and expenses

against the attorneys and law firm that represented the

plaintiff, Sam J. Alberts, Trustee for the DCHC Liquidating Trust

in this adversary proceeding.[1]   For the reasons that follow, I

will grant Epstein Becker's motion in part, imposing sanctions

against Sam J. Alberts as counsel for the plaintiff with respect

to litigation pursued after the court granted Epstein Becker's

motion for summary judgment.[2]

I

In seeking attorney's fees and expenses, Epstein Becker

relies on 28 U.S.C. § 1927 and the inherent authority of this

court.

A.

Under 28 U.S.C. § 1927:

Any attorney or other person admitted to conduct cases
in any court of the United States or any Territory
thereof who so multiplies the proceedings in any case
unreasonably and vexatiously may be required by the
court to satisfy personally the excess costs, expenses,
and attorneys' fees reasonably incurred because of such
conduct.

---

[1]   Epstein Becker's motion seeks sanctions against Sam J.
Alberts, Esq.; Lucius B. Lau, Esq.; Francis A. Vasquez, Esq.; and
the law firm in which those attorneys practiced, White & Case
LLP.  For reasons discussed later, sanctions are appropriate only
against Alberts.  Because I conclude that none of the conduct
prior to the dismissal of the adversary proceeding warrants
sanctions, I will review the plaintiff's conduct in the
proceeding prior to dismissal without specifying which attorneys
were carrying out that conduct on the plaintiff's behalf.

[2]   This Memorandum Decision constitutes the court's findings
of fact and conclusions of law regarding the motion.  At the
hearing of November 27, 2007, the court reserved for a later
hearing the resolution of the amount of fees to be awarded if the
court determined after the initial hearing that there was
misconduct warranting an award of costs, expenses, and attorneys'
fees.

The purpose of § 1927 is to allow the court "to assess attorneys' fees against an attorney who frustrates the progress of judicial proceedings." *United States v. Wallace*, 964 F.2d 1214, 1217 (D.C. Cir. 1992). As observed in *Wallace*, 964 F.2d at 1220-21 (footnote omitted):

> Where courts have employed section 1927, the attorney's behavior has been repeated or singularly egregious. For example, in *Fritz v. Honda Motor Co.*, 818 F.2d 924 (D.C. Cir. 1987), this court upheld section 1927 sanctions where the attorney "repeatedly took actions which required [the defendant] to expend unnecessary time and money, even though he had no intention of pursuing this litigation." *Id.* at 925; *see also Julien v. Zeringue*, 864 F.2d 1572, 1575-76 (Fed. Cir. 1989) (sanctioning attorney who "continually missed deadlines, requested at least 10 extensions of time to file his briefs, and submitted a joint appendix 11 months after he was given extensive and explicit instructions"); *Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 875 (5th Cir. 1988) (en banc) ("section 1927 imposes a continuing obligation on attorneys by prohibiting the persistent prosecution of a meritless claim"); *Toombs v. Leone*, 777 F.2d 465, 471-72 (9th Cir. 1985) (counsel sanctioned for deliberately failing to meet pretrial brief deadline and then filing, on morning of trial, 148-page trial brief and 34-page exhibit list).

Before imposing sanctions on an attorney under § 1927, the court must evaluate whether the attorney's conduct has been "*at least* reckless[.]" *Wallace*, 964 F.2d at 1217 (emphasis in original). Accordingly, "inadvertent, and negligent acts will not support an imposition of sanctions under section 1927." *Wallace*, 964 F.2d at 1219 (*quoting Cruz v. Savage*, 896 F.2d 626, 631 (1st Cir. 1990)); *see also Healey v. Labgold*, 231 F. Supp. 2d

3

64, 68 (D.D.C. 2002) ("A showing that counsel's behavior has been

unreasonable and vexatious requires more than a showing of

negligence.  Instead, it requires a showing of deliberate action

in the face of a known risk, the likelihood or impact of which

the actor inexcusably underestimates or ignores.") (citations and

internal quotations omitted).

Such conduct that recklessly multiplies the proceedings in

an unreasonable fashion is adequate to warrant a finding of

vexatiousness under § 1927.  *Reliance Ins. Co. v. Sweeney Corp.,*

*Md.*, 792 F.2d 1137 (D.C. Cir. 1986).  In *Reliance Ins.*, the Court

of Appeals stated:

> While the language of § 1927 suggests deliberate
> misbehavior, subjective bad faith is not necessary;
> attorneys have been held accountable for decisions that
> reflect a reckless indifference to the merits of a
> claim.  *In re TCI Ltd.*, 769 F.2d 441, 445 (7th Cir.
> 1985).  We adopt these standards in the case at bar.

792 F.2d at 1138.  That holding makes sense.  The court already

has authority pursuant to its inherent authority to sanction bad

faith conduct, and § 1927 would add nothing if it requires a

showing of bad faith.  *See Jones v. Continental Corp.*, 789 F.2d

1225, 1230 (6th Cir. 1986).

The Court of Appeals later expressed the view that the law

in the D.C. Circuit is unsettled as to whether a court must find

subjective bad faith or merely recklessness to impose sanctions

under § 1927.  *See Wallace*, 964 F.2d at 1218-19.[3]  However, the
only D.C. Circuit decision cited in *Wallace* as suggesting that
§ 1927 requires subjective bad faith was *Hilton Hotels Corp. v.
Banov*, 899 F.2d 40, 45 n.9 (D.C. Cir. 1990).  Rule 11 sanctions,
not § 1927 sanctions, were at issue in *Hilton Hotels*.  The
suggestion in *Hilton Hotels* (relegated to a footnote) was thus
mere dictum, and is not enough to overturn the holding of
*Reliance Ins. Co.*[4]  I view myself as bound to follow the holding
of *Reliance Ins. Co.*

If only a showing of recklessness is needed for § 1927
sanctions, a party must demonstrate the opposition made a
"conscious choice of a course of action, either with knowledge of
the serious danger to others involved in it or with knowledge of
facts which would disclose this danger to any reasonable man."
*Wallace*, 964 F.2d at 1220 (quoting *Restatement (Second) of Torts*,
§ 500 cmt. G (1964)).  This standard is a higher bar than
negligence, which "consists in mere inadvertence, incompetence,
unskillfulness, or a failure to take precautions to enable the
actor adequately to cope with a possible or probable future

---

[3]  *See also LaPrade v. Kidder Peabody & Co.*, 146 F.3d 899,
905 (D.C. Cir. 1998), *cert. denied*, 525 U.S. 1071 (1999) (citing
*Wallace* for this proposition).

[4]  The holding in *Reliance Ins. Co.* was viewed as being a
holding, not dictum, by at least one commentator.  *See* Josselyn,
*The Song of the Sirens-Sanctioning Lawyers under 28 U.S.C.
§ 1927*, 31 B.C. L. Rev. 477, 489 (1990).

emergency." *Id.*

The standards of bad faith and recklessness are similar and
distinguishable; although both involve a general, deliberate
action in the face of a risk, a bad faith actor intends the "bad"
consequence to come about, such as the needless delay of
proceedings, whereas a reckless actor knows of but is indifferent
to the risk of the "bad" consequence. *See id.* at 1219-20.

B.

Epstein Becker also seeks an award of attorneys' fees and
expenses pursuant to the court's inherent authority to impose
sanctions on attorneys for misconduct.  Epstein Becker never
moved for sanctions under Fed. R. Bankr. P. 9011.  I underscore
that point because Epstein Becker's motion advances arguments
that would have been pertinent to a motion under Rule 9011, the
analog of Fed. R. Civ. P. 11, but that for the most part fall
short of establishing conduct supporting a finding of abuse under
§ 1927 or under the court's inherent authority

Rule 9011(c) permits an award of attorney's fees when a
filed paper fails to comply with the standards of Rule 9011(b),
and the party who filed the paper neglects to withdraw the paper
within the safe harbor time period of Rule 9011(c)(1)(A).  In
contrast to § 1927 and the court's inherent authority, Rule 9011
does not require a showing of recklessness or bad faith in order
for sanctions to be awarded.  Although the plaintiff's attorneys'

6

conduct may have violated Rule 9011, the claims against Epstein Becker have already been dismissed by a final judgment that is no longer appealable. If that dismissal of the claims against Epstein Becker did not bar pursuit of a Rule 9011 motion, the plaintiff could readily defeat a Rule 9011 motion by filing a motion (within the safe harbor time period of Rule 9011(c)(1)(A)) to withdraw any paper that violated Rule 9011.

Epstein Becker's failure to avail itself of Rule 9011 does not preclude awarding sanctions under § 1927 (or pursuant to the court's inherent power) if the plaintiff's attorneys had engaged in unreasonable and reckless or bad faith conduct warranting such sanctions. *See Glatter v. Mroz (In re Mroz)*, 65 F.3d 1567, 1575 (11th Cir. 1995). However, the plaintiff's attorneys' filing of papers in violation of Rule 9011 with a good faith, non-reckless pursuit of litigation of the claims cannot form a basis for such sanctions.

Although a court's "inherent powers must be exercised with restraint and discretion," a court has the inherent authority and duty to police conduct in proceedings before it. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-46 (U.S. 1991) (citations omitted). Assessing attorneys' fees is appropriate where a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order," or otherwise "act[s] in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers*, 501

7

U.S. at 45-46.  Such a sanction both "vindicates judicial authority without resort to the more drastic sanctions available for contempt of court and makes the prevailing party whole for expenses caused by his opponent's obstinacy."  *Hutto v. Finney*, 437 U.S. 678, 690 n.14 (1978) (citation omitted).  Bad faith is required for the court to impose such sanctions under its inherent authority.  *Wallace*, 964 F.2d at 1219 (noting that in *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980), the Court indicated that sanctions under a court's inherent powers requires a finding "as to whether counsel's conduct in [the] case constituted or was tantamount to bad faith").

Unlike 28 U.S.C. § 1927, an award of sanctions pursuant to the court's inherent authority does not require that a party's bad faith conduct have caused a multiplication of proceedings.

C.

To make a showing of bad faith, whether for purposes of imposing sanctions pursuant to § 1927 or the court's inherent authority, a party must demonstrate that the opposition engaged in deliberate conduct for an improper motive, such as harassment, needless delay, or disruption of the litigation.  Even in those circuits that hold that § 1927 requires a showing of bad faith, such bad faith can be proven directly through evidence of subjective intent, or indirectly through evidence of objective actions that lead to an inference of subjective intent--such as

8

filing a document with the court that is plainly frivolous, lacking even a colorable basis in law or fact. *See, e.g., United Steel, Paper & Forestry, Rubber Mfg. Energy, Allied Indus. & Service Workers Intern. Union, AFL-CIO, CLC v. Shell Oil Co.*, 549 F.3d 1204, 1209 (9th Cir. 2008) ("Imposing sanctions under the Court's inherent powers requires a finding of bad faith, which may be demonstrated by actions delaying or disrupting the litigation."); *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997) (A party may demonstrate bad faith by "delaying or disrupting the litigation or hampering enforcement of a court order.") (citation omitted); *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986), *cert. denied*, 480 U.S. 918 (1987) ("Like an award made pursuant to the court's inherent power, an award under § 1927 is proper when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay.").

II

The court must determine whether fees and expenses are appropriately awarded here and, if so, whether they should be awarded for the entirety of the litigation or only a portion of it. I address in this part II the conduct preceding the granting of the motion for summary judgment, and conclude that it is not sanctionable. It is first necessary to review the history of the

9

proceeding preceding the granting of summary judgment.

A.

Epstein Becker's allegations of the plaintiff's attorneys'
bad faith refer to various periods during the litigation.  Many
of Epstein Becker's arguments boil down to a contention that the
attorneys advanced claims and arguments lacking legal merit.
Section 1927, however, does not amount to a repeal of the
traditional American Rule that each party bears its own legal
costs.  Indeed, § 1927 "does not distinguish between winners and
losers, or between plaintiffs and defendants.  The statute is
indifferent to the equities of a dispute and to the values
advanced by the substantive law.  It is concerned only with
limiting the abuse of court processes."  *Roadway Express, Inc. v.
Piper*, 447 U.S. 752, 762 (1980).

The history of this adversary proceeding buttresses Epstein
Becker's position that it viewed the proceeding as unwarranted
and that it pressed throughout for a prompt resolution, and that
the court entered orders that made clear that there was to be a
firm deadline for resolving Epstein Becker's motion for summary
judgment.  But the following review of that history demonstrates
that until the motion for summary judgment was granted in Epstein
Becker's favor, none of the plaintiff's attorneys had engaged in
misconduct sanctionable under § 1927 or the court's inherent
power.  The basic thrust of Epstein Becker's motion for sanctions

10

is that the plaintiff's attorneys muddied Epstein Becker's reputation by continually accusing it of malpractice and of affirmatively aiding and abetting breaches of fiduciary duty relating to the debtors' deepening insolvency, did so without any factual basis and with specious legal theories, and failed to ever avail themselves of the opportunity to take discovery to demonstrate that the facts justified the complaint.

In 2002, Doctors Community Healthcare Corporation ("DCHC") and its affiliates as debtors commenced the cases (under chapter 11 of the Bankruptcy Code (11 U.S.C.)) within which this adversary proceeding was pursued.  A chapter 11 plan was confirmed, which created the DCHC Liquidating Trust, vested with certain claims that had been property of the estate under 11 U.S.C. § 541 and certain avoidance and recovery powers under chapter 5 of the Bankruptcy Code that the debtors, as debtors in possession, had enjoyed pursuant to 11 U.S.C. § 1107(a).  Sam J. Alberts was appointed trustee of that trust, and in that capacity he is the plaintiff in this adversary proceeding.  Epstein Becker does not seek sanctions against Alberts in that capacity, and seeks sanctions only against the attorneys (including Alberts) and the law firm that represented him in the adversary proceeding.

In November 2004, the plaintiff filed his original complaint seeking monetary damages against Epstein Becker, Kutak Rock LLP

(another law firm), and certain of the debtors' directors and officers.  The adversary proceeding was based upon each defendant's participation in a financing scheme that permitted the debtors to improperly receive hundreds of millions of dollars from National Century Financial Enterprises and its affiliates (individually and collectively referred to as NCFE or National Century), beyond the debtors' ability to repay such amounts.

As to Epstein Becker and Kutak Rock, the Trustee sought damages based primarily upon theories of deepening insolvency and legal malpractice.  Epstein Becker had a long-standing, close relationship with DCHC and its subsidiaries, which eventually included Greater Southeast Community Hospital Corporation I (an entity created as a DCHC subsidiary to acquire a hospital in Washington, D.C.).  As part of that relationship, Epstein Becker executed opinion letters in December 1999 used in connection with Greater Southeast's fully leveraged acquisition of its hospital.  That acquisition required Greater Southeast to assume (as non-recourse obligations against its assets that were being pledged) all liabilities of all of the debtors owed to National Century, which at that time totaled approximately $205 million.

Two of the opinion letters executed by Epstein Becker allegedly contained language that Epstein Becker (1) "assumed" neither DCHC nor Greater Southeast was "insolvent" at the time of the transaction; or (2) "assumed" the accuracy of certain debtor

12

representations that DCHC and Greater Southeast were solvent at
the time of the transaction and would not become insolvent by
reason of the transaction.  As discussed later, the claims
relating to those opinion letters were eventually dismissed on
the basis that no reasonable reliance can be placed on the parts
of an opinion letter that merely hypothesize that certain facts
are true.  Had those claims survived that hurdle, the factual
premise of those claims--that the assumptions were inaccurate and
Epstein Becker had reason to know that--was not bad faith for the
reasons discussed next with respect to the one remaining opinion
letter.

In the remaining opinion letter Epstein Becker went a step
further beyond only making assumptions: it represented that it
found nothing in its representation of Greater Southeast that led
it to believe that the representations of solvency of Greater
Southeast made in one document that Epstein Becker reviewed were
"inaccurate or incomplete in any material respect."  One of the
certificates Epstein Becker reviewed stated that Greater
Southeast was solvent and stated that Greater Southeast "will not
become insolvent . . . and . . . will have an adequate amount of
capital to conduct its business and anticipates no difficulty in
continuing to do so for the foreseeable future."  Epstein Becker
allegedly knew or should have known that this representation was
false.  To support that allegation, the plaintiff noted that when

13

Epstein Becker executed the opinion letter in December 1999, an
Epstein Becker partner had attended a meeting of the DCHC board
of directors on March 9, 1998.  At that meeting, it was noted
that the consolidated balance sheet for DCHC and its subsidiaries
reflected "a negative net worth of ($10,459,539) and that "the
. . . consolidated income statement for January [1998] shows a
net loss of $(353,215) compared to a budgeted net loss of
$(367,157)."  (Docket Entry ("DE") No. 399 Ex. 8).  Prior to the
purchase by Greater Southeast of the hospital, an e-mail of
November 30, 1999, revealed that an Epstein Becker partner
involved in advising DCHC regarding the forthcoming purchase was
of the view that DCHC "will have its hands full trying to turn
the hospital around quickly post-acquisition, and staunch the
negative cash flow . . . ."  (DE No. 399 Ex. 9).

Epstein Becker has demonstrated via evidence presented in a
later motion for summary judgment that Epstein Becker had no
reason to believe that any of the representations of solvency
made in the documents Epstein Becker reviewed were "inaccurate or
incomplete in any material respect."  Epstein Becker has also
demonstrated that the evidence that the plaintiff relied upon as
suggesting to the contrary was at best extremely weak.  There was
a 20-month gap between the meeting that the Epstein Becker
partner attended in March 2008, and the opinion letter of
December 2009.  The minutes of the March 2008 meeting referred to

14

DCHC attempting to raise $50,000,000 in equity capital
investments in DCHC (which would have increased the debtor's
assets without increasing its debts, and have resulted in
substantial solvency) in conjunction with a forthcoming
acquisition of a hospital in Chicago.  In the 20-month period
since March 2008, DCHC had engaged in the acquisition of several
hospitals the value of which would affect the solvency issue.

Finally, the March 2008 board meeting addressed the solvency
of DCHC, not Greater Southeast.  As to that latter point,
however, the plaintiff's attorneys note that Greater Southeast
had signed a security agreement (Pl. Attorneys' Ex. 29A) that
posted the collateral to secure not only Greater Southeast's
obligations to NCFE but also the obligations owed to National
Century by DCHC and other DCHC affiliates.  That security
agreement pledged not only Greater Southeast's real property
described in an attachment to the security agreement but also
"all . . . machinery, fixtures, furniture and articles of
property now owned or hereafter acquired by the Borrower located
on the Premises, and used or acquired for use in the business of
the Borrower . . . ."  Epstein Becker contends that Greater
Southeast pledged only some of its assets to secure debts of DCHC
and other affiliates, but the plaintiff's attorneys could
reasonably argue that Greater Southeast had pledged at least the
majority of its assets.  The term "Premises" was defined as

meaning the real property described in an attachment to the
security agreement, but Exhibit 29A did not include the
attachment.  The term "Premises" presumably included at a minimum
the hospital facility, Greater Southeast's principal asset, and
the plaintiff's attorneys could view Greater Southeast as having
pledged so much of its assets that any significant insolvency of
DCHC and its affiliates would result in Greater Southeast being
insolvent as well because the acquisition was essentially fully
leveraged.[5]

The plaintiff's attorneys, in other words, relied on
information, albeit slim, that constituted a good faith basis to
justify their belief that as of December 1999 Epstein Becker had
reason to believe that the representations *were* inaccurate,
essentially contending that the dire circumstances of DCHC in
March 1998 warranted Epstein Becker's being hesitant in
certifying that it had no reason to believe that the
representations in December 1999 were inaccurate.  It was a close
call whether they could legitimately assert that claim, but not
bad faith.  Moreover, prior to the entry of summary judgment in
Epstein Becker's favor, the plaintiff's attorneys did not
multiply proceedings regarding that claim.  Even if the assertion
of the claim could be viewed as done in reckless disregard of its

---

[5]   The burden of proof was on Epstein Becker to demonstrate
bad faith or recklessness, and the missing attachment must thus
be viewed in a light unfavorable to Epstein Becker.

16

infirmities, the plaintiff's attorneys allowed the adjudication of the claim to progress to summary judgment without unreasonably multiplying the proceedings to get to that point.

The plaintiff filed his first amended complaint on April 15, 2005, renumbering the counts and adding additional claims against Epstein Becker relating to certain opinion letters and allegedly unreasonable compensation paid to Epstein Becker. The amended complaint cannot be viewed as unreasonably multiplying the proceedings as it merely added new claims that had not been asserted previously.

In a decision of October 31, 2005, addressing the first amended complaint, the court dismissed "all counts [against the law firm defendants] except for Count XIV insofar as it alleges malpractice based on the Law Firm Defendants' negligent preparation of opinion letters used by the NCFE Entities to overfund the Debtors and Counts XVI-XXI, which state claims for fraudulent conveyances under federal and Arizona state law." *Alberts v. Tuft (In re Greater Southeast Community Hosp. Corp. I)*, 333 B.R. 506, 539 (Bankr. D.D.C. 2005).

The court dismissed claims (in Counts XI and XII) against Epstein Becker based on causing deepening insolvency and aiding and abetting deepening insolvency, rejecting the view of some decisions that deepening insolvency could be an independent tort. 333 B.R. at 516-17. The court also dismissed the trustee's

17

claims (in Count XV) based on 11 U.S.C. § 544(a), 333 B.R. at
517-22, rejecting the reasoning of decisions that supported the
trustee's attempted invocation of § 544(a), 333 B.R. at 517, and
rejecting what the court characterized as a clever alternative
argument by the plaintiff.  333 B.R. at 521.  These dismissed
claims cannot be said to have been pursued recklessly or in bad
faith.

As to Count XIII (Aiding And Abetting Breach Of Fiduciary
Duties), the amended complaint alleged in paragraph 306 that
Epstein Becker "knowingly participated in the D&O Defendants'
breach of their fiduciary duties by (1) failing to inform the
Debtors of the consequences associated with the Debtors'
deepening insolvency; and (2) negligently preparing opinion
letters that allowed NCFE to perpetuate a Ponzi scheme and
overfund the Debtors."  The court ruled that the amended
complaint failed to allege a breach of fiduciary duty by the
directors and with respect to funding from National Century, 333
B.R. at 529, and that, alternatively, to the extent the
allegation was that Epstein Becker gave bad business advice, a
law firm, hired to give legal advice, cannot be sued for giving
bad business as opposed to legal advice.  333 B.R. at 529 n.28.

Count XIV (Legal Malpractice - Negligence) alleged in
paragraph 312 that Epstein Becker breached its professional
duties of care to the debtors "by (1) failing to inform the

Debtors of the consequences associated with the Debtors'
deepening insolvency; and (2) negligently preparing opinion
letters that allowed NCFE to perpetuate a Ponzi scheme and
overfund the Debtors." The court ruled that the first ground
failed to establish legal malpractice because a law firm is not
hired to give business advice, and, in any event, the plaintiff
had failed to plead any *legal* harm arising with respect to the
National Century funding. 333 B.R. at 529-30. The dismissed
claims that were based on Epstein Becker having given erroneous
business advice may have been without merit, but they were not
pursued recklessly, in bad faith, or to multiply the proceedings.

As to the second alleged ground for finding legal
malpractice, the court noted:

The Complaint states in pertinent part:

Over the years of representation, Epstein
Becker provided a number of legal opinions to
NCFE on behalf of the Debtors. The legal
opinions were drafted in accordance with
NCFE's requests and, in some cases, were
initially drafted by NCFE. The legal
opinions allowed NCFE to perpetuate a Ponzi
scheme. (Compl. [¶ 129]).

. . . .

Other paragraphs allege that Epstein Becker authored an
opinion letter to NPF X, Inc. (Greater Southeast's
primary lender and an NCFE subsidiary) containing
assumptions which the author knew to be false.
(Compl.¶ 133). Another letter was sent that same day to
NPF XII, Inc. and NPFS, Inc. (Compl. ¶ 134). These
NCFE spin-offs overfunded Greater Southeast, thereby
deepening its insolvency. (Compl. ¶ 112).

19

Although criticizing the lack of definiteness as to which debtors Epstein Becker was representing (333 B.R. at 530 n.30 and 531 n.31), the court concluded that this part of Count XIV sufficed to state a claim for legal malpractice.  333 B.R. at 530-31.

Epstein Becker has appropriately taken umbrage at the plaintiff having argued in opposition to the motion to dismiss the first amended complaint that "[b]ecause at minimum the Law Firm Defendants turned a blind eye to the Debtors' substantial problems and rubber-stamped opinion letters, the Debtors' insolvency was steadily increased with no recovery in sight." Oppos. (DE No. 203) at 22.  The term "Law Firm Defendants" included both Epstein Becker and Kutak Rock, and the assertion inappropriately tarred Epstein Becker by including it with the other Law Firm Defendant in a list of alleged misdeeds by the Law Firm Defendants that included rubber stamping that had been pled, if at all, only with respect to Kutak Rock.  The argument must be read in the context of the first amended complaint which alleged at ¶ 130 that NCFE had initially drafted some of the opinion letters that Epstein Becker issued, and which alleged at ¶ 145 that Kutak Rock prepared opinion letters that were largely drafted by NCFE.  Read in that context, the argument regarding rubber stamping can be viewed as relating to Kutak Rock, not Epstein Becker.  Lumping Epstein Becker and Kutak Rock together in the same argument that included the reference to rubber

stamping was inappropriate conduct because it left the impression that it was being asserted that both Law Firm Defendants engaged in such misconduct. Nevertheless, with respect to the claims prosecuted against Epstein Becker, there never was a claim based on rubber stamping, and thus no occasion for sanctions in that regard.

As to what *was* pled as part of any claim against Epstein Becker, namely, that National Century prepared initial drafts of some opinion letters, National Century *did* prepare the initial draft (Respondents' Ex. 15(a)) of the one opinion letter later issued by Epstein Becker that remained at issue prior to the grant of summary judgment. That draft included some language (but not much) that eventually was contained in the opinion letter that Epstein Becker issued, and in no way can Epstein Becker be viewed as having rubber stamped National Century's draft. But ¶ 130 of the first amended complaint did not assert rubber stamping by Epstein Becker and was not a factually unfounded claim in regard to National Century having prepared initial drafts in some instances. Accordingly, that paragraph is not a basis for sanctions.

In Counts XVI-XXI, the plaintiff also sought to recover payments made to Epstein Becker as fraudulent conveyances because the debtors made the transfer of legal fees to Epstein Becker without receiving reasonably equivalent value. Because the

complaint had sufficed to state a claim for legal malpractice,
the court concluded that the fraudulent conveyance claims
survived.  333 B.R. at 531-32.

The court recognized that the plaintiff had not had an
opportunity to again amend the complaint in response to the
specific objections raised by the defendant directors and
officers, and, accordingly, the court gave the plaintiff leave to
file a second amended complaint to cure any of the defects
identified as to certain of the claims against those defendants.
333 B.R. at 539.  In turn, the court granted leave to amend the
complaint as to Epstein Becker regarding the first prong of its
malpractice count (the prong addressing advice regarding
deepening insolvency) and regarding aiding and abetting breach of
fiduciary duty if new allegations were made against the defendant
officers and directors that would support amended claims against
Epstein Becker.  333 B.R. at 539 n.40.  The court indicated that
Epstein Becker might be entitled to a more definite statement as
to the allegations regarding negligent preparation of opinion
letters, 333 B.R. at 539-40 and 540 n.41, and regarding
identifying, as to each opinion letter, the debtors for which the
law firms had been hired to prepare the letters, 333 B.R. at 531
n.31.

When the law firm defendants sought a more definite
statement as to the first amended complaint, the plaintiff

opposed their motions by indicating that the forthcoming second
amended complaint would provide a more definite statement.  (DE
No. 158).  The court granted the motions for a more definite
statement, directing that when the plaintiff filed his second
amended complaint he was required to provide certain definite
information regarding the opinion letters.  (DE No. 168).

The plaintiff filed his second amended complaint on December
23, 2005.  (DE No. 171).  The filing of memoranda addressing
motions to dismiss the second amended complaint was not completed
until May 4, 2006, and oral argument was held on May 16, 2006.
The court addressed Epstein Becker's motion to dismiss the second
amended complaint in a decision of September 26, 2006.  *Alberts
v. Tuft (In re Greater Southeast Community Hosp. Corp. I)*, 353
B.R. 324 (Bankr. D.D.C. 2006).

With respect to the claims of malpractice, the second
amended complaint included two sets of allegations the court
dismissed out of hand as not having asserted wrongdoing:

> Alberts alleges that Epstein Becker "sponsored" the
> "misleading and false" testimony of NCFE CEO Lance
> Poulsen at a hearing before this court on November 11,
> 1999, and that Epstein Becker "assist[ed]" the D & O
> Defendants in their pursuit of a contract with the
> District of Columbia for millions of dollars that
> inured to the benefit of the D & O Defendants through
> their self-serving use of those funds (Compl.¶¶ 175-80,
> 182-83).  There are no allegations that Epstein Becker
> knew that Poulsen's testimony was false or that it knew
> that the D & O Defendants were wasting their
> fiduciary's money, and therefore no allegations of
> wrongdoing.

23

353 B.R. at 359.  The count asserting malpractice claims, although incorporating these allegations, addressed the opinion letters as having constituted malpractice, and did not seek relief regarding these allegations, and added nothing to the claims asserted.  Accordingly, this was an inappropriate cheap shot, alleging an irrelevant fact whose only purpose was to besmirch Epstein Becker by innuendo via guilt by association, and put forward to advance the claims for relief that *were* asserted. Nevertheless, these allegations did not multiply the proceedings, and, not having asserted claims for relief, cannot be viewed as bad faith prosecution of invalid claims.

The second amended complaint, for the first time, sufficed to plead claims for breach of fiduciary duty against some of the defendant directors and officers with respect to the debtors' deepening insolvency.  353 B.R. at 338-43.  Taking up the court's invitation in its earlier decision, 333 B.R. at 539 n.40, the second amended complaint pled anew, in that context of breaches of fiduciary duty by certain directors and officers, that Epstein Becker had committed malpractice with respect to its advice regarding deepening insolvency, and had aided and abetted the breaches of fiduciary duty.  The second amended complaint, however, did not plead that Epstein Becker knew or should have known of those breaches of fiduciary duty when they approved the allegedly harmful financial transactions with National Century

24

entities, and instead only pled that Epstein Becker knew or

should have known of the effects of the debtors' deepening

insolvency.  Without more, the court ruled, this did not amount

to an allegation that Epstein Becker should have known that the

directors and officers were breaching fiduciary duties, because,

as the court had explained in its previous decision, a company's

acquisition of additional debt, by itself, is not a legal wrong.

*Alberts v. Tuft*, 353 B.R. at 357-58.  Accordingly, the court

dismissed the claims asserted in the second amended complaint for

malpractice in giving legal advice regarding deepening

insolvency, *id.*, and the claims for aiding and abetting the

breach of fiduciary duty, 353 B.R. at 359-60.[6]  I address in part

B, below, whether sanctions are appropriate with respect to these

dismissed claims.

Shorn of those dismissed claims, the case against Epstein

---

[6]  More fully, the court stated:

As the court explained in its prior opinion, "a
company's acquisition of additional debt, by itself, is
not a legal wrong . . . ."  *In re Greater Southeast
Cmty. Hosp. Corp. I*, 333 B.R. at 530.  Deepening
insolvency is not a tort, and a law firm's knowledge
that a corporate transaction is going to deepen the
corporation's insolvency does not mean that the law
firm knows that the corporation's fiduciaries are
breaching their duties of care or loyalty in approving
such transactions.  *Ergo*, the failure to advise the
debtors of the consequences of acquiring excess debt is
not malpractice.

353 B.R. at 357-58.

25

Becker boiled down to the alleged inaccuracies in opinion letters. The second amended complaint dropped the prior allegation that some of the opinion letters were initially drafted by National Century. By dropping that allegation, the plaintiffs' attorneys could not be said to have multiplied the proceedings in that regard.

Turning to what the second amended complaint *did* allege, two of the opinion letters it addressed contained assumptions of fact that Epstein Becker allegedly knew or should have known were erroneous. The court dismissed those allegations on the basis that "[w]hen a lawyer prepares legal opinions on the basis of assumed or hypothesized facts, she puts her client and anyone else reading the opinion on notice that she is not vouching for the veracity or accuracy of those facts." 353 B.R. at 358.

That left only one opinion letter, and Epstein Becker had represented in that letter that nothing had come to its attention in the course of its representation of the debtors which had led it to believe that any representations set forth in any of the certificates relating to a National Century loan were inaccurate or incomplete in any material respect. Second Amended Compl. ¶ 174. One of the certificates stated that Greater Southeast was solvent and stated that Greater Southeast "will not become insolvent . . . and . . . will have an adequate amount of capital to conduct its business and anticipates no difficulty in

continuing to do so for the foreseeable future." Epstein Becker allegedly knew or should have known that this representation was false. *Id.* This sufficed to state a claim of legal malpractice unless barred by an affirmative defense.

Based on an *in pari dilecto* defense, the *direct* claims for malpractice as to even the one opinion letter were dismissed. 353 B.R. at 361-369. The plaintiff's arguments against the *in pari dilecto* defense were based on reasoning, supported by at least one decision, that had not been rejected in this circuit. The assertion of the direct claims for malpractice in the face of the *in pari dilecto* defense is accordingly not a proper basis for imposing sanctions even under Fed. R. Bankr. P. 9011, s*ee Burns v. George Basilikas Trust*, 599 F.3d 673, 677 (D.C. Cir. 2010), and thus certainly not under § 1927 or the court's inherent authority.

All that survived as to Epstein Becker were claims to avoid and recover payments of attorney's fees to Epstein Becker as fraudulent conveyances, which turned on the allegedly negligent preparation of the one opinion letter, and claims (based on such avoidability) for disallowance or subordination of Epstein Becker's claims against the debtors. 353 B.R. at 369-70.

After the issuance of the decision regarding the motions to dismiss the second amended complaint, the court set deadlines for completing discovery and for responding to Epstein Becker's

27

motion for summary judgment.  The plaintiff's attorneys never
conducted the depositions they had noticed up, and failed to
oppose Epstein Becker's motion for summary judgment, which led to
the court's granting that motion as unopposed.

B.

Sanctions are not warranted based on Epstein Becker's
contention that the plaintiff's initial complaint and later
amended complaints rested on erroneous views of the law.
"Something more than a lack of merit is required for § 1927
sanctions or they would be due in every case."  *McMahan v. Toto*,
256 F.3d 1120, 1129 (11th Cir. 2001), *amended on reh'g with
respect to other parts of decision*, 311 F.3d 1077 (11th Cir.
2002), *cert. denied*, 539 U.S. (2003) (an erroneous argument
regarding the collateral estoppel effect of a state court
decision did not warrant § 1927 sanctions).  The "advancement of
meritless positions . . . unless it is utterly without colorable
basis, will not support" a § 1927 sanction.  *Kassatly v. Dynaco
Acquisition Corp.*, 1997 WL 31104, at *3 (D.D.C. Jan. 22, 1997)
(meritless arguments regarding the interpretation of an
arbitration statute did not justify § 1927 sanctions).

To the extent that this court, in addressing the motions to
dismiss, determined some of the plaintiff's claims were not in
accordance with the law, their shortcomings did not extend to the
point that they were without a colorable basis, unpersuasive

though they may have been.  These shortcomings do not support a
finding of bad faith or recklessness, and thus recovery under §
1927 and the court's inherent authority is unwarranted for the
plaintiff's erroneous views.

The closest Epstein Becker has come to showing sanctionable
conduct with respect to erroneous assertions of law was the
plaintiff's attorneys renewal of the claims for malpractice based
on advice regarding deepening insolvency (and regarding aiding
and abetting breaches of fiduciary duty regarding deepening
insolvency).  The court's decision addressing the first amended
complaint invited assertion anew of such claims if, for the first
time, the second amended complaint were adequately to plead
breaches of fiduciary duty by directors and officers regarding
deepening insolvency.  333 B.R. at 539 n.40.  What the court said
elsewhere in that decision may have been a clear indicator (as
discussed in n.6, *supra*) of what would happen to the second
amended complaint's claims regarding malpractice with respect to
deepening insolvency and with respect to aiding and abetting
breaches of fiduciary duty even if breaches of fiduciary duty by
the directors and officers were pled in the second amended
complaint.  But that issue had not yet been definitively
resolved, as the court had expressly contemplated that the
plaintiff could renew those claims if breaches of fiduciary duty
by directors and officers were adequately pled.  In any event,

29

the pleading of those claims anew cannot be said to have
multiplied the proceedings unreasonably.  Instead, it pled the
claims anew shed of the defect of failing to relate to any
misconduct of the directors and officers regarding deepening
insolvency, thus presenting a cleaner set of allegations for
determining whether attorneys have a duty to advise a client
regarding the dangers of deepening insolvency.  The claims were
readily disposed of (*see* n.6, *supra*), and the conduct thus did
not unreasonably multiply the proceedings.  To the extent the
plaintiff's attorneys reasoned that pleading the claims anew in
the context of the allegations of breaches of fiduciary duty by
the directors and officers would alone suffice to state valid
claims against Epstein Becker, that was erroneous reasoning, but
not bad faith.  Accordingly, sanctions are not warranted either
under § 1927 or pursuant to the court's inherent power.

## C.

Epstein Becker also argues that the plaintiff had no factual
basis for his claims in the initial complaint.  In relation to
the initial complaint, the act of filing a meritless complaint
(at least one never asserted by the attorney in other
proceedings) is insufficient to warrant imposition of § 1927
sanctions.  *Steinert v. Winn Group, Inc.*, 440 F.3d 1214, 1225
(10th Cir. 2006) ("[I]t is not possible to multiply proceedings
until *after* those proceedings have begun.") (emphasis in

30

original); *DeBauche v. Trani*, 191 F.3d 499, 511 (4th Cir. 1999)

("as a matter of law . . . the filing of a single complaint

cannot be held to have multiplied the proceedings unreasonably

and vexatiously"), *cert. denied*, 529 U.S. 1033 (2000); *Zuk v.*

*Eastern Pa. Psychiatric Inst.*, 103 F.3d 294 (3d Cir. 1996); *In re*

*Keegan Mgmt. Co., Sec. Litig.*, 78 F.3d 431, 435 (9th Cir. 1996).[7]

Neither are sanctions under the court's inherent authority

appropriate based upon the lack of a factual basis for the

complaint.  The initial complaint's claims were legally unsound,

but the allegations of fact appear to have had a colorable basis.

There is no evidence of a subjective, bad faith motive for filing

the complaint, nor does the objective evidence permit an

inference of bad faith.

D.

In relation to the amended complaints and the responses in

opposition to Epstein Becker's motions to dismiss, Epstein Becker

similarly seeks sanctions due to a lack of a factual basis.  In

opposing the motions to dismiss, the plaintiff was entitled to

attempt to show that he had pled valid claims against Epstein

---

[7]   To the extent *In re TCI, Ltd.*, 769 F.2d 441, 448 (7th
Cir. 1985), suggests that § 1927 can be a basis to sanction the
filing of an initial complaint, the Seventh Circuit rejected that
suggestion in *Dahnke v. Teamsters Local 695*, 906 F.2d 1192, 1201
n.6 (7th Cir. 1990), stating that "[s]ince the basis of Judge
Shabaz's imposition of sanctions seems to have been Dahnke's
failure to investigate the legal foundation for his claim before
filing it in federal court . . . section 1927 is not implicated
here."

Becker, and did not add facts beyond those pled in the complaints.  The claims in the amended complaints against Epstein Becker regarding deepening insolvency and aiding and abetting were dismissed as a matter of law, and Epstein Becker has not pointed to those claims as factually unsound.  What was left were the opinion letters.[8]

With respect to factual allegations regarding the opinion letters, as discussed in the court's review of the proceedings preceding the granting of summary judgment, Epstein Becker has not shown that the factual allegations were ones for which the attorneys had no colorable basis for making the allegations, and thus there was no bad faith.  The inferences the plaintiff's attorneys drew to reach their factual assertions may have been extremely weak, but they were not made in bad faith.  Nor did the assertion of the claims unreasonably multiply the proceedings. The claims were adjudicated in due course pursuant to Epstein Becker's motion for summary judgment.  Accordingly, despite the thin factual basis for the claims relating to the opinion letters, Epstein Becker has not shown that sanctions are

---

[8]  As noted previously, the claims relating to two of the opinion letters (those that set forth assumptions of fact that were not true facts) were dismissed as legally insufficient, but depended on the same thin factual foundation as the third opinion letter.  The allegations regarding the third opinion letter survived as a matter of law with respect to the fraudulent conveyance claims to recover compensation paid for that opinion letter, and as a basis for seeking disallowance or subordination of Epstein Becker's claims against the debtors.

32

warranted under § 1927 or the court's inherent authority.[9]

E.

Epstein Becker also contends that the plaintiff's failure
promptly to attempt to gather evidence to support his claims
unreasonably multiplied the proceedings, but Epstein Becker has
not shown that such conduct was the result of bad faith or
recklessness.  The Court of Appeals has emphasized that bad faith
and recklessness are to be distinguished from acts that are
unintended, inadvertent, or negligent.  *See Wallace*, 964 F.2d at
1219 (citation omitted).  These latter acts will not support
sanctions under § 1927 or the court's inherent power.

Epstein Becker's evidence, taken at its strongest, indicates
that the plaintiff's attorneys did not exhibit the due diligence
expected of attorneys in promptly and thoroughly pursuing
discovery and development of the factual basis for a plaintiff's
claims.  The evidence does not demonstrate any improper
motivation.  Instead, the decision not to pursue discovery was
likely prompted by the difficulties that the plaintiff would face

---

[9]  There having been no bad faith or an unreasonable
multiplication of proceedings, Epstein Becker's contention that
the complaints lacked a factual basis seems more properly suited
for a motion for sanctions under Fed. R. Bankr. P. 9011(b)(3), a
provision not raised by Epstein Becker.

once such discovery was completed,[10] and the relatively small

amount of the claim still left in play after the court's decision

of September 21, 2006 (absent a successful appeal of the court's

prior rulings).  This is what likely prompted the plaintiff as

early as December 4, 2006, to focus on attempting to settle the

remaining claims against Epstein Becker.  Discovery efforts were

terminated only once the plaintiff's attorneys thought they had a

settlement in principle that would be acceptable to the DCHC

Liquidating Trust committee (which had to approve any settlement

by the plaintiff).

Although lax pursuit of a claim is in no way commendable, it

does not demonstrate a deliberate attempt to continue the

proceedings for an improper purpose or to obstruct the resolution

---

[10]  The court had noted in its decision addressing the
second amended complaint that to the extent that the malpractice
claims survived (which they did only as an element of the
fraudulent conveyance claims, and of the claims for disallowance
or subordination of Epstein Becker's claims against the debtors),
the plaintiff "would have a tough row to hoe."  *Alberts v. Tuft,*
353 B.R. at 359 n.52.  Specifically:

> He would need to show that the Law Firm Defendants did
> not exercise a reasonable standard of care in reviewing
> the documents described in the supposedly erroneous
> opinion letters, that the debtors relied on this
> specific guarantee to close their deals with NCFE and
> its subsidiaries ( *i.e.*, that the deals could not have
> closed had these certifications not been there), and
> that these transactions actually impaired the business
> operations of the debtors to some degree.  This task
> might or might not prove to be possible in the long
> run . . . .

*Id.*

of the proceeding.  Nor does it demonstrate recklessness that
leads to unreasonably multiplying proceedings.  The Federal Rules
of Civil Procedure and a court's local rules and orders set the
parameters for pursuing the factual development of a case, and a
plaintiff's failure to develop the case through discovery within
those parameters may result in that plaintiff's being unable to
prove its case, but that failure does not demonstrate a
multiplication of proceedings.  Nor, on the facts of this case,
does it demonstrate bad faith.

Although sanction determinations are very fact-specific, *see
Wallace*, 964 F.2d at 1219, other sanction cases provide some
insight here.  In *Wallace*, a defense attorney, with only six days
remaining before trial, had not yet subpoenaed witnesses.  *Id.* at
1215.  The next day, the attorney contacted an investigator to
serve the subpoenas; however, they were not served, and the
attorney informed the court only one day before trial of his
failure to serve the subpoenas.  *Id.*  On the day of the trial,
the witnesses did not show up at 9:30 am for the trial.  *Id.* at
1216.  However, sanctions under § 1927 and the court's inherent
authority were not warranted because such sanctions should "flow
only from an intentional departure from proper conduct, or, at a
minimum, from a reckless disregard of the duty owed by counsel to
the court."  *Id.* at 1120.  Just as the attorney in *Wallace*
demonstrated a lax approach to making necessary preparations for

35

trial, so too--according to Epstein Becker's evidence--the plaintiff's attorneys were lax in the development and pursuit of litigation.

This laxness is in stark contrast to cases that have warranted sanctions:

- In *Fritz v. Honda Motor Co., Ltd.*, the plaintiff's attorney unilaterally advised his client not to attend a scheduled deposition; took a deposition despite knowing that he was no longer going to pursue the case in that forum; and informed the parties at that deposition that he was *considering* pursuing the claim in state court, despite having already filed a complaint in state court.  818 F.2d 924, 924-25 (D.C. Cir. 1987).

- In *Healey v. Labgold*, the plaintiff filed a complaint with five claims that had already been deemed part of his bankruptcy estate, and thus claims only the trustee could bring.  231 F. Supp. 2d 64, 68 (D.D.C. 2002). There, the court viewed his actions as "the kind of purposeful, intentional action that rises well above negligence, to at least the level of recklessness." *Id.*

- In *Morrison v. Int'l Programs Consortium, Inc.*, counsel's failure to attend a trial date was a

36

"conscious, intentional decision" because he knew the

date of the trial and had no valid excuse why he

neglected to act in conformity with the dates scheduled

by the court.  240 F. Supp. 2d 53, 58 (D.D.C. 2003).

The common denominators of these latter cases are the

deliberateness of the sanctioned parties' actions and the bad

faith and vexatiousness inherent in pursuing those actions which

it was clear (or should have been clear) would lead to disrupting

court proceedings.  The evidence here does not establish that

level of deliberateness and bad faith in failing to pursue

discovery, and although the failure may have recklessly cost the

plaintiff his case, it did not recklessly multiply the

proceedings.  Rather, it cost the plaintiff the ability to oppose

the motion for summary judgment, and thus resulted in his losing

the case, and flowed from the belief that a settlement was

imminent.

F.

Epstein Becker further argues that the plaintiff's attorneys

acted in bad faith in their continuing failure to dismiss the

plaintiff's claims when they determined those claims were no

longer viable.  (*See, e.g.,* DE No. 382, Attachment 2, pp. 14-15.)

There is a conflict among the circuits as to whether 28 U.S.C. §

1927 imposes such a duty on counsel to seek to have its client's

claims dismissed when counsel determines those claims are no

37

longer viable,[11] and no opinion in this circuit appears to
resolve the matter.[12]

However, regardless of whether 28 U.S.C. § 1927 encompasses
inaction which multiplies proceedings, such inaction is
sanctionable under the court's inherent authority. "[W]hen there
is bad-faith conduct in the course of litigation that could be
adequately sanctioned under the Rules, the court ordinarily
should rely on the Rules rather than the inherent power. But if
in the informed discretion of the court, neither the statute nor
the Rules are up to the task, the court may safely rely on its
inherent power." *See Chambers*, 501 U.S. at 50. A court has the
inherent authority to "assess attorney's fees when a party has
acted in bad faith, vexatiously, wantonly, or for oppressive

---

[11]   As examples, the Seventh Circuit has held that § 1927
imposes a continuing duty, *see Jolly Group, Ltd. v. Medline
Indus., Inc.,* 435 F.3d 717, 720 (7th Cir. 2006) (citing *Dahnke v.
Teamsters Local 695*, 906 F.2d 1192, 1201 n.6 (7th Cir. 1990)).
In discussing Rule 11 in conjunction with § 1927, the First
Circuit has held that a continuing duty exists, *see
Alvarado-Morales v. Digital Equipment Corp.,* 843 F.2d 613, 618
(1st Cir. 1988), while the Fifth Circuit has held that no such
duty exists, *see Thomas v. Capital Sec. Services, Inc.,* 836 F.2d
866, 872 n.9 (5th Cir. 1988).

[12]   The United States District Court for the District of
Columbia, in an unpublished opinion, while rejecting the
imposition of a duty to dismiss under Fed. R. Civ. P. 11, noted
that "[f]or any continuing abuse of court processes, the court
may resort to section 1927 or to its inherent power." *Norris v.
American Nat. Red Cross*, 1988 WL 90396, at *3 (D.D.C. 1988).
*Norris* does not parse whether a continuing duty to withdraw
unsupported claims constitutes an "abuse of court processes" or,
if it does, whether the conduct is sanctionable under both § 1927
and the court's inherent authority.

reasons," *id.* at 45-46, because it has a duty to police its own proceedings and the counsel and parties before it.  Thus, where counsel or a party endeavors to delay or disrupt litigation in bad faith, whether by action or inaction, that course of conduct is sanctionable under the court's inherent authority.  *See Hutto v. Finney*, 437 U.S. 678, 690 (U.S. 1978) ("An equity court has the unquestioned power to award attorney's fees against a party who shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.") (citations omitted).

Epstein Becker argues that the plaintiff's attorneys had a duty to withdraw the plaintiff's claims throughout the litigation because they never had any grounds upon which to base those claims against Epstein Becker.  (*See* DE No. 383, Memo. at 6.)  However, as discussed above, Epstein Becker has failed to demonstrate that the plaintiff's attorneys filed and amended the complaint in bad faith and without any colorable basis.  Therefore, Epstein Becker has failed to prove that the plaintiff's attorneys had any duty to withdraw the claims during that time.  At the point that the plaintiff's opportunity to conduct discovery and to oppose the motion for summary judgment had expired, the plaintiff's attorneys were operating under the good faith belief that the claims that the plaintiff was pursuing would be mooted by what they expected would be a settlement of the matter.  Moreover, by then, the work had already been done in

seeking summary judgment, and hence the plaintiff's attorneys'
inaction cannot be said to have multiplied the proceedings.

F.

Epstein Becker takes specific issue with the plaintiff's
attorneys' request for discovery to address the summary judgment
motion, because this request prolonged the litigation and the
plaintiff's attorneys ultimately did not pursue such discovery in
any significant way.  (DE No. 383, Attachment 2, pp. 14-15, 17.)
The evidence does not demonstrate that this was done in bad faith
or with reckless disregard for the delay it would engender.
Rather, after requesting an additional discovery period from the
court, the plaintiff's attorneys decided instead to pursue
settlement.  This evidence does not show that the plaintiff's
attorneys determined the plaintiff's claims were without any
factual basis; rather, the evidence is more likely indicative of
a much more common realization in litigation--that litigating the
matter was unlikely to produce an outcome that warranted the
expense of litigation.

III

Alberts' conduct in one aspect of this litigation does rise
to the level of bad faith, sufficient to sustain an award of fees
and expenses under both 28 U.S.C. § 1927 and the inherent
authority of the court.  The plaintiff's motion to vacate the
summary judgment order and establish a new briefing and discovery

40

schedule was baseless, unreasonable, unnecessarily prolonged the proceedings, and was filed in bad faith.

A.

After the court had ruled on the motion to dismiss the second amended complaint on September 21, 2006, Epstein Becker filed a motion for summary judgment and made clear that it was ready to provide discovery expeditiously in order to permit a prompt disposition of its motion for summary judgment.  Epstein Becker filed its motion for summary judgment on November 2, 2006. At a scheduling conference on that date, Epstein Becker made clear that it wanted the deadline for any discovery that was needed to oppose its motion for summary judgment to be set so that it was completed on an expedited basis, and sooner than the deadline for other discovery in the adversary proceeding. Epstein Becker's counsel stated, "All the documents have been produced informally, but we'll do it formally if they'd like. And if they want to take the depositions of the five people whose affidavits we filed, they're ready at any time." Tr. (Ex. 1 to DE No. 281) at 6.  He further stated, "If the Trustee wants to also have expert discovery or whatever they want to do, we're game for that.  So my only point is, is we don't want to be kept hostage in this case for another year under the schedule [set for completing other discovery in the adversary proceeding]." *Id.* at 6-7.

41

On November 16, 2006, the plaintiff objected to the motion
for summary judgment under Fed. R. Civ. P. 56(f) on the basis
that he needed time for discovery. (DE No. 281.) Epstein Becker
filed a reply on November 27, 2006, requesting that the court
approve an expedited schedule for discovery, briefing, and
hearing with respect to the motion. (DE No. 287.) On November
30, 2006, the court held a hearing to address the plaintiff's
objection. Epstein Becker's counsel told the court that he
wanted an expedited schedule for discovery related to the motion
for summary judgment instead of being held hostage for more than
a year to the deadline otherwise being set for discovery and
disposition of motions for summary judgment so that there would
be "a [sic] opportunity for the Court to rule earlier and to, in
the words of Moses, 'Let my people go.'" Tr. (DE No. 294, Ex. A)
at 6. The court resolved the matter by setting the following
deadlines and dates with respect to the disposition of Epstein
Becker's motion for summary judgment:

> March 31, 2007, was the last day for completing discovery,
> including the taking of depositions;
>
> April 16, 2007, was the deadline for the plaintiff to file a
> response to Epstein Becker's motion for summary judgment;
>
> April 30, 2007 was Epstein Becker's deadline to file a
> reply; and
>
> May 16, 2007, was the date for hearing the motion for

summary judgment.[13]

It should go without saying that, when a court establishes deadlines, those deadlines are binding on the parties. Even if a court routinely grants consensual modifications of such deadlines, a party is not entitled unilaterally to assume that if promising settlement negotiations are ongoing, the other party will consent to an alteration of the deadlines. Yet, as discussed below, the plaintiff made no effort to adhere to or seek modification of the court-ordered deadlines.

Here, throughout the litigation, Epstein Becker was adamant in securing discovery and briefing deadlines that would provide for an expeditious disposition of its motion for summary judgment. When the plaintiff filed motions (DE Nos. 295 and 304) on December 29, 2006, and on March 16, 2007, to delay deadlines as to the Kutak Rock, based on ongoing settlement efforts, Epstein Becker filed responses (DE Nos. 297 and 307) on January 9, 2007, and on March 27, 2007, stating that it had no objection, provided that the relief did not alter, and was not a basis for modification or reconsideration of, the schedule for disposition

---

[13] On December 4, 2006, the court entered the general scheduling order (DE No. 292), and noted on that order that "[a] separate order will issue regarding the special deadlines (announced in an oral decision of November 30, 2006) designed to place Epstein Becker's motion for summary judgment in a posture to be ripe for disposition." The parties submitted a proposed order setting forth the deadlines that had been announced on November 30, 2006, and the order was signed on March 15, 2007, and entered on March 16, 2007. (DE No. 305.)

of Epstein Becker's motion for summary judgment.  The court's
orders (DE Nos. 302 and 308) addressing the plaintiff's motions
made clear that they did not alter, or provide a basis for
modification or reconsideration of the schedule for disposition
of Epstein Becker's motion for summary judgment.

Commencing December 4, 2006, and continuing until May 8,
2007, the parties exchanged settlement proposals, but the parties
never reached a settlement.  The plaintiff scheduled depositions
for the week of March 25, 2007, with the first depositions to
occur on March 27, 2007.  On the afternoon of March 26, 2007,
Alberts and Daniel J. Carrigan, counsel for Epstein Becker,
engaged in telephone conferences discussing settlement.  Carrigan
then e-mailed Alberts a letter offering to settle the adversary
proceeding, with one of the terms of the settlement to be that
the terms were to be kept confidential only until July 15, 2007.
At 5:53 p.m. on that day, Alberts e-mailed Carrigan, stating:

> Dan, I think we have enough of a deal in principal
> [sic] to nix tomorrow's depositions.  Could you please
> send me a form, short, settlement agreement.

The plaintiff (through Alberts or other counsel) never wrote to
accept the terms of Epstein Becker's March 26, 2007 offer.
Despite the existence of no actual settlement, Alberts did not
request Carrigan to re-set the March 27, 2007 depositions so that
they could be held before the March 31, 2007 deadline for
completing discovery.  Nor did he request Carrigan to agree to

44

seek a modification of the March 31, 2007 deadline so that he
could take discovery later if a deal was not finalized with all
details ironed out.  Nor did he request Carrigan to agree to seek
an extension of the April 16, 2007 deadline for the plaintiff to
oppose the motion for summary judgment pending execution of a
final settlement agreement.  Alberts was sufficiently confident
that a deal would be finalized that he abandoned deposition
discovery by permitting the deadline to pass.  He later failed to
file an opposition to the motion for summary judgment by the
April 16, 2007 deadline.

Alberts assumed that Epstein Becker would agree to push the
deadlines, as occurred with other settlements in the adversary
proceeding, and believed that Epstein Becker would not act to
pursue the motion for summary judgment (which it later did by
filing a reply on April 30, 2007, noting the lack of opposition
to the motion).  Tr. of Hearing of May 25, 2007 (DE No. 373) at
19.  Alberts further explained his being surprised by Epstein
Becker's April 30, 2007 reply (which noted the lack of an
opposition to the motion for summary judgment) by stating:

> frankly, I lost track of the date that there was even a
> motion for summary judgment dismissal.  From my point
> of view I looked, you know, when I was looking at the
> situation I thought we had a deal, we were trying to
> get the final paperwork done, I was busy on a lot of
> different things, and frankly it was nice to have this
> piece taken care of.  I could focus on something else.

*Id.* at 19-20.

45

But Epstein Becker did not lose sight of the scheduling order, and had communicated that to Alberts.  As already noted, on March 14, 2007, the plaintiff had filed a motion to alter deadlines as to Kutak Rock based on ongoing settlement negotiations.  That motion had noted that Epstein Becker objected to the motion "to the extent that this proposed schedule would interfere with the schedule for its motion for summary judgment." On March 27, 2007, the day after Alberts canceled the depositions, Epstein Becker filed a response to the plaintiff's motion stating that it had no objection, provided that the relief did not alter, and was not a basis for modification or reconsideration of, the schedule for disposition of Epstein Becker's motion for summary judgment.  On April 2, 2007, the court entered an order addressing the motion relating to Kutak Rock, and the order (prepared by Epstein Becker) included the proviso requested by Epstein Becker.  Accordingly, Epstein Becker made it abundantly clear to Alberts that the scheduling order regarding its motion for summary judgment was to remain in place and not be altered by any ongoing efforts at settlement.

In nixing the depositions on March 26, 2007, Alberts had asked Carrigan to send a settlement agreement.  On March 28 and 29, 2007, Carrigan sent Alberts a draft Settlement Agreement and

46

the exhibits thereto.[14]  On March 30, 2007, he sent Alberts a
revised version of the proposed Settlement Agreement executed on
behalf of Epstein Becker by the chairman of Epstein Becker's
board of directors.  On April 13, 2007, Alberts sent Carrigan a
revised draft settlement agreement.  On April 18, 2007, Carrigan
sent Alberts a further revised draft settlement agreement, and it
was that proposed settlement agreement that was Epstein Becker's
last offer of relevance to its sanctions motion.  As will be
seen, that offer was rejected.  Between April 18th and 30th,
there was no communication between the parties.  As of April 30,
2007, Alberts was still in the process of soliciting final
comments on that draft.  (DE No. 313, Exhibit A, p. 2.)

April 30, 2007, was also the deadline for Epstein Becker to
file a reply for its summary judgment motion, and Epstein Becker
filed such a reply bringing to the court's attention that the
motion had not been opposed.  (*See* DE No. 310.)  On May 2, 2007,
Alberts sent an e-mail to Epstein Becker's counsel, stating:

> [T]he Trust Committee went ballistic when it saw the
> Epstein Becker reply, and this has undercut their
> confidence that Epstein Becker will soft-play the deal.
> At bottom, I think I can get them to calm down, but **I
> believe it will require one small concession.
> Basically, the Committee does not want the deal itself
> or terms to go public.**  This is mostly out of respect
> to Kutak.  This does not mean Epstein cannot discuss
> the deal with suitors or internally.

---

[14]  Carrigan noted that the drafts remained "subject to
further review and comment by our client."

47

(Emphasis added.)  Alberts made no effort to contact the court
regarding the reply or the pursuit of settlement, and the court
granted the summary judgment motion on May 3, 2007.  (*See* DE No.
311.)  On May 3, 2007, Epstein Becker's counsel wrote to Alberts,
stating that it was regrettable that Epstein Becker's April 18
proposal had been rejected, and stating that the Trust
committee's counter-proposal described in Alberts' May 2, 2007
e-mail "which was not acceptable when first broached in February,
remains unacceptable to our client."

At no time during this period did Alberts sign any draft of
a settlement offer, or communicate to Epstein Becker that he
accepted one.  (*See* DE No. 373, pp. 15-18.)  On May 7, 2007,
Alberts presented Epstein Becker with a revised proposed
settlement agreement that was the same as what Epstein Becker had
previously proposed except that it (1) changed a reference to "a
date certain" to the "July 15, 2007" mentioned elsewhere in the
agreement, and (2) required Epstein Becker to prepare a motion
for withdrawal of the summary judgment order.  He informed
Epstein Becker that it had until that same day at 5:00 p.m. to
accept those settlement terms.  (*Id.*, pp. 17-18.)  Epstein Becker
did not sign the settlement agreement or otherwise accept the
terms, and on the next day, May 8, 2007, Carrigan wrote to
Alberts that the proposed agreement was not acceptable, and

proposed an alternative settlement.[15]

At that point on May 8, 2007, Epstein Becker was entitled
(absent an appeal of the summary judgment) to view the litigation
as at an end pursuant to the fruits of its vigorous insistence
that there be a clear day of reckoning for the plaintiff to
oppose its motion for summary judgment.  But two days later, on
May 10, 2007, the plaintiff filed his motion to vacate the
summary judgment that had been entered a week prior.  (*See* DE No.
313.)  That motion was signed by Alberts and litigated by him as
an attorney for the plaintiff, and, for ease of discussion, will
be referred to as Alberts' motion.

### B.

Alberts' motion to vacate was based upon two subsections of
Fed. R. Civ. P. 60(b), as adopted by Fed. R. Bankr. P. 9024.  (DE
No. 313, pp. 3-4.)  Alberts asserted that vacating the order was
appropriate due to "excusable neglect," pursuant to Rule
60(b)(1), and "any other reason that justifies relief," pursuant
to Rule 60(b)(6).  (*Id.*, pp. 4-5.)  Although Alberts' motion
could be treated as a motion under Fed. R. Civ. P. 59 (because it
was made within the deadline for a Rule 59 motion), the grounds
for relief, and the propriety or impropriety of asserting those

---

[15]   No settlement was reached until *after* Alberts had
unsuccessfully pursued a motion to vacate the summary judgment
order.

49

grounds, would have been the same whether the motion was pursued under Rule 59 or Rule 60.

Alberts' grounds were predicated on Alberts' alleged "good faith belief that the parties reached agreement in March 2007." (*See* DE No. 313, p. 4.)  Under Rule 60(b)(1), Alberts argued it was "excusable neglect" not to file a response to the motion for summary judgment or not to conduct and answer discovery as a result of this belief.  *Id.* at pp. 4-5.  Under Rule 60(b)(6), Alberts argued that relief was necessary to "accomplish justice" because Epstein Becker did not inform the court of its agreement with Alberts to settle when Epstein Becker filed its reply to its summary judgment motion.  *Id.*  However, Alberts presented no good-faith basis for his asserted belief that he had settled the case with Epstein Becker.  In fact, the evidence presented was clear in demonstrating that no settlement agreement existed.

First, in viewing the evidence and based upon the matters discussed at the hearing, at most, Alberts alleged he had agreed with Epstein Becker that the case ought to be settled.  A mere agreement-to-agree does not create a valid contract.  *See, e.g., Maloney v. E. I. Du Pont de Nemours & Co.,* 352 F.2d 936, 938 (D.C. Cir. 1965); *Overseas Partners, Inc. v. PROGEN Musavirlik ve Yonetim Hizmetleri, Ltd. Sikerti*, 15 F. Supp. 2d 47, 53 (D.D.C. 1998).  Alberts provides no legal or factual reason why, in this case, Alberts' belief that the parties were in agreement that the

case ought to be settled could excuse the plaintiff's deliberate failure to adhere to the court-ordered discovery deadlines and deadline to file a response to the summary judgment motion.

Second, Epstein Becker and the plaintiff did not agree upon any set of terms with which to form a binding agreement. On April 18, 2007, Epstein Becker circulated a revised proposed settlement agreement. The plaintiff never accepted those terms, and Alberts was still soliciting comments on them as late as April 30, 2007. (DE No. 313, Exhibit A, p. 2.) Because there was never an agreement to terms, there was no good-faith basis for Alberts to believe or assert reliance upon a settlement agreement.

Third, Alberts himself recognized that there was no binding agreement when on May 2, 2007, he told Epstein Becker's counsel that the committee had gone ballistic when it saw Epstein Becker's reply regarding the pending summary judgment motion and he communicated to Epstein Becker's counsel an additional concession from Epstein Becker that would be necessary to finalize a deal, a concession that was contrary to the terms regarding confidentiality contained in the pending proposed agreement that Epstein Becker had circulated on April 18, 2007. Alberts' communication can only be viewed as a rejection of the pending proposed agreement that Epstein Becker had circulated on

April 18, 2007.[16]  Alberts definitively demonstrated on May 7,

2007, that he did not believe that any agreement had been reached

when he transmitted a proposed agreement that materially altered

the terms of the proposed agreement that Epstein Becker had

circulated on April 18, 2007.

Fourth, all of these negotiations--from April 18, 2007, to

May 7, 2007--occurred *after* the plaintiff's court-set deadlines

to conduct discovery (March 31, 2007) and to file a response to

the summary judgment motion (April 16, 2007).[17]  (See DE No.

305.)  Alberts provided no excusable explanation for not having

---

[16]  Alberts' assertion--that this concession language merely
conveyed that people were upset, and did not constitute a
rejection--is not credible.  Tr. (DE No. 373) at p. 15.  Alberts
represented to the court that the language was meant to convey
"just my belief on what I think would be needed . . . ."  *Id.*
Although he did not specify for what it was needed, the only
clear answer is to effectuate a finalized agreement--and Alberts
presented no evidence to demonstrate a reasonable explanation
otherwise.  Even if I were to credit Alberts' statement, Alberts
was clearly communicating that the Trust had *not* accepted Epstein
Becker's proposed agreement.

[17]  The evidence indicates that Epstein Becker was pursuing
settlement, and even preferred settlement to prevailing on its
summary judgment motion.  For instance, Epstein Becker circulated
settlement terms on April 18, 2007--two days after the deadline
for the plaintiff to file a response to its summary judgment
motion, and well after the termination of the discovery deadline.

There are numerous reasons why Epstein Becker might have
preferred settlement over summary judgment; as examples, a
settlement might have offered better terms, or avoided an appeal.
Regardless of Epstein Becker's motives for pursuing settlement
even after it realized its motion for summary judgment was
unopposed, the relevant issue here is that there was no actual
settlement agreement between the parties at any time during the
litigation.

adhered to those deadlines, or for not having sought to have them modified because he believed a settlement could be reached.  Had he asked Epstein Becker's counsel to agree to extend the discovery deadline, Epstein Becker had twice made clear that it would not agree to such an extension.

Based upon the evidence submitted to the court and the representations made by counsel, there was no good faith basis for Alberts to assert that a settlement agreement existed, and thus no valid ground upon which to move to have summary judgment vacated and discovery reopened.  Alberts' motion was frivolous, unreasonable, and in bad faith, having been based upon facts he knew to be false.  His conduct was based on an obstinate refusal to acknowledge that the entry of the summary judgment order had brought the claims against Epstein Becker to an end with a finality that Epstein Becker had repeatedly made clear it desired.

Epstein Becker is entitled to be made whole for the attorney's fees and expenses arising from Alberts' obstinacy. *Chambers*, 501 U.S. at 46, citing *Hutto*, 437 U.S. at 689 n.14. Furthermore, the motion unnecessarily prolonged the litigation and increased litigation costs.  *See Walter v. Fiorenzo*, 840 F.2d 427, 435 (7th Cir. 1988) (imposing sanctions for multiplying proceedings by not raising ground for opposing motion for summary judgment in the initial opposition to the motion).

53

Pursuant to both 28 U.S.C. § 1927 and the inherent authority
of the court, sanctions against Alberts are appropriate in an
amount to compensate Epstein Becker for costs, expenses, and
attorneys' fees incurred in addressing Alberts' motion to vacate
summary judgment and reopen discovery. (*See* DE No. 313.)  This
amount may also include the portion of the costs, expenses, and
attorneys' fees that Epstein Becker reasonably incurred in
seeking sanctions for Alberts' motion to vacate summary judgment
and reopen discovery, and for filing a reply to Alberts' response
concerning that motion. (*See* DE Nos. 383, 413.)  Such fees were
"reasonably incurred because of [the sanctioned] conduct." *See*
28 U.S.C. § 1927; *Baldwin Hardware Corp. v. FrankSu Enterprise
Corp.*, 78 F.3d 550, 561 (9th Cir. 1996) ("fees for fees" are
available under § 1927); *cf. Brandt v. Schal Assocs., Inc.*,
960 F.2d 640, 649-50 (7th Cir. 1992) (Rule 11 sanctions include
attorney's fees incurred at trial level in recovering such
sanctions).

The motion for sanctions sought sanctions as well for the
period preceding the granting of summary judgment.  As noted
previously, the motion's discussion of the conduct preceding the
granting of summary judgment buttresses Epstein Becker's point
that it viewed the plaintiff's claims as baseless and
persistently pressed for a prompt resolution of the claims, and
its point that, in light of the history of the proceeding, it was

54

plain as could be that Epstein Becker intended the deadline for
opposing its motion for summary judgment to remain firm despite
ongoing settlement negotiations.  Nevertheless, the discussion in
Epstein Becker's sanctions motion of the conduct preceding the
granting of summary judgment was longer than it reasonably would
have been had Epstein Becker limited its request to Alberts'
conduct after the entry of the summary judgment order.
Accordingly, only a portion of the time spent regarding that
discussion ought to be compensable.[18]

Additionally, the plaintiff's motion to seal certain
documents to be filed in response to Epstein Becker's motion for
sanctions resulted in additional filings.  (*See* DE No. 402.)
Epstein Becker's costs, expenses, and attorneys' fees regarding
the plaintiff's motion to seal will also be recoverable as
necessarily flowing from Alberts' improperly pursuing his motion
to vacate.  Similarly, Epstein Becker filed a motion to unseal
exhibits that were received in evidence at the hearing on the
plaintiff's motion to vacate the summary judgment order, to
permit their use at the hearing on the motion for sanctions, and
that time as well ought to be compensable.

---

[18]   At the hearing on the motion for sanctions, the
arguments were focused on the conduct preceding the entry of
summary judgment, and very little of that time may reasonably be
compensated.

IV

Sanctions under § 1927 are only appropriate against Alberts.
Under 28 U.S.C. § 1927, the court has the authority to sanction
"any attorney or other person admitted to conduct cases in any
court of the United States or any Territory" that committed the
offending conduct. *Claiborne v. Wisdom*, 414 F.3d 715, 722-24
(7th Cir. 2005), holds that sanctions under § 1927 may not be
imposed against a law firm, and I adopt the reasoning of that
decision on that point. Although the Court of Appeals for this
circuit upheld an award of sanctions against a law firm under
§ 1927 in *LaPrade v. Kidder Peabody & Co., Inc.*, 146 F.3d 899,
905 (D.C. Cir. 1998), the law firm failed to raise the issue of
whether a law firm, and not only those attorneys of the law firm
who conducted the litigation, could be sanctioned under § 1927,
and the decision in *LaPrade* thus did not decide the issue.
Limiting the award of § 1927 sanctions to one against only
Alberts, however, does not address his law firm's vicarious
liability for the award if Alberts fails to pay the award.
*Claiborne v. Wisdom*, 414 F.3d at 724.

V

Under its inherent authority, the court may sanction a
party's law firm. *In re Mroz*, 65 F.3d at 1574; *Fellheimer,
Eichen & Braverman, P.C. v. Charter Technologies, Inc.*, 57 F.3d
1215, 1228 (3d Cir. 1995) (upholding sanctions--beyond Rule 9011

56

sanctions imposed against one attorney, who had signed the
offending paper--against law firm pursuant to the court's
inherent power because the trial court concluded that other
attorneys at the law firm were primarily responsible for the
sanctionable conduct). *See Wallace*, 964 F.2d at 1218.  Here, the
sanctionable conduct was committed in the filing of the motion to
vacate the order and reopen discovery.  (*See* DE No. 313, p. 6.)
Alberts signed and litigated that motion, and sanctions against
him under the court's inherent authority are appropriate as to
him.  There is no evidence that anyone else in his law firm bore
any responsibility for that course of conduct.  In the exercise
of my discretion, I do not believe it appropriate to impose
sanctions for bad faith litigation against the White & Case law
firm as a whole.  *See Wolters Kluwer Fin. Servs., Inc. v.
Scivantage*, 564 F.3d 110 (2d Cir. 2009), *cert. denied*, ___ U.S.
___ (Nov. 16, 2009).  In *Scivantage*, an attorney, Peters, engaged
in bad faith conduct, and the district court imposed sanctions
against her law firm.  The court of appeals declined to uphold
such sanctions against the law firm, finding that the district
court imputed Peters's bad faith to the law firm because the law
firm failed to prevent what she did.  The court of appeals
explained:

> we have held that "[b]ad faith is personal" and "may
> not automatically be visited" on others.  *Browning
> Debenture Holders' Comm. v. DASA Corp.*, 560 F.2d 1078,
> 1089 (2d Cir.1977).  Accordingly, absent other specific

> evidence of [the law firm's] bad faith, a sanction
> under the court's inherent power is unjustified.

In this court, the local rules provide for an attorney to enter
his or her appearance on behalf of a client, although the
attorney's law firm is also understood to be representing the
client.  To impose sanctions against the law firm personally
appears unwarranted when the law firm, as an institution, has not
engaged in any conduct leading to the bad faith conduct.  *See*
*Claiborne*, 414 F.3d at 724 (contemplating sanctions on a law firm
where previous litigation and events had put the law firm on
notice that the attorney's litigation practices were questionable
and warranted monitoring).  Nevertheless, this does not address
the issue of whether White & Case LLP can be held vicariously
liable for the sanctions award if Alberts does not satisfy the
award.

Because Alberts, in his capacity as counsel, signed and
litigated the motion to vacate the summary judgment order, the
sanctions, the amount of which will be determined at a later
hearing, are imposed upon Alberts in his capacity as counsel for
the plaintiff.[19]  This will require him "to satisfy personally
the excess costs, expenses, and attorneys' fees reasonably

---

[19]  This is to clarify that Alberts is not sanctioned in his
capacity as Trustee for The DCHC Liquidating Trust.

58

incurred because of such conduct." *See* 28 U.S.C. § 1927.[20]

VI

In light of the foregoing analysis, the court grants in part and denies in part Epstein Becker's motion to recover costs, expenses, and attorneys' fees. (*See* DE No. 383.) It is

ORDERED that Epstein Becker's motion to recover costs, expenses, and attorneys' fees with regard to and incurred as a result of Alberts' filing of a motion to vacate summary judgment and reopen discovery (*see* DE NO. 313) is **GRANTED** against Alberts, but Epstein Becker's motion in all other respects is **DENIED** (but does not bar Epstein Becker's pursuit against White & Case LLP, on the basis of vicarious liability, of amounts awarded against Alberts). It is further

ORDERED that:

(1) within 28 days after entry of this Memorandum Decision and Order, Epstein Becker shall file a memorandum that includes a statement of the costs, expenses, and attorney's fees it asserts are recoverable pursuant to this Memorandum Decision and Order that flowed from and occurred

---

[20] The motion to file certain documents under seal was signed by Dana E. Foster, and not by Alberts, although Alberts' name is listed as an attorney submitting the motion. (*See* DE No. 402.) The motion to seal was not itself vexatious, but it was necessitated by Alberts' filing of the motion to vacate the summary judgment order. Because the motion to seal flows from his sanctionable conduct in his previous filing, costs, expenses, and attorney's fees flowing from the motion to file under seal are appropriately imposed upon Alberts.

as a result of Alberts' groundless motion seeking to vacate summary judgment and reopen discovery;

(2) within 21 days after the filing of that memorandum and statement, Alberts shall file an opposition to whatever amounts, if any, he asserts are not recoverable pursuant to this Memorandum Decision and Order;

(3) within 14 days after the filing of that opposition, Epstein Becker may file a reply;

(4) once Epstein Becker has a satisfactory idea as to the date by which the foregoing submissions will be concluded, Epstein Becker may contact the clerk to arrange a date and time for it to notice up a hearing to address the amounts recoverable;

(5) at least 7 days prior to the hearing, the parties shall file lists of their exhibits and witnesses, and exchange copies of their exhibits and prepare two copies of the exhibits (one for the judge to mark up, and one for his law clerk) for the court's use at the hearing which will be a trial of the matter;

(6) at least 7 days prior to the hearing, the parties shall confer in good faith to attempt to reach agreement regarding the amount of fees recoverable pursuant to this Memorandum Decision and Order, and, because attorneys sometimes hesitate to be the party that first makes an offer

60

lest it be taken as a sign of weakness, Alberts is

designated as the party to make the first offer.

[Signed and dated above.]

Copies to: All counsel of record.